MARY ANN McNETT MASON (SBN 115089)
County Counsel
D. CAMERON BAKER (SBN 154432)
JASON W. MAUCK (SBN 255133)
Deputy County Counsel
COUNTY OF CONTRA COSTA
1025 Escobar Street, Third Floor
Martinez, California 94553
Telephone:    (925) 655-2280
Facsimile:    (925) 655-2266
Electronic Mail: cameron.baker@cc.cccounty.us

Attorneys for Defendant ANDREW HALL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEANNIE ATIENZA, individually and as successor-in-interest to Decedent LAUDEMER ARBOLEDA;<br><br>          Plaintiff,<br><br>v.<br><br>ANDREW HALL, individually; PHILLIP ARBOLEDA, individually, as successor-in-interest to Decedent LAUDEMER ARBOLEDA, and DOES 1-50 inclusive,<br><br>          Defendants. | No. C19-03440 RS<br><br>NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT<br><br>Date:    July 15, 2021<br>Time:    1:30 p.m.<br>Crtrm:   3, 17th Floor<br>Judge:   Hon. Richard Seeborg, Presiding<br>Date Action Filed: June 17, 2019<br>Trial Date:   December 6, 2021 |

<u>TABLE OF CONTENTS</u>

NOTICE OF MOTION AND MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.    FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.     LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.      LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      The Court Should Grant Summary Judgment as to the Fourth Amendment Claim. . . 10

                1.      Hall's Shooting of Arboleda was Justified Under the Fourth Amendment. . . . 10

                        a.      Arboleda Posed an Immediate Threat to Hall and Others. . . . . . . . . . 11

                                i.      Arboleda Posed an Immediate Threat to Hall. . . . . . . . . . . . . 11

                                ii.     Arboleda Posed an Immediate Threat to Others. . . . . . . . . . . 12

                        b.      Time to Consider Alternatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                        c.      Arboleda Posed a Risk of Severe Crimes. . . . . . . . . . . . . . . . . . . . . . 15

                        d.      Arboleda Was Actively Resisting Arrest and Attempting to Evade
                                Capture. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                        e.      Other Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                2.      Qualified Immunity Applies to This Fourth Amendment Claim. . . . . . . . . . . 16

        B.      The Court Should Grant Summary Judgment on Atienza's Fourteenth Amendment
                Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                1.      There was No Violation of the Fourteenth Amendment. . . . . . . . . . . . . . . . . 18

                2.      Qualified Immunity Precludes Atienza's Fourteenth Amendment
                        Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        C.      The Court Should Dismiss the State Claims For Lack of Subject Matter Jurisdiction
                or, in the Alternative, Grant Summary Judgment on These Claims. . . . . . . . . . . . . . 19

                1.      State Law Immunities Apply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                2.      Hall's Conduct was not Negligent and did not Cause Arboleda's
                        Death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                        a.      Hall's Conduct Was Not Negligent. . . . . . . . . . . . . . . . . . . . . . . . . . 20

                    b.    Even if Hall Was Negligent, His Conduct Did Not Proximately Cause
                          Arboleda's Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

          3.    There Was No Violation of the Bane Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

          4.    There Was No Assault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    F.    The Court Should Grant Summary Judgment as to Two Damage Claims . . . . . . . . . 25

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1

## TABLE OF AUTHORITIES

2

**Cases**

3    *Abuka v. City of El Cajon,* 804 Fed. Appx. 693 (9th Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4    *Acosta v. City & Cnty. of S.F.,* 83 F.3d 1143 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5    *Arian v. City of Los Angeles,* 622 Fed. Appx. 692 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . 19

6    *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7    *Billington v. Smith,* 292 F.3d 1177 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

8    *Bodine v. Warwick,* 72 F.3d 393 (3d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

9    *Bordegaray v. Cnty. of Santa Barbara,*
     2016 U.S. Dist. LEXIS 173754 (C.D. Cal. December 13, 2016). . . . . . . . . . . . . . . . . . . . . . 14

10

11    *Brosseau v. Haugen*, 543 U.S. 194 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 16, 18

12    *Brown v. Ransweiler,* 171 Cal. App. 4th 516 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

13    *Bryan v. MacPherson,* 630 F.3d 805 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   *Bryant v. Glastetter,* 32 Cal. App. 4th 770 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

14    *Cameron v. Craig,* 713 F.3d 1012 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15    *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

16    *City & Cty. of S.F. v. Sheehan,* 135 S. Ct. 1765 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

17    *Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18    *Edson v. City of Anaheim,* 63 Cal. App. 4th 1269 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

19    *Elliot v. Leavitt,* 99 F.3d 640 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

20    *Estate of Lopez v. Torres,* 105 F. Supp. 3d 1148 (S.D. Cal. 2015). . . . . . . . . . . . . . . . . . . . . . . . . 23

21    *Estate of Serrano v. Trieu,* 713 Fed. Appx. 631 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . 16

22    *Estate of Toribio v. City of Santa Rosa,* 381 F. Supp. 3d 1179 (N.D. Cal. 2019). . . . . . . . . . . . . 20, 24

23    *Garcia v. Santa Clara Cty.,* 2004 U.S. Dist. LEXIS 20391 (N.D. Cal. September 29, 2004). . . . . . . 19

24    *Gonzales v. City of Antioch*, 2015 U.S. Dist. LEXIS 142642 (N.D. Cal. October 20, 2015),
     *aff'd* 697 Fed. Appx. 900 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

25

26    *Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 18

27    *Graham v. Connor,* 490 U.S. 386 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 15

28    *Grudt v. City of Los Angeles,* 2 Cal. 3d 575 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1  *Han v. City of Folsom,* 551 Fed. Appx. 923 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

2  *Haugen v. Brosseau,* 351 F.3d 372 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

3  *Hayes v. Cty. of San Diego,* 57 Cal. 4th 622 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

4  *Hayes v. Cty. of San Diego,* 736 F.3d 1223 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5  *Hernandez v. City of Huntington Beach,* 798 Fed. Appx. 85 (9th Cir. 2019). . . . . . . . . . . . . . . . 18

6  *Hernandez v. City of Pomona,* 46 Cal. 4th 501 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

7  *Hernandez v. Town of Gilbert,* 989 F.3d 739 (9th Cir. 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8  *Hundley v. District of Columbia,* 494 F.3d 1097 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . 23, 24

9  *J.A.L. v. Santos,* 2016 U.S. Dist. LEXIS 31913 (N.D. Cal. March 10, 2016). . . . . . . . . . . . . . . 16, 20

10 *J.A.L. v. Santos,* 724 Fed. Appx. 531 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 22

11 *Johnson v. City of Phila.,* 837 F.3d 343 (3d Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

12 *Juricich v. Cty. of San Mateo,* 2021 U.S. Dist. LEXIS 18764 (N.D. Cal. January 29, 2021). . . . . 20, 25

13 *Kane v. Lewis,* 604 Fed. Appx. 229 (4th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

14 *Koussaya v. City of Stockton,* 54 Cal. App. 5th 909 (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

15 *Latits v. Phillips,* 878 F.3d 541 (6th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

16 *Lopez v. City of L.A.,* 196 Cal. App. 4th 675 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

17 *Losee v. City of Chico,* 738 Fed. Appx. 398 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 *Martinez v. Cnty. of L.A.,* 47 Cal. App. 4th 334 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

19 *Mattos v. Agarano,* 661 F.3d 433 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

20 *Mendez v. Cty. of L.A.,* 897 F.3d 1067 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

21 *Monzon v. City of Murrieta,* 978 F.3d 1150 (9th Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . 10-12, 15

22 *Mullenix v. Luna,* 577 U.S. 7 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

23 *Orn v. City of Tacoma,* 949 F.3d 1167 (9th Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

24 *Plumhoff v. Rickard,* 572 U.S. 765 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

25 *Reese v. Cty. of Sacramento,* 888 F.3d 1030 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

26 *Reynolds v. Cty. of San Diego,* 84 F.3d 1162 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

27 *S.B. v. Cnty. of San Diego,* 864 F.3d 1010 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 *Sabbe v. Wash. Cty. Bd. of Commissioners,* 2021 U.S. Dist. LEXIS 87901 (D. Ore. May 7, 2021). . . 23

1    *Saucier v. Katz,* 533 U.S. 194 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

2    *Scott v. Harris,* 550 U.S. 372 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

3    *Smith v. Freland,* 954 F.2d 343 (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

4    *T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n,* 809 F.2d 626 (9th Cir. 1987). . . . . . . . . . . 9

5    *Tennessee v. Garner,* 471 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

6    *Van Ort v. Estate of Stanewich,* 92 F.3d 831 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

7    *Villanueva v. California,* 986 F.3d 1158 (9th 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

8    *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . 9

9    *Whren v. United States,* 517 U.S. 806 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10   *Wilkinson v. Torres,* 610 F.3d 546 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-13, 15

11   *Zion v. Cty. of Orange,* 874 F.3d 1072 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

12

13   **Statutes and Rules**

14   42 United States Code Section 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 19

15   California Penal Code Section 196. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 19, 25

16   California Penal Code Section 835a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 20, 25

17   Federal Rule of Civil Procedure 56(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

18   Federal Rule of Civil Procedure 56(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

19

20   **Other Authorities**

21   Ninth Circuit Model Jury Instruction 5.5 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

22

23

24

25

26

27

28

1

TABLE OF EXHIBITS TO BAKER DECLARATION

2

3
4

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| A | Report prepared by Jason Alexander, an expert on behalf of defendant Andrew Hall |
| B | Excerpts from the Deposition of Nicholas Muller |
| C | Transcript from Coroner's Inquest re: Death of Laudemer Arboleda |
| D | Excerpts from the Deposition of Andrew Hall |
| E | Still image with time stamp of 3.003 seconds |
| F | Excerpts from the Deposition of Chris Martin |
| G | Still image with time stamp of 3.971 seconds |
| H | Back to Civic Photo |
| I | First Shot Photo |
| J | Forensic Services Report |
| K | Still image of Honda Civic |
| L | Forensic Pathologist's Report prepared by Dr. Arnold Josselson |
| M | Excerpts from the Deposition of Dr. Arnold Josselson in this matter |
| N | Transcript of the Interview of Andrew Hall |
| O | Amended Responses to Special Interrogatories, Set One, to Plaintiff Jeannie Atienza |
| P | Report prepared by Robert Fonzi, an expert on behalf of defendant Andrew Hall |
| Q | Excerpts from the Deposition of Roger Clark |
| R | Excerpts from the POST Learning Domain 22 |
| S | Excerpts from the POST Learning Domain 21 |

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 15, 2021, at 1:30 p.m., or as soon thereafter as the matter may be heard in the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, California, Defendant Andrew Hall will and hereby does move this Court for summary judgment as to all claims asserted in Plaintiff Jeannie Atienza's Fourth Amended Complaint ("4AC"), ECF No. 40, on the grounds that the undisputed evidence shows as follows:

1.   Hall did not violate Laudemer Arboleda's Fourth Amendment rights or Atienza's Fourteenth Amendment rights and should be given qualified immunity as to both Section 1983 claims.

2.   The Court lacks subject matter jurisdiction over the three California state law claims.

3.   There is no liability under state law due to California Penal Code sections 196 and 835a.

4.   Hall is not liable as to the wrongful death negligence claim because his conduct was not negligent and did not proximately cause Arboleda's death.

5.   Hall did not violate the Bane Act as he did not commit any constitutional violations or act with the requisite intent required by that act.

6.   Hall did not assault Arboleda.

7.   Atienza lacks evidence to support her wrongful death damage claim because Hall did not engage in any wrongful conduct that caused Arboleda's death.

8.   Atienza lacks evidence to support the punitive damage claim against Hall.

In the alternative, Hall seeks partial summary judgment on the preceding issues.

This motion is supported by this notice, the memorandum of points and authorities, the Declarations of Andrew Hall, Jason Ingrassia, Christian Martin and D. Cameron Baker and exhibits thereto, the papers and records on file in this action, and such materials as may be submitted at or before the hearing.

//

//

//

//

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I. INTRODUCTION**

3

On November 3, 2018, Laudemer Arboleda was shot by Contra Costa County Sheriff's Deputy

4 Andrew Hall in Danville, California. As reflected in video footage[1] of this chaotic and fluid incident,

5 Arboleda drove his Civic directly at Hall, posing an immediate risk of serious harm to Hall and others.

6 As Hall's shooting was justified, he bears no liability in this action.

7

The seven seconds in question start with Hall and Arboleda parking their respective vehicles

8 front to front in a northbound lane of Front Street, Danville. Hall got out and started going around the

9 back of his vehicle with the intention of taking cover behind his passenger side front door. As Hall got

10 out of his vehicle, Arboleda started to drive forward, going to his left and entering into the southbound

11 lane of Front Street. At this time, Hall was not aware that Arboleda has resumed driving.

12

As Hall and Arboleda took these actions, Sergeant Chris Martin's marked SUV made a wide

13 left turn from Diablo Road, ending up in the southbound lane of Front Street. Martin thought

14 Arboleda had remained stopped, but discovered Arboleda moving forward into the southbound lane.

15 To avoid a collision with Arboleda, Martin stopped short in the southbound lane to the right of, and

16 slightly behind, Hall's patrol car.

17

At that point, Arboleda could have stopped or continued forward to pass Martin's SUV on its

18 passenger side. Instead, Arboleda made a hard right turn towards the newly-formed space between

19 Martin's and Hall's vehicles, nearly hitting Martin's SUV. As Arboleda did so, Hall came around the

20 back of his patrol vehicle to discover the Civic turning directly towards him. The top photo on the

21 next page shows what Hall saw roughly four seconds[2] after he stopped: the top of Martin's SUV is

22 visible over Hall's right arm and, on the far right, the Civic is just starting its hard right turn.

23

Arboleda accelerated and continued forward with the Civic's front wheels now pointed at Hall.

24 The photo at the bottom of the next page shows what Hall saw at the 4.7 second mark, which is

25

---

26

[1] Relevant footage from Hall's Body Worn Camera ("BWC") and the forward dash cam from a

27 patrol vehicle are submitted respectively as Exhibits A and B to the Declaration of Jason Ingrassia.

28

[2] The photo has a time stamp ("4.071") in the upper left corner indicating the time in seconds from the time that Hall started to exit his vehicle. *See* Expert Report of Alexander Jason ("Jason Report") at 5, attached as Exhibit A to the Declaration of D. Cameron Baker ("Baker Decl.").

approximately when Hall would have made the decision to fire his first shot.



Over the next two seconds, Arboleda continued forward, nearly hitting Hall, while Hall continued to backpedal and to fire his weapon.  Hall fired ten shots in total, one of which was fatal and



whose path of travel was from Arboleda's front to his back.  Seven of Hall's shots hit the Civic's front windshield.  Of the remaining three shots, one went through the front passenger door window and the other two did not enter the interior of the Civic.

1    Under the circumstances of this incident, including the amount of time Hall had to react to

2    discovering Arboleda's Civic was accelerating towards him with its front wheels pointed at him,

3    Hall's conduct was justified under federal and California law based on the threat Arboleda posed to

4    Hall and others.  Hall, thus, should be granted summary judgment on the claims asserted against him.

5    **II.    ISSUES PRESENTED**

6        1.    Should the Court grant summary judgment on the Fourth Amendment claim where Hall

7    did not use excessive force against Arboleda and Hall asserts qualified immunity as to this claim?

8        2.    Is summary judgment appropriate on the Fourteenth Amendment claim where Hall did

9    not violate Atienza's Fourteenth Amendment rights and asserts qualified immunity?

10       3.    In the event the Court grants summary judgment on the two section 1983 claims,

11   should the Court dismiss the pendent state claims for lack of subject matter jurisdiction?

12       4.    Should the Court grant summary judgment on the wrongful death negligence claim,

13   where Hall asserts immunity under California Penal Code section 196 and section 835a, did not breach

14   any duty owed to Arboleda, and did not proximately cause Arboleda's death via any alleged breach?

15       5.    Should the Court grant summary judgment on the Bane Act claim where Hall asserts

16   immunity under California Penal Code section 196 and section 835a, committed no constitutional

17   violations, and did not act with the requisite intent?

18       6.    Should the Court grant summary judgment on the California assault claim where  Hall

19   asserts immunity under California Penal Code section 196 and section 835a, did not commit assault

20   against Arboleda and did not act with the requisite intent?

21       7.    Should the Court grant summary judgment on Atienza's claim for wrongful death

22   damages where Hall's alleged wrongful conduct did not cause Arboleda's death?

23       8.    Should the Court grant summary judgment on the claim for punitive damages against

24   Hall because Atienza lacks evidence establishing a basis for punitive damages?

25   **III.    FACTUAL BACKGROUND**

26       At approximately 11:00 a.m. on Saturday, November 3, 2018, a Danville resident reported a

27   suspicious male "person of color" approaching homes.  4AC, ¶1.   At that time, the following officers

28   were out in marked patrol cars:  1) Deputy Nicolas Muller and a trainee, Officer Sonasi Maka;

2) Deputy Charles Caruso with a "ride-along," Madison Slaughter; and 3) Hall.  Deposition of

Nicholas Muller, Exhibit B to the Baker Decl., at 14:3-13, 16:24-17:5, 20:7-11, 26:22-27:2; Transcript

from July 30, 2019 Coroner's Inquest, Exhibit C to the Baker Decl., at 53:8-11.  The call was assigned

to Muller, who was, thus, the "primary" officer.  Deposition of Andrew Hall, Exhibit D to the Baker

Decl., at 57:11-58:3.  Caruso "attached" himself to the call as a cover officer assisting Muller.  Ex. B[3]

at 23:20-24:3; Ex. D at 58:4-18.  Hall heard Dispatch assign the call to Muller.  Ex. D at 38:22-39:22.

Muller, with Maka driving, proceeded to the reported location and observed Arboleda getting

into a silver Civic.  Ex. B at 21:5-8, 21:22-22:4.  They attempted a consensual stop, but Arboleda

drove away.  *Id.* at 22:19-23:19.  Caruso arrived around this time.  *Id.* at 23:20-23.  Maka attempted a

second unsuccessful consensual stop on Princeton.  *Id.* at 31:4-13, 33:15-23.  Muller observed

Arboleda speeding and initiated a traffic stop.  Ex. C at 34:19-35:7.  Arboleda initially pulled over,

but when Muller and Maka got out of their vehicle, he again drove off, this time running a nearby stop

sign.  *Id.* at 34:19-35:19.  Caruso, who was just parking his vehicle behind Muller's vehicle,

immediately followed, becoming the lead pursuit vehicle.  *Id.* at 35:21-25.  As Arboleda drove, he

threw something out the window.  *Id.* at 50:17-19.

Arboleda drove onto Hartz Way, made a right turn onto a dead end street and stopped.  *Id.* at

36:4-8.  After parking nearby, Caruso, Muller and Maka got out, drew their weapons and gave verbal

commands to Arboleda to stop and exit his vehicle.  *Id.* at 36:9-16.  Despite being at gunpoint and the

officers' verbal commands, Arboleda again drove off.  *Id.* at 36:17-23.  He eventually ended up

proceeding northbound on Front Street.  Ex. B at 54:7-13.

Hall heard about the traffic enforcement stop and the Civic "fleeing," and attached himself to

the call as a cover officer.  Ex. D at 43:19-24, 45:10-20, 46:14-21, 47:23-48:2.  He learned the subject

had thrown something out of his car, which might be drugs.  *Id.* at 48:14-22, 49:13-50:8.  He heard

Muller report having "the car at gunpoint and he just drove around us" and became concerned -

"[s]omeone with that kind of disregard while driving poses a significant threat to pedestrians and other

vehicles on the road as well as the officers involved."  *Id.* at 53:18-54:1, 54:12-15.

Hall estimated where the fleeing Civic might be headed and eventually ended up on Diablo

---

[3]  To minimize confusion, all exhibits to the Baker Decl. will be referenced solely as "Ex. []."

1   Road driving westbound towards Front Street.  Ex. D at 60:2-17.   While on Diablo Road, Hall passed

2   Sergeant Chris Martin in his SUV.  *Id.* at 65:24-66:3.  After Hall passed, Martin turned left onto

3   Diablo Road and followed Hall.  Declaration of Christian Martin ("Martin Decl."), ¶2.

4       As Hall approached the intersection of Front Street and Diablo Road, he saw Arboleda, Muller

5   and Caruso on Front Street driving towards that same intersection.  Ex. D at 66:4-13; *see also* Martin

6   Decl., ¶2.  Hall made a left turn onto Front Street and, shortly thereafter, parked in the northbound

7   "number one" lane -- the same lane of travel as the Civic and the two patrol vehicles.[4]  Ex. D at 68:19-

8   69:12.  Hall parked so as to leave Arboleda at least one path of travel if he  continue to flee.  *Id.* at

9   70:17-21, 72:9-14.  The Civic also stopped at approximately the same time.  The two vehicles were

10  roughly front to front separated by a short distance.  Declaration of Andrew Hall ("Hall Decl."), ¶3.

11      Hall "paused in the car to see if the vehicle would immediately try to flee and it remained

12  stopped in front of [him]."  *Id.*; Ex. D at 75:3-5.  Hall thought Arboleda "was going to stay there.  So

13  the next step is to conduct a high-risk stop to safely take him into custody, the driver of the Honda,

14  that is."  Ex. D at 76:1-4.  To be in a better tactical position, Hall got out of his patrol vehicle and then

15  started around the back of that vehicle towards his front passenger door, intending to use it as cover.

16  Hall Decl., ¶5; Ex. D at 76:5-7, 79:25-80:5, 84:12-15; *see also* Ex. C at 37:22-24 (Muller testimony).

17  As Hall explained, "hopefully [my] police presence would deter [the driver] from continuing to flee,

18  but [] in the event that he does stay put, doesn't attempt to flee, if I need to make high-risk stop or

19  arrest, I want to be on the same side of his car as he is since I was face to face with him. . . . Going to

20  my passenger side puts me in the same position as him, so if I had to go up and open the door, I can do

21  that."  *Id.* at 78:24-79:8.  As Hall had no information at that time that would warrant using deadly

22  force against Arboleda, Hall had no intention of doing so.  Hall Decl., ¶6.   If Arboleda continued to

23  flee, Hall's back-up plan was "to get back into the car and continue the pursuit."  Ex. D at 80:17-21.

24      As Hall went towards the back of his vehicle, Martin's SUV arrived, making a wide left turn

25  into the southbound lane of Front Street.  Martin Decl., ¶3; *see also* Hall BWC 3-003 jpeg, Exhibit E

26  _____

27      [4]  The Jason Report includes figures depicting Hall, the Civic, and Martin's SUV at various
    points during the incident.  *See* Ex. A, Figures 1-8 at 3-4.  As shown in those figures, Front Street has
28  three lanes of travel:  1) a southbound lane; 2) a northbound lane for going straight or turning left, aka
    the northbound "number one" lane; and 3) a lane for turning right, aka the northbound "number 2" lane
    or "pocket" lane.  Ex. A, Figures 1-8, at 3-4; *see also* Ex. D at 69:9-70:7.

1   to the Baker Decl.  Believing that Arboleda had remained parked, Martin was going to drive past

2   Hall's vehicle and park the SUV "nosed" in towards the Civic, i.e. angling the SUV to his left.  Martin

3   Decl., ¶3; Deposition of Chris Martin at 71:2-5, Exhibit F to the Baker Decl.  He discovered that

4   Arboleda was not parked, but was moving forward into the southbound lane.  Martin Decl., ¶4.  To

5   avoid a possible collision, Martin stopped quickly slightly north of Hall's vehicle and blocking part of

6   the southbound lane of Front Street.  *Id.*; Ex. D at 80:23-81:1; Hall BWC 3-971 Photo, Exhibit G to

7   the Baker Decl.; *see* Ex. A, Figure 3 at 3.  Martin did not think the gap between his SUV and Hall's

8   vehicle was "wide enough for another car to drive between."  Ex. F at 71:6-11.  Martin anticipated that

9   if Arboleda resumed fleeing, he could go on the driver's side of Hall's vehicle or on the passenger's

10   side of Martin's SUV.  *Id.* at 71:14-18.  If Arboleda did resume fleeeing, Martin's back-up plan, like

11   Hall's back-up plan, was to continue the pursuit.  *Id.* at 72:23-73:5.

12        After Martin parked his vehicle, Arboleda had three options: 1) simply stop; 2) make a hard

13   right and drive into the space between Martin's vehicle and Hall's vehicle; or 3) continue forward and

14   pass Martin's vehicle on the passenger side.  *See* Ex. A, Figures 15-16, 26, at 10, 15.  The right hand

15   turn was so tight that Arboleda almost hit Martin.  Ex. F at 59:11-12; Ex. A, Figure 5 at 4 and Figure

16   13 at 9.  Arboleda made the hard right turn.

17        When Martin's SUV arrived, it caught Hall's attention, but he continued going around the rear

18   of his vehicle.  Hall Decl., ¶7.  Hall rounded the passenger side rear corner of his vehicle and observed

19   the Civic coming towards him.  Ex. D at 81:2-24.  At that point, the Civic was still making its hard

20   right turn.  Ex. A, Figure 16 at 10; *see also id.,* Figure 11 at 7.  Up until that point, Hall thought

21   Arboleda was still stopped in front of Hall's vehicle.  Hall Decl., ¶8.  "I did not know the Honda was

22   moving at all.  I believed I was moving from one position of cover to another."  Ex. D at 84:9-11; *see*

23   *also* Back to Civic Photo, Exhibit H to the Baker Decl.

24        Hall tried to stop his forward momentum, but could not.  Hall Decl.*,* ¶9.  He raised his firearm

25   into the shooting position and pointed it at Arboleda.  *Id.*; *see also* top photo, *supra,* at 3.  Hall did not

26   fire immediately, hoping that Arboleda would stop.  Hall Decl., ¶9.  However, the Civic continued to

27   make the hard right turn as it approached Hall.  Ex. A, Figure 12 at 7.  At this point, the Civic

28   accelerated with its front wheels pointed directly at Hall.  *Id.* at 8; First Shot Photo, Exhibit I to the

1   Baker Decl.; Ex. B at 61:5-20; Ex. C at 37:22-38:2, 39:16-19 (Muller testimony); Ex. A at 8; Ex. F at

2   62:15-17 (slow when "he made that right-hand turn, but I believe he accelerated at that point").

3         Hall backpedaled and, fearing for his safety, commenced shooting.  Hall Decl., ¶9; Ex. D at

4   87:21-23; Ex. C at 63:21-64:3 (Hall testimony).  Just slightly more than a second elapsed from when

5   Hall first observed the Civic driving towards him until Hall commenced firing.[5]

6         At the time of the first shot, the Civic was extremely close to Hall.  Ex. A, Figure 13; *see also*

7   Hall Decl., ¶9.  At his post-incident interview, Hall stated that he believed the Civic was

8   "approximately a half a car length away from" him.  Ex. D at 90:8-12.  As the Civic continued

9   forward, almost striking Hall, he continued to fire.  Ex. A, Figures 19-20, 31-40.  He stopped with

10  three bullets remaining.  Forensic Services Report, Exhibit J to the Baker Decl., at 2.

11        Hall fired ten shots in all.  The approximate bullet trajectories are set out in Figure 27 of the

12  Jason Report.  The first five shots all hit in the same general area of the front windshield.  *See*

13  Photograph of Civic, Exhibit K to the Baker Decl.  The next two shots also hit the front windshield,

14  but more on the passenger side.  *Id.*  Of the remaining three shots, the second to last shot went through

15  the front passenger window and the other two did not enter the interior of the vehicle.  Ex. A, Figure

16  27; Ex. J at 2.  At the time of the second to last shot, the Civic had not passed Hall.  *See id.,* Figure 48.

17        The autopsy performed by Dr. Arnold Josselson determined that there was a single fatal shot.

18  Ex. C at 24:5-25:2 (testimony of Dr. Arnold Josselson); Forensic Pathologist's Report, Exhibit L the

19  Baker Decl., at 2.  The path of this shot was "from the victim's right to left, front to back, and slightly

20  downward."  Deposition of Dr. Arnold Josselson, Exhibit M to the Baker Decl., at 13:2-4.  Dr.

21  Josselson testified that he could not determine which shot of Hall's ten shots was the fatal one or

22  Hall's location when he shot the fatal shot.  *Id.* at 11:1-7, 35:9-23.

23        Hall was interviewed that evening.[6]  In his initial statement, given before he watched any of

24  the video footage, Hall informed the investigators that

---

26      [5]  The still photo from Hall's BWC with the time stamp of 3.971 shows Hall starting to bring
his firearm up, indicating that he has already seen Arboleda.  Ex. G; Hall Decl., ¶9.  Hall fired the first

27  shot at 5.072 seconds after stopping.  Ex. A, Figures 31-32.  Hall would have made his decision to
shoot between .25 and .35 seconds prior to shooting.  *Id.* at 8.  This means Hall decided to shoot .65-.75

28  seconds after observing the Civic coming towards him.

    [6]  Hall was sequestered and then interviewed at 6:26 p.m. on November 3, 2018.

the car then lurched forward, proceed to drive forward towards me.  Uh, at that point I was on the passenger side of my car.  I had no protection, um, that I could take cover behind, like my trunk or - or  use a car to barricade myself.  Um, since the car was driving at me, I believed he was gonna ram me, uh, and kill me.  I was fearful that he was - had no intention of stopping, and that he would kill me if I did not take any action.  Uh, so fearing for my life, uh, I discharged my firearm toward the driver in the driver's seat, through the windshield.  I do not recall exactly how many rounds I fired. I believe, uh, it was somewhere, uh, between four and five rounds.  . . .  he then turned the wheel left towards Sergeant Martin.  I now feared that he was gonna try and strike Sergeant Martin, so fearing for his safety, I want to try and prevent him from harming Sergeant Martin, so I discharged - I again do not remember the exact amount, um, but I discharged four or five more rounds, um into the driver compartment area, the driver's seat area.

Hall Interview, Exhibit N to the Baker Decl., at 6:229-244.  After Hall reviewed the video footage, he stated "I initially thought that I had fired my weapon, paused and then fired my weapon.  Um, I now see that it was one continuous volley, um, as the vehicle moved, um, passed my car and Sergeant Martin's car.  Once the threat had passed me I stopped firing . . . ."  *Id.* at 23:996-999.

The current operative complaint is the Fourth Amended Complaint, ECF No. 40.  That complaint asserts five causes of action: 1) a Fourth Amendment claim asserted on behalf of Arboleda; 2) a Fourteenth Amendment claim asserted on behalf of Atienza; 3) a wrongful death negligence claim; 4) a Bane Act claim; and 5) a battery claim.  Hall now seeks summary judgment as to all five claims or, in the alternative, summary adjudication of issues.

## IV.    LEGAL STANDARD

Summary judgment is appropriate.  There are no disputed material facts, and, viewing the evidence most favorably to Atienza, Hall is entitled to prevail as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The evidence set forth in this motion meets Hall's initial burden of establishing no disputed material facts.  *Celotex*, 477 U.S. at 325; *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).  Notably, the Court may rely on the video evidence submitted by Hall and disregard any contradictory versions of events proffered by Atienza.  *Scott v. Harris*, 550 U.S. 372, 381-82 (2007); *see also Hernandez v. Town of Gilbert,* 989 F.3d 739, 746 (9th Cir. 2021).  Atienza cannot overcome Hall's showing unless she produces "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  *Bhan*, 929 F.2d at 1409; *T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

1   Partial summary judgment may be granted as to the individual claims and defenses or a "part of

2   each claim or defense." Fed. R. Civ. P. 56(a).  The Court may also adjudicate individual facts not

3   genuinely in dispute.  Fed. R. Civ. P. 56(g).

4   **V.      LEGAL ARGUMENT**

5   In this case, Atienza contends that Hall is liable for Arboleda's death because Hall, with

6   knowledge of where Arboleda was fleeing, ran into the gap between his vehicle and Martin's vehicle

7   in order to shoot Arboleda and only shot Arboleda as "Arboleda's car was passing him."  4AC, ¶2.

8   This central contention finds no support in the video evidence and other evidence now before the

9   Court.  To the contrary, the undisputed evidence demonstrates that 1) Hall had no prior notice that

10  Arboleda was in fact driving into that gap, 2) that prior to and at the time of Hall's initial shots,

11  Arboleda posed an immediate threat to Hall as the Civic was accelerating towards him with its front

12  wheels pointed directly at him, and 3) that Hall could not have anticipated Arboleda driving into the

13  gap between his vehicle and Martin's SUV because the gap did not even exist when he decided to go

14  to his passenger side front door.  In light of the undisputed evidence, Arboleda's conduct, which was

15  unforeseeable, left Hall with no option but to fire in self-defense.  Consequently, Hall bears no liability

16  for Arboleda's tragic death.

17         **A.      The Court Should Grant Summary Judgment as to the Fourth Amendment Claim**

18               **1.      Hall's Shooting of Arboleda was Justified Under the Fourth Amendment**

19  Under *Graham v. Connor,* 490 U.S. 386 (1989), the Court uses an objective standard to

20  evaluate the reasonableness of the force used by Hall under the Fourth Amendment, which "requires

21  careful attention to the facts and circumstances of each particular case, including the severity of the

22  crime committed by the suspect, whether the suspect poses an immediate threat to the safety of the

23  officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

24  at 396, 397.  "The calculus of reasonableness must embody allowance for the fact that police officers

25  are often forced to make split-second judgments – in circumstances that are tense, uncertain, and

26  rapidly evolving – about the about of force that is necessary in a particular situation."  *Id.* at 396-97.

27  The Court "view[s] the facts as an officer would have encountered them" at the time of the incident.

28  *Monzon v. City of Murrieta,* 978 F.3d 1150, 1157 (9th Cir. 2020); *see also Graham,* 490 U.S. at 396;

1   *Gonzalez v. City of Anaheim,* 747 F.3d 789, 794 (9th Cir. 2014).  Based on these factors, Hall's use of

2   deadly force was reasonable under the Fourth Amendment, given the threat posed by Arboleda and the

3   extremely limited time Hall had to make a decision regarding whether to shoot (roughly a second).

### a.      Arboleda Posed an Immediate Threat to Hall and Others.

5   Whether the suspect poses an immediate threat is the most important factor.  *Mattos v.*

6   *Agarano,* 661 F.3d 433, 441 (9th Cir. 2011) (*en banc*); *see Bryan v. MacPherson,* 630 F.3d 805, 826

7   (9th Cir. 2010).  "When 'the officer has probable cause to believe that the suspect poses a threat of

8   serious physical harm, either to the officer and or to others, it is not constitutionally unreasonable to

9   prevent escape by using deadly force.'"  *Monzon,* 978 F.3d at 1157 (quoting *Tennessee v. Garner,* 471

10  U.S. 1, 111 (1985)).  In this case, the video evidence demonstrates that Arboleda posed an immediate

11  deadly threat to Hall and to pedestrians and other drivers.

### i.      Arboleda Posed an Immediate Threat to Hall

13  The video evidence establishes that, as Hall came around the back of his vehicle, he discovered

14  Arboleda driving his Civic towards Hall with its front wheels pointed directly at Hall.  *See Top Photo,*

15  *supra* at 3.  That evidence also establishes that Arboleda was accelerating towards Hall at the time[7]

16  and had an average speed of 14 mph, meaning that it was traveling 21 feet per second.[8]  Ex. A at 8.

17  Finally, it establishes that although Hall had his firearm pointed at Arboleda, Arboleda continued to

18  drive towards Hall with the Civic's wheels still pointing at Hall up to and past Hall's first shot.  *Id.*,

19  Figures 11-12, 31-32 at 7, 20; Ex. I (still of first shot).  Hall did not have to await being hit.  "'[T]he

20  Fourth Amendment does not require omniscience,' and the absolute certainty of harm need not

21  precede an act of self-protection."  *Wilkinson,* 610 F.3d at 553 (quoting *Elliot v. Leavitt,* 99 F.3d 640,

22  644 (4th Cir. 1996)); *see also Monzon,* at 1158 (officers entitled to use deadly force when they have

23  "probable cause" to believe suspect poses a threat of serious physical harm to themselves or others).

24  The threat posed by Arboleda to Hall is equally evident in the later stills showing the Civic at

25  the time of the second through six shots.  Ex. A, Figures 33-36.  Indeed, right before Hall's second

27  [7]  This acceleration is corroborated by statements of witnesses, including Hall, Muller and
Martin.  Hall Decl., ¶8; Ex. B at 61:5-20; Ex. F at 62:10-17; Ex. C at 39:16-19.

28  [8]  This is the Civic's average speed as it passed Martin's SUV.  Ex. A at 8.

shot, even though he was backpedaling, he was nearly hit by Arboleda as the Civic was mere inches

from him.  *See id.*, Figure 19 at 12.  At the time of the fifth and sixth shots, while the front of the Civic

is past Hall, Hall is still inches from the Civic and Arboleda could easily have swerved to the right and

hit Hall.  *Id.,* Figures 21, 37-42 at 12, 21.  Notably, because of the lag time between perception and

physical reaction, Hall fired at least one shot, if not two shots, after he believed himself to be out of

danger and decided to stop shooting.  *Id.* at 23.

The Ninth Circuit has found an immediate threat to officer safety in analogous situations.  In

*Monzon,* the Ninth Circuit found that "Monzon posed an immediate threat to the safety of the officers

when he ignored commands to stop the van and drove near, toward, and amongst the officers on foot."

978 F.3d at 1157.  In that case, Monzon was accelerating, had reached a top speed of 17.4 mph, and,

although the vehicle was "no longer moving," the engine was "revving."  978 F.3d at 1158, 1159 n.8.

Likewise, in *Wilkinson v. Torres,* 610 F.3d 546 (9th Cir. 2010), the Ninth Circuit held that "a

reasonable officer had probable cause to believe that the threat to safety justified the use of deadly

force" where "the driver of a moving vehicle, ignoring police commands, attempted to accelerate

within close quarters of two officers on foot."  610 F.3d at 55.  In *Wilkinson,* at the time of the

shooting, the vehicle was traveling at a "slow rate of speed" but could have accelerated if it gained

traction.  610 F.3d at 552; *cf. Villanueva v. California,* 986 F.3d 1158, 1164, 1170-72 (9th Cir. 2021)

(no basis to use deadly force where, *inter alia,* vehicle was going 5 mph, not pointed at the officers

and not accelerating, and officers were 15-20 feet away).  And in a 2014 en banc decision, the Ninth

Circuit distinguished the fact pattern before it in a manner affirmatively supporting Hall's position.

*Gonzalez v. City of Anaheim,* 747 F.3d 789 (9th Cir. 2014)(*en banc*).  While reversing the grant of

summary judgment in that case, the Ninth Circuit was careful to note that the officer "was not on foot

next to a vehicle that might run him over at any moment should it have accelerated."  *Id.* at 796.

### ii.  Arboleda Posed an Immediate Threat to Others

Atienza may argue that at some point, the Civic ceased to be an immediate threat to Hall and,

thus, Hall was required by the Fourth Amendment to stop shooting.  Putting aside that courts generally

1    do not "parse" a single volley in this fashion,[9] under the Fourth Amendment, Hall could continue to

2    shoot because Arboleda's driving his Civic towards Hall established that Arboleda posed an imminent

3    danger to the public, specifically the pedestrians in nearby downtown Danville as well as other drivers.

4        "Where the officer has probable cause to believe that the suspect poses a threat of serious

5    physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent

6    escape using deadly force.  Thus, if the suspect threatens the officer with a weapon, . . .  deadly force

7    may be used if necessary to prevent escape, and if, where feasible, some warning has been given."

8    *Garner,* 471 U.S. at 11-12.  In 2007, the Supreme Court clarified that under *Garner*, deadly force can

9    be used where the suspect's "flight by itself (by means of a speeding automobile) [] posed the threat of

10   'serious physical harm . . . to others.'"  *Scott v. Harris,* 550 U.S. 372, 381 n.9 (2007) (quoting

11   *Garner*).  As the Ninth Circuit recently held, the Supreme Court's decisions authorize the use of

12   deadly force where "the flight itself posed a threat of serious harm to others.  But to warrant the use of

13   deadly force, a motorist's prior interactions with police must have demonstrate that 'he either was

14   willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless

15   behavior that threatened the lives of all those around.'"  *Orn v. City of Tacoma,* 949 F.3d 1167, 1177

16   (9th Cir. 2020) (quoting *Latits v. Phillips,* 878 F.3d 541, 548 (6th Cir. 2017)).

17       The video evidence of the incident satisfies the *Garner* standard as it affirmatively shows that

18   Arboleda was "willing to injure" Hall who "got in the way of escape."  Consequently, a reasonable

19   officer in Hall's position had objective evidence warranting the use of deadly force to prevent

20   Arboleda from continuing to flee.  Not surprisingly, Hall thought Arboleda's continuing to flee despite

21   being at gunpoint showed a willingness to risk the safety of others.  Ex. D at 54:12-15.

22       Hall is not conjuring up some fictional risk.  The shooting took place roughly a block from the

23   Danville downtown, which, around noon on a Saturday, would have lots of pedestrian traffic.  Ex. F,

24   at 13:25-14:15, 36:20-37:3; *see also* Ex. D at 48:4-7.  Notably, Martin recognized the "[p]otential for

25   other people to be injured" and would have ordered termination of the pursuit if Arboleda turned

26   towards downtown.  Ex. F at 37:19-38:4; *compare Brosseau v. Haugen,* 543 U.S. 194, 197 (2004).

27

28       [9] *See Plumhoff v. Rickard,* 572 U.S. 765, 777 (2014) (case would be different if "an initial round had clearly incapacitated Rickard" or he had "clearly given himself up."); *Wilkinson,* 610 F.3d at 552, 553 & n.4.

1   Even if Arboleda had turned right at Diablo Road, his driving put other drivers at risk.  A reasonable

2   officer in Hall's position could consider these risks in determining whether to continue to fire.  *See*

3   *Smith v. Freland,* 954 F.2d 343, 347 (6th Cir. 1992) (appropriate to consider risk to other officers and

4   the public where suspect "had proven he would do almost anything to avoid capture").

5          Plaintiff may contend that Hall cannot rely on this justification because he did not state it

6   during his interview.  During that interview, Hall was not asked to identify all the reasons for him to

7   shoot.  More significantly, Hall's intent and subjective motive for shooting are irrelevant under

8   *Graham.  Graham,* at 397; *see also Whren v. United States,* 517 U.S. 806, 806 (1996).  Indeed, both

9   the Supreme Court and the Ninth Circuit have implicitly rejected this argument, including in *Garner.*

10  As the Ninth Circuit noted in *Haugen v. Brosseau,* 351 F.3d 372 (9th Cir. 2003), *rev'd on other*

11  *grounds,* 543 U.S. 194 (2004), in "*Garner,* [] the police officer had initially justified his use of deadly

12  force based only on the need to prevent Garner's escape but asserted later – apparently through

13  counsel – that deadly force was justified by Garner's dangerousness."  *Id.,* 351 F.3d at 387.  And in

14  *Haugen,* the Ninth Circuit, citing *Graham,* analyzed whether shooting to prevent a dangerous high-

15  speed chase was a valid reason for the use of deadly force, even though this reason was articulated by

16  the dissent but not the officer.  *See id.*  Significantly, the Supreme Court reversed the Ninth Circuit in

17  *Haugen* on that very reason, positing the issue on qualified immunity was whether the officer could

18  "shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the

19  immediate area are at risk from that flight."  543 U.S. at 200.

20         The Central District denied a plaintiff's motion in limine to eliminate any "suggestion that a

21  rule exists permitting an officer to shoot someone if the officer believes that person is a 'fleeing

22  felon,'" which motion rested on the fact that the officer did not testify this rule was a reason for his

23  shooting.  *Bordegaray v. Cnty. of Santa Barbara,* 2016 U.S. Dist. LEXIS 173754, *24-25 (C.D. Cal.

24  December 13, 2016).  The Court denied the motion under *Graham,* holding that the relevant query is

25  whether the shooting was "objectively reasonable" "'without regard to [the officer's] underlying intent

26  or motivation.'"  *Id.* at *25 (quoting *Graham*).

27         Given the undisputed evidence establishing Arboleda's driving the Civic posed an immediate

28  risk of serious harm to Hall, a reasonable officer would have perceived Arboleda as not just a threat to

Hall, but to pedestrians and other drivers as well, justifying the use of deadly force.

### b. Time to Consider Alternatives.

In addition to the risk of harm posed by Arboleda, the Court must make "allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 397. This is particularly true here and favors Hall.

The entire incident took only seven seconds. *See* Ex. A, Figures 49-50 (final shot taken 7.174 seconds after Hall stopped); *compare Monzon,* 978 F.3d at 1159 ("chaotic situation spanning a mere 4.5 seconds"); *Wilkinson,* 610 F.3d at 551 (incident took "in less than nine seconds"). Prior to Martin's last-second arrival, the situation was already tense and rapidly evolving. His arrival made it more so, resulting in a narrow gap between his vehicle and Hall's vehicle that Arboleda unexpectedly decided to drive into. *See* Ex. D at 85:3-13. Hall was not aware of Arboleda turning into this gap until after Hall came around the back of his patrol vehicle and discovered the Civic directly before him and accelerating. He had to decide whether to shoot almost immediately. He shot roughly 1 second later, only five seconds after he had stopped.

### c. Arboleda Posed a Risk of Severe Crimes

In *Monzon,* the Ninth Circuit found that this factor weighed in favor of the use of deadly force where Monzon led officers on a dangerous, high-speed chase at night, refused to stop the van and then, ignoring commands to stop, "drove near, toward, and amongst the officers on foot." 978 F.3d at 1157. In this case, Arboleda disregarded Hall's presence and firearm and "drove near [and] toward" an officer on foot (Hall). Accordingly, from Hall's perspective and based on what he knew about Arboleda, this factor favors the use of force. *Id.*

### d. Arboleda Was Actively Resisting Arrest and Attempting to Evade Capture.

In this case, the undisputed evidence establishes that Arboleda "was actively resisting arrest and attempting to evade arrest by flight." *Graham,* 490 U.S. at 397. This factor favors Hall.

### e. Other Factors

The Court in the past has considered other factors in assessing the reasonableness of the force used. None of those factors apply here to defeat summary judgment.

1  Hall cannot be faulted for not verbally warning Arboleda prior to using deadly force.  Hall's

2  pointing of his firearm at Arboleda was warning enough.  Further, a verbal warning in the

3  circumstances was neither practical nor reasonable.  *J.A.L. v. Santos,* 724 Fed. Appx. 531, 533 (9th

4  Cir. 2018); *see also Gonzales v. City of Antioch,* 2015 U.S. Dist. LEXIS 142642, *55 (N.D. Cal.

5  October 20, 2015), *aff'd* 697 Fed. Appx. 900 (9th Cir. 2017).

6  Arboleda's impaired mental health, likewise, does not figure into the analysis.  Similar to the

7  fact pattern in *J.A.L,* Hall only saw Arboleda's face right before the shooting and thought Arboleda

8  "looked like he was spaced out . . . under the influence of something or, uh, mentally not

9  understanding what was going on." Ex. N at 6:226-228.  This is insufficient to establish Hall was

10  aware of Arboleda's mental health issues.  *J.A.L.,* 724 Fed. Appx. at 534.  Even if Hall was aware of

11  Arboleda's mental health issues, Arboleda still posed an immediate threat of harm to Hall and others

12  by virtue of his driving.  *J.A.L. v. Santos,* 2016 U.S. Dist. LEXIS 31913, *12-13 (N.D. Cal. March 10,

13  2016) (citing *City & Cty. of S.F. v. Sheehan,* 135 S. Ct. 1765, 1775 (2015)).

14  Nor can Atienza rely upon Hall's tactical decisions.  The Ninth Circuit's "cases do not 'permit

15  a plaintiff to establish a Fourth Amendment violation based merely on bad tactics that result in a

16  deadly confrontation that could have been avoided.'" *Han v. City of Folsom,* 551 Fed. Appx. 923, 923

17  (9th Cir. 2014) (quoting *Billington v. Smith,* 292 F.3d 1177, 1190 (9th Cir. 2002)); *see also Estate of*

18  *Serrano v. Trieu,* 713 Fed. Appx. 631, 632 (9th Cir. 2018).

19  In view of the undisputed evidence in this case, and considering all of the *Graham* factors,

20  Hall's use of deadly force did not violate Arboleda's Fourth Amendment rights.

21  ### 2.    Qualified Immunity Applies to This Fourth Amendment Claim

22  The qualified immunity analysis must be particularized to the situation that Hall faced.

23  *Brosseau,* 543 U.S. at 200; *Plumhoff,* 572 U.S. at 779; *Mullenix v. Luna,* 577 U.S. 7 (2015); *see also*

24  *S.B. v. Cnty. of San Diego,* 864 F.3d 1010, 1015 (9th Cir. 2017).  There is no prior case law squarely

25  holding Hall could not use deadly force to protect himself in his situation.  And, as discussed in greater

26  depth below, there is no case law clearly establishing he could not use deadly force to protect others

27  even if the Court were to conclude that Hall continued to shoot after the Civic no longer posed a threat

28  to him.  Qualified immunity is, therefore, appropriate as to the Fourth Amendment claim.

As the Supreme Court recognized in *Mullenix,* "excessive force cases involving car chases reveal [a] hazy legal backdrop." 577 U.S. at 14.  The Supreme Court has not addressed a factually similar case that "squarely governs" here.  *See id.* at 15 (discussing *Scott* and *Plumhoff*).

Nor has the Ninth Circuit.  In cases involving factually distinct situations, it has held "the use of deadly force to stop a slow-moving vehicle unreasonable when the officers could have easily stepped out of the vehicle's path to avoid danger."  *Villanueva, supra,* 986 F.3d at 1170 (citing *Orn*; *Acosta v. City & Cnty. of S.F.,* 83 F.3d 1143 (9th Cir. 1996)); *see also Losee v. City of Chico,* 738 Fed. Appx. 398 (9th Cir. 2018).  In *Villanueva,* the vehicle "was not aimed [at one of the officers] and was moving very slowly and not accelerating."  *Id.* at 1171.  In *Orn,* the suspect was driving "at just five miles per hour" and the officer could easily "have avoided any risk of being struck" by taking "'a step backwards and get out of the path of Mr. Orn's vehicle.'"  *Orn,* 949 F.3d at 1176 (quoting officer).  Likewise, in *Acosta,*  the officer could "have avoided any risk of injury 'by simply stepping to the side.'"  *Id.* (quoting *Acosta,* 83 F.3d at 1146-47).  And in *Losee*, while affirming summary judgment as to four officers based on their "reasonable fear of imminent harm," the Ninth Circuit reversed the grant of qualified immunity to a fifth officer where that officer fired his first two shots because he "could have avoided the Honda as it slowly backed away" and his second two shots were shot through the vehicle's back window.  738 Fed. Appx. at 400-1.

This case presents a materially different situation.  Hall had roughly one second to decide whether to shoot with the Civic accelerating towards him with its wheels pointed at him and him trapped between his patrol vehicle and Martin's SUV.  None of the Ninth Circuit's prior decisions addressed a sufficiently similar situation so as to inform a reasonable officer that deadly force could not be used in the situation that Hall faced.

And decisions from other Circuits affirmatively provide support for qualified immunity for Hall.  In *Long v. Slaton,* the Eleventh Circuit held an officer was entitled to use deadly force under the Fourth Amendment on an individual "attempting to flee in the deputy's car, even though at the time of the shooting the individual had not yet operated the cruiser dangerously."  *Mullenix,* 577 U.S. at 17 (discussing *Long*).  In *Latits v. Phillips,* 878 F.3d 541 (6th Cir. 2017), the Sixth Circuit held the officer entitled to qualified immunity for the use of deadly force arising from a pursuit and distinguished prior

cases holding that "shooting a driver while positioned to the side of his fleeing car violates the Fourth Amendment" because those cases involved "shooting the non-violent driver as he attempted to *initiate* flight." 878 F.3d at 553 (italics in original; citations omitted); *id.* (prior cases "clearly established that 'shooting a driver while positioned to the side of his fleeing car violated the Fourth Amendment, absent some indication suggesting that the driver poses more than a passing threat.'").

In sum, Hall's actions, even assuming they violated the Fourth Amendment, were in the "'hazy border between excessive and acceptable force.'" *Brosseau,* 543 U.S. at 201 (quoting *Saucier v. Katz,* 533 U.S. 194, 206 (2001)). The Court should grant Hall qualified immunity on this claim.

**B.    The Court Should Grant Summary Judgment on Atienza's Fourteenth Amendment Claim**

**1.    There was No Violation of the Fourteenth Amendment**

Where, as here, the officer has essentially no time to react to the situation, the Court uses a "purpose to harm" standard to determine whether there was a violation of the Fourteenth Amendment. *Abuka v. City of El Cajon,* 804 Fed. Appx. 693, 694 (9th Cir. 2020). This standard applies even if the situation arose due to the officer's tactical mistakes. *Id.* To prevail on her claim, Atienza must establish that Hall acted with a "purpose to harm" unrelated to any legitimate law enforcement objectives. *Id.*; *see also Gonzalez,* 747 F.3d at 797. She cannot because Hall's use of force was related to a legitimate law enforcement objective, protecting himself and others. *Abuka,* 804 Fed. Appx. at 694; *see also Hernandez v. City of Huntington Beach,* 798 Fed. Appx. 85*,* 87 (9th Cir. 2019).

In 2017, the Ninth Circuit addressed a somewhat similar Fourteenth Amendment claim in *Zion v. Cty. of Orange,* 874 F.3d 1072 (9th Cir. 2017). In that case, Connor Zion stabbed an officer. *Id.* at 1075. Another officer, Deputy Michael Higgins, witnessed the attack and fired a volley of nine shots while Zion was roughly fifteen feet away. *Id.* After Zion fell to the ground, Higgins ran up to within four feet of Zion and fired nine more shots, emptying his weapon. *Id.* Higgins then paused, walked around in a circle, and, while Zion was still on the ground, took a running start and stomped three times on Zion's head. *Id.* The Ninth Circuit affirmed the grant of summary judgment on the Fourteenth Amendment claim with respect to all of the shots,[10] despite there being two separate

---

[10] The plaintiff in *Zion* did not challenge the legality of the initial nine shots, but did challenge the second volley of nine shots. 874 F.3d at 1076.

volleys and Higgins' emptying his weapon. *Id.* at 1077. "The two volleys came in rapid succession, without time for reflection. Whether excessive or not, the shootings served the legitimate purpose of stopping a dangerous suspect." *Id.*

Even *assuming arguendo* some of Hall's shots in defense of Martin were unrelated to a legitimate law enforcement purpose, which they were not, summary judgment is appropriate as to this claim because Plaintiff cannot establish those shots caused Arboleda's death. As stated above, there was only one fatal shot and there is insufficient evidence to establish that any of the later shots were in fact the shot that killed him. Ex. M at 11:1-7, 35:9-23.

### 2.     Qualified Immunity Precludes Atienza's Fourteenth Amendment Claim

In addition to this issue, the Court should grant summary judgment on this claim due to qualified immunity. Simply put, there are no cases squarely holding that Hall would violate Atienza's Fourteenth Amendment rights by using deadly force in the factual situation before him.

### C.     The Court Should Dismiss the State Claims For Lack of Subject Matter Jurisdiction or, in the Alternative, Grant Summary Judgment on These Claims

If the Court determines that summary judgment is appropriate on Plaintiff's two Section 1983 claims, the Court should dismiss the three state law claims for lack of subject matter jurisdiction. *Reynolds v. Cty. of San Diego,* 84 F.3d 1162, 1171 (9th Cir. 1996). In the alternative, the Court should grant summary judgment to Hall on those claims for the reasons discussed below.

### 1.     State Law Immunities Apply

Two California immunities preclude Atienza's state law claims.

Under Penal Code section 196, "there is no civil liability when a homicide is justified." *Garcia v. Santa Clara Cty.,* 2004 U.S. Dist. LEXIS 20391, *31 (N.D. Cal. September 29, 2004); *see also Arian v. City of Los Angeles,* 622 Fed. Appx. 692 (9th Cir. 2015), as amended by 2015 U.S. App. LEXIS 22113 (December 18, 2015). "The test for determining whether a homicide is justifiable under Penal Code § 196 is whether the circumstances created a fear of death or serious bodily harm to the officer or another." *Martinez v. Cnty. of L.A.,* 47 Cal. App. 4th 334, 349 (1996). There is undisputed evidence here meeting that standard as Arboleda's driving his Civic towards Hall created a reasonable fear of serious bodily harm to Hall. *See Arian, supra,* 2015 U.S. App. LEXIS 22113, *2; *Garcia,* 2004 U.S. Dist. LEXIS 20391, at *32. Based on the immunity of section 196, the Court should grant

1    summary judgment as to the wrongful death negligence claim and on the Bane Act and the assault

2    claim to the extent that they are predicated upon Arboleda's death. *Estate of Toribio v. City of Santa*

3    *Rosa,* 381 F. Supp. 3d 1179,  1191 (N.D. Cal. 2019).

4         Penal Code section 835a also precludes these claims.  This section "provides that a peace

5    officer with reasonable cause to make an arrest 'may use reasonable force to effect the arrest' and

6    'need not retreat or desist from his efforts [to make an arrest] by reason of the resistance or threatened

7    resistance of the person being arrested.'" *Hernandez v. City of Pomona,* 46 Cal. 4ᵗʰ 501, 519 (2009)

8    (quoting Penal Code § 835a); *see also Koussaya v. City of Stockton,* 54 Cal. App. 5th 909, 942 (2020).

9    Under this section, reasonable force is evaluated under the *Graham* standard and acts to bar Atienza's

10   state law claims. *Edson v. City of Anaheim,* 63 Cal. App. 4th 1269, 1272-73(1998).

**2.      Hall's Conduct was not Negligent and did not Cause Arboleda's Death**

12        The Court should grant summary judgment on the wrongful death negligence claim[11] for two

13   additional reasons.  First, Hall's conduct fell within the zone of reasonable actions and, thus, was not

14   negligent.  Second, Hall's conduct, even if negligent, did not proximately cause Arboleda's death.

**a.      Hall's Conduct Was Not Negligent**

16        Under California law, a negligence claim based on the use of deadly force can include pre-

17   shooting tactical decisions as well as the use of force itself. *Hayes v. Cty. of San Diego,* 736 F.3d

18   1223, 1236 (9th Cir. 2013); *Hayes v. Cty. of San Diego,* 57 Cal. 4th 622, 639 (2013).  In addition to

19   evaluating the reasonableness of the use of force itself, "negligent conduct by officers that provokes

20   the situation that requires law enforcement to use force can render otherwise reasonable force

21   unreasonable." *Juricich v. Cty. of San Mateo,* 2021 U.S. Dist. LEXIS 18764, *38 (N.D. Cal. January

22   29, 2021) (citing *Hayes,* 57 Cal.4th at 629-30); *see also J.A.L., supra,* 2016 U.S. Dist. LEXIS 31913,

23   at *19-20 (conduct that "unreasonably provoked" or "aggravated").  Because Hall's use of force was

24   reasonable and his pre-shooting conduct did not "provoke" Arboleda into driving the Civic towards

25   Hall, Hall's conduct was not negligent under California law.

26        "The standard for evaluating the unreasonable use of force [under California law] reflects

27

28

---

[11]  In this claim, Atienza specifically alleges Hall's negligence caused Arboleda's death and
seeks only damages caused to her as a result of his death.  4AC, ¶33.

1    deference to the split-second decisions of an officer and recognizes that, unlike private citizens,

2    officers may use deadly force" and "are charged with acting affirmatively and using force as part of

3    their duties." *Lopez v. City of L.A.,* 196 Cal. App. 4th 675, 685 (2011). Thus, "[w]here potential

4    danger, emergency conditions, or other exigent circumstances exist, [t]he Supreme Court's definition

5    of reasonable is . . . comparatively generous to the police" and "surround[s] the police who make these

6    on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases."

7    *Brown v. Ransweiler,* 171 Cal. App. 4th 516, 528 (2009) (citations and internal quotation marks

8    omitted); *Hayes,* 57 Cal. 4th at 632 ("a degree in discretion as to how [officers] choose to address a

9    particular situation"). "As long as an officer's conduct falls within the range of conduct that is

10   reasonable under the circumstances, there is no requirement that he or she choose the 'most

11   reasonable' action or the conduct that is least likely to cause harm and at the same time the most likely

12   to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence."

13   *Hayes,* 57 Cal. 4th at 632.

14          While Atienza faults Hall's decision to position himself behind his passenger side front door,[12]

15   that decision and related actions fell within the range of reasonable conduct, particularly in light of the

16   limited time he had to evaluate the situation and his duty to act affirmatively in response to the threat

17   posed by Arboleda's ongoing flight. Expert Report of Robert Fonzi, Exhibit P to the Baker Decl., at

18   30-32; *see* Ex. B at 58:12-13 (situation was "fluid so there's not a lot of time to formulate a plan.").

19          Hall's decision was consistent with the training provided by California's Commission on Peace

20   Officer Standards and Training ("POST"). That training does not specify whether when the officer's

21   patrol vehicle and the suspect vehicle are parked front-to-front, Hall should remain on his driver's side

22   or go to his passenger's side. Deposition of Roger Clark, Exhibit Q to the Baker Decl., at 88:24-

23   89:18. Instead, POST directs the officer to "identify, plan and then move to a position that is

24   advantageous." POST LD 22 Excerpt, Exhibit R to the Baker Decl., at 1. Hall's decision was

25   consistent with this training as it involved making a plan and identifying the position of cover he

26   wished to take, which was on his passenger's side. Ex. D at 84:12-15.

27

28
_____

    [12] *See* Amended Responses to Special Interrogatories, Set One, to Plaintiff Jeannie Atienza,
    Response Interrogatory No. 4 at 6, Exhibit O to the Baker Decl.

1   Further, Hall's plan was consistent with his duties as a cover officer under POST.  As the cover

2   officer, Hall was responsible for observing Arboleda.  POST LD 21 Excerpt, Exhibit S to the Baker

3   Decl., at 2 (cover officer "responsible for surveillance and control of a suspect").  Hall specifically had

4   to be able to observe Arboleda's hands; as POST states emphatically - "***Always*** be aware of the

5   suspect's hands." *Id.* at 8 (bold and italics in original).  On the passenger side of his vehicle, Hall

6   would be in a better position to observe Arboleda, including his hands, and to approach Arboleda, if

7   he remained stopped. Ex. D at 76:5-7, 78:24-79:8.  Hall's plan had the further benefit of establishing

8   a perimeter to contain Arboleda. *See id.* (Hall's presence on the passenger side might deter Arboleda

9   from continuing to flee).

10   Plaintiff's expert Roger Clark agreed that Hall's plan would have been "fine" if Hall "had not

11   shot and he let the vehicle pass by and got back in his car and went after him."[13] Ex. Q at 41:8-12.

12   Clark's caveat has no merit; it ignores both the threat that Arboleda's Civic posed to Hall[14] and Hall's

13   "back-up plan," which was to let Arboleda pass without shooting.  Ex. D at 80:17-21.

14   Hall's plan of going to his passenger side door was not only reasonable, but did not, in any

15   manner, "provoke" Arboleda into driving his Civic at Hall. *Compare Grudt v. City of Los Angeles,* 2

16   Cal. 3d 575, 585-88 (1970) (officer in plain clothes carrying a shotgun approached a car, causing the

17   car to accelerate towards a second plainclothes officer).  When Hall made his plan and started to

18   effectuate it, Martin had not yet parked in the southbound lane, thus, Arboleda had the whole

19   southbound lane available to him and no reason to drive at Hall.  Even after Martin had parked,

20   Arboleda did not have to drive into the gap and towards Hall; Arboleda could have stopped or

21   proceeded straight and passed Martin's vehicle on the passenger side.  Given Arboleda's decision and

22   role in causing the shooting, "a reasonable juror could not find" Hall was negligent. *J.A.L.,* 724 Fed.

23   Appx. at 534 (suspect responded to use of non-lethal force by running towards officer with blade,

24

25   [13] Later in his deposition, Clark opined that Hall could not use either the driver's side door nor
    the passenger's side door as cover due to the risk that Arboleda would simply smash into the doors and,
26   thus, Hall's "best choice" was "to get to the rear of [his] vehicle so [he had] the mass of the vehicle as
    cover." Ex. Q at 89:12-24.  This proposed plan makes no sense and violated POST training because in
27   that sheltered position, Hall would not be able to observe Arboleda or his hands, or perform any other
    duties of a cover officer, i.e. protect and assist Muller.

28   [14] Disregarding the video evidence, Clark testified that Hall's fear of being hit by Arboleda's
    Civic was "unreasonable." Ex. Q at 61:10-15.  That opinion should be excluded.

"immediately creating a life-threatening situation").

> **b. Even if Hall Was Negligent, His Conduct Did Not Proximately Cause Arboleda's Death**

Atienza also must establish that Hall's negligence was the proximate cause of Arboleda's death. She cannot because 1) the shooting was not foreseeable at the time of Hall's alleged negligence and 2) Martin's and Arboleda's conduct were superceding causes, breaking the causal chain. This is an independent basis to grant summary judgment on this claim.

Atienza must show that Hall's conduct was the proximate cause of the injury. *Van Ort v. Estate of Stanewich,* 92 F.3d 831, 837 (9th Cir. 1996). The "touchstone of proximate cause" is foreseeability. *Sabbe v. Wash. Cty. Bd. of Commissioners,* 2021 U.S. Dist. LEXIS 87901, *33 (D. Ore. May 7, 2021); *see also Bryant v. Glastetter,* 32 Cal. App. 4th 770, 778 (1995). When Hall decided to position himself on his passenger side, it was not foreseeable, and could not be foreseen, that Arboleda would drive into down the then-non-existent gap and force Hall to shoot in self-defense. To be sure, Plaintiff's expert Clark testified that, prior to the shooting, Hall should have considered Arboleda to be a low risk. Ex. Q at 34:8-12. As the D.C. Circuit aptly noted, "it is not ordinarily reasonable to foresee that a citizen will react to a police stop by attacking the detaining officer, thereby triggering a situation that requires the officer to use deadly force in self-defense. To the contrary, citizens have a duty to obey a police officer's orders, and officers are entitled assume that citizens will comply with their orders." *Hundley v. District of Columbia,* 494 F.3d 1097, 1105 (D.C. Cir. 2007). Likewise, in *Sabbe, supra,* the Court held that it was "not reasonably foreseeable from [an illegal] entry alone that Sabbe would then decide to ram the officers with his truck" and that "it was not reasonable foreeable that even after repeated attempts to seize Sabbe through a PIT maneuver he would continue to resist law enforcement efforts and threaten the officers with a firearm." 2021 U.S. Dist. LEXIS 87901, *34.

In addition, Hall's conduct is not the proximate cause if an "an abnormal or unforeseen action . . . intervenes to break the chain of proximate causality." *Estate of Lopez v. Torres,* 105 F. Supp. 3d 1148, 1158 (S.D. Cal. 2015) (citing *Van Ort*). Intervening causes can include conduct of other officers, like Martin, as well as the "the behavior of a shooting victim." *Id.* at 1156-57 (actions of SWAT unit were intervening event); *Mendez v. Cty. of L.A.,* 897 F.3d 1067, 1081 (9th Cir. 2018);. Here, there are two superceding causes at work.

1      The first superceding cause was Martin parking his SUV exactly where he did.  The location of

2  the SUV was critical.  Had the SUV been further forward, Arboleda could not have made the hard

3  right turn.  Had it been further back, Arboleda might have elected to proceeded forward to pass the

4  SUV on its passenger side.  And had it been closer to Hall's vehicle, the gap would have been too

5  narrow for Arboleda to drive through.  *See* Ex. C at 40:10-11 (patrol vehicle unable to "get through the

6  space").  And significantly, Martin did not intend to park the SUV where he did, but parked there to

7  avoid colliding with Arboleda.  Martin Decl., ¶4.

8      Further to the point, without the SUV in the southbound lane, Arboleda could have passed Hall

9  without driving towards him and Hall, consistent with his "backup" plan, would not have fired.

10  Conversely, had Arboleda driven at Hall despite having the whole southbound lane, Arboleda's actions

11  would be a superceding cause of the shooting.  *Mendez,* 897 F.3d at 1097 ("If a resident sees that an

12  officer has entered and intentionally tries to harm the officer, who in turn draws his weapon and

13  shoots, the resident's intentional action would be a superseding cause of the injury."  Citing *Bodine v.*

14  *Warwick,* 72 F.3d 393, 400 (3d Cir. 1995)); *see also Hundley,* 494 F.3d at 1105; *Johnson v. City of*

15  *Phila.,* 837 F.3d 343, 352 (3d Cir. 2016); *Kane v. Lewis,* 604 Fed. Appx. 229, 237 (4th Cir. 2015).

16      The second superceding cause was Arboleda's hard right turn and continuing to drive forward.

17  Arboleda could have stopped or gone straight instead of making the hard right turn.  Notably, at that

18  time, Arboleda should have known that Hall was headed towards that same gap.  And Arboleda could

19  have (should have) stopped when he saw Hall in front of the Civic with his weapon drawn and pointed,

20  but he didn't.  Arboleda's conduct was a superceding cause.  *Mendez,* 897 F.3d at 1097.

21      In sum, Hall's conduct was not the proximate cause of Arboleda's death.

22              **3.      There Was No Violation of the Bane Act**

23      Atienza's Bane Act claim is predicated upon the assertion that Hall violated Arboleda's Fourth

24  Amendment rights.  *See Cameron v. Craig,* 713 F.3d 1012, 1022 (9th Cir. 2013).  Consequently, as

25  there was no Fourth Amendment violation, her Bane Act claim necessarily fails.  *Estate of Toribio,*

26  381 F. Supp. 2d at 1191.  Further, even assuming that Hall violated Arboleda's Fourth Amendment

27  rights, there is no evidence that he did so with the intent to deprive Arboleda of these rights.  *Reese v.*

28  *Cty. of Sacramento,* 888 F.3d 1030, 1043 (9th Cir. 2018); *Estate of Toribio,* 381 F. Supp. 3d. at 1191.

1   To the contrary, Hall fired in self-defense and in defense of others.  Ex. N at 6:229-244.

2   **4.   There Was No Assault**

3   To show assault under California law, Atienza must show that Hall's use of force was

4   unreasonable.  *Juricich, supra,* 2021 U.S. Dist. LEXIS 18764, *39.  This claim fails in light of

5   Atienza's inability to establish a Fourth Amendment violation.  *Id.*

6   **F.   The Court Should Grant Summary Judgment as to Two Damage Claims**

7   The Court should grant summary judgment as Atienza's claim for wrongful death damages and

8   her claim for punitive damages.

9   Atienza cannot wrongful death damages because she cannot prove wrongful conduct by Hall

10  caused Arboleda's death.  Here there was only one fatal shot, but Atienza cannot establish which shot

11  was the fatal one.  Ex. M at 11:1-7, 35:9-23.  Since at least some of Hall's shots were reasonable as a

12  matter of law, Atienza cannot meet her burden of proof.

13  Atienza cannot obtain punitive damages because Hall's actions were not malicious, oppressive,

14  or in reckless disregard of Arboleda's rights.  *Dang v. Cross*, 422 F.3d 800, 810 (9th Cir. 2005); Ninth

15  Circuit Model Jury Instruction 5.5 (2008).  To the contrary, he acted in self defense and in defense of

16  Martin.  *See* Ex. N at 6:229-244.

17  **VI.   CONCLUSION**

18  Based on the undisputed evidence, the Court should grant summary judgment in favor of Hall

19  as to all five claims in this case.  Given the threat that Arboleda posed to Hall and others, Hall's

20  conduct was appropriate under the Fourth and Fourteenth Amendments and immunized by the state

21  law immunities set out in California Penal Code sections 196 and 835a.  In addition, in light of

22  Arboleda's conduct, the fluidity of the situation and the time Hall had to respond, Hall's conduct was

23  not negligent, did not violate the Bane Act or constitute assault, and did not proximately cause

24  Arboleda's death.  Further, for the same reasons, Atienza's claim for punitive damages has no merit.

25  //

26  //

27  //

28  //

1
2

DATED: June 2, 2021

MARY ANN McNETT MASON
COUNTY COUNSEL

3
4
5

By: _____/s/ D. Cameron Baker_____
D. CAMERON BAKER
Deputy County Counsel

6

Attorneys for Defendant Andrew Hall

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28