**JOHN L. BURRIS, ESQ., SBN 69888**
LAW OFFICES OF JOHN L. BURRIS
7677 Oakport Street, Suite 1120
Oakland, CA 94621
Telephone:  (510) 839-5200
Facsimile:  (510) 839-3882
Email: john.burris@johnburrislaw.com

**ADANTÉ D. POINTER, ESQ., SBN 236229**
**PATRICK BUELNA, ESQ., SBN 317043**
POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St. Suite 1140,
Oakland, CA 94612
Telephone: (510) 929-5400
Email: APointer@LawyersFTP.com
Email: PBuelna@LawyersFTP.com

**NOLD LAW**
**Melissa C. Nold, Esq. SBN 301378**
521 Georgia Street
Vallejo, California 94590
Telephone: (707)644-4004
Email: melissa@noldlaw.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

| | |
|---|---|
| JEANNIE ATIENZA, individually and as successor-in-interest to Decedent LAUDEMER ARBOLEDA, | CASE NO.:  C19-03440 RS |
|       Plaintiff, | **PLAINTIFF JEANNIE ATIENZA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
|    v. | HON. RICHARD SEEBORG |
| TOWN OF DANVILLE, a municipal corporation; COUNTY OF CONTRA COSTA, a municipal corporation; ANDREW HALL, individually and in his capacity as a City of Danville Police Officer; and DOES 1-50 inclusive, | Date: June 17, 2021<br>Time: 1:30 PM<br>Ctrm: 3, 17th Floor |
|       Defendants. | |

## <u>TABLE OF CONTENTS</u>

Table of Contents ............................................................................................................  ii

Table of Authorities .......................................................................................................  iv

I. Introduction ...............................................................................................................  1

II. Statement of Facts ....................................................................................................  3

    A. Initial Encounter on Laurel Avenue.........................................................................  3

    B. Contact on Princeton Street.....................................................................................  4

    C. Two Additional Brief Stops…….............................................................................  5

    D. Contact at the Dead End of Hartz Way....................................................................  6

    E. Subsequent Pursuit and Joining Officers…...........................................................  7

    F.  Fatal Shooting at the Intersection of Front Street and Diablo Road.......................  8

III. Argument.................................................................................................................  10

    A. Legal Standard.........................................................................................................  10

    B. Defendant Hall Used Excessive Force…...............................................................  11

        1.  The Government's Intrusion Was at the Highest Level…………………….……  12

        2. The Government's Interest for the Intrusion Under the Totality of the Circumstances…...  12

            a.   Immediacy of the Threat …………………………………………….……  12

            b.   Severity of the Crime……………………………….……..……….……  13

        3.  Balancing the Factors ………………………...………………………..……  13

    C. Defendant Is Not Entitled to Qualified Immunity……………………………….…..  15

        1.     Clearly Established……………………...…………………………..…..  15

    D. Plaintiff's Fourteenth Amendment Claim Must Proceed…………………...………  20

    E. Plaintiffs' State Claims Must Proceed………………………………………………  22

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

1.      Plaintiff's Negligence and Assault Claims Must Proceed…………………………..   22

2.      Defendant's State Immunities Do Not Apply Either…………………………..……   23

3.      Plaintiff's Bane Act Claim Must Proceed…………………………..………………   24

4.      Plaintiff's Assault Claim Must Proceed…………………………..…………………   25

5.      Plaintiff's Damages Claim Must Proceed…………………………..………………   25


IV. Conclusion  ……….....………………………………………………………………………….   25

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

iii

# **TABLE OF AUTHORITIES**

## Cases

### State Cases

*Brown v. Ransweiler*, 171 Cal. App. 4th 516 (2009) ...................................................................24

*Cornell v. CCSF*, 17 Cal.App.5th 766 (Ct. App. 2017) .................................................................24

*Grudt v. City of Los Angeles*, 86 Cal. Rptr. 465 (1970) ...............................................................22

*Hayes v. Cty. Of San Diego*, 57 Cal. 4th 622 (2013)....................................................................22

*Martinez v. Cty. of Los Angeles*, 47 Cal. App. 4th 334 (1996).....................................................24

*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041................................................................................23

*People v. Lashley* (1991) 1 Cal.App.4th 938 ................................................................................25

*Simmons v. Superior Court* (2016) 7 Cal.App.5th 1113 ...............................................................24

*Venegas v. County of Los Angeles* (2007) 153 Cal. App. 4th 1230...............................................24

### Federal Cases

*A.K.H. by & through Landeros v. City of Tustin,* 837 F.3d 1005 (9th Cir. 2016) ...........................12

*Anderson v. Creighton*, 483 U.S. 635 (1987) .........................................................................15, 16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................10

*Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010)....................................................................12

*Carroll v. Carman*, 135 S. Ct. 348 (2014) ...................................................................................15

*Community House, Inc. v. City of Boise*, 623 F.3d 945 (9th Cir. 2010) .........................................16

*Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ......................................................................21

Deorle v. Rutherford, 272 F.3d 1272 (2001)..................................................................................14

*Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528 (9th Cir. 2010).....................................................11

*George v. Morris,* 736 F.3d 829 (9th Cir. 2013) ..........................................................................12

*Glenn v. Washington Cnty.*, 673 F.3d 864 ...................................................................................11

*Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) .........................................................14

Graham v. Connor, 490 U.S. 386 (1989) .......................................................................................11

*Hope v. Pelzer*, 536 U.S. 730 (2002) ...........................................................................................15

*Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006) ......................................................15

1    *Messerschmidt v. Millender*, 565 U.S. 535 (2012)..................................................................15

2    *Mitchell v. Forsyth*, 472 U.S. 511, 535, n. 12 (1985)..............................................................16

3    *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365 (9th Cir. 1998) ..........................21

4    *Mullenix v. Luna,* 136 S. Ct. 305 (2015) ..................................................................................2

5    *Nieto v. City and County of San Francisco,* 2015 WL 7180609 ...........................................21

6    *Nunez v. City of San Jose*, 381 F.Supp.3d 1192 (N.D. 2019) .................................................21

7    *Orn v. City of Tacoma*, 949 F.3d 1167 (9th Cir. 2020) ...........................................................2

8    *Osolinski v. Kane*, 92 F.3d 934 (9th Cir. 1996)......................................................................16

9    *Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................................................15

10    *Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008)...................................................................21

11    *Reese v. County of Sacramento,* (9th Cir. 2018) 888 F.3d 1030 ...........................................25

12    *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 492 F.3d 962 (9th Cir. 2005) ....................16

13    *Saucier v. Katz*, 533 U.S. 194 (2001)....................................................................................15

14    *Sorrels v. McKee*, 290 F.3d 965 (9th Cir. 2002) ...................................................................16

15    Tennessee v. Garner, 471 U.S. 1 (1985) .................................................................................11

16    *Villanueva v. California,* 986 F.3d 1158 (9th Cir. 2021) .........................................................2

17    *Young Han v City of Folsom*, 695 Fed.Appx. 197, 198 (9th Cir. 2017) .................................23

18    *Young Han v. City of Folsom*, 695 F. App'x 197 (9th Cir. 2017) ..........................................22

19

## Federal Rules

20    Fed.R.Civ.P. 56(a) ..................................................................................................................10

21

22

23

24

25

26

27

28

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

## I.   INTRODUCTION

Defendant Andrew Hall has filed a summary judgment motion in an effort to escape liability and accountability for shooting and killing Mr. Laudemer Arboleda. Defendant Hall argues that it is reasonable to shoot to kill the driver of a slow moving car who was only suspected of committing minor traffic violations and misdemeanors without providing any verbal warning of his intent to use deadly force. Despite Defendant Hall's contentions, the Contra Costa County District Attorney clearly disagrees with the reasonableness of Defendant Hall's actions, as she has charged him with several felonies arising out of him shooting and killing Mr. Arboleda.

Officer Maka's dash cam captured the moment Defendant shot, and plainly shows that Laudemer came to a complete stop in front of Defendant Hall's patrol vehicle, then drove at walking speed (2-5 mph) as he turned around the front end of Hall's car and drove past Hall at slow speed when Defendant Hall opened fire. (Buelna Decl., **Ex. 10** – Muller Dashcam, at 08:38-08:47). There is no better evidence that Laudemer was driving at a walking speed than the fact video evidence captured Defendant Hall being able to walk at pace with Laudemer's vehicle while firing and killing him. (*Id.*) Moreover, Defendant Hall testified at his deposition: Laudemer "was not spinning [his] tires or anything to that effect" (**Ex. 8** – Hall Depo, p. 86); Hall did not believe Laudemer was trying to run him over or flooring the accelerator (**Ex. 8 –** Hall Depo. P. 86-87); Hall could see Laudemer's facial expression and was convinced Laudemer did not even knew what was going on. (**Ex. 8**, Hall Depo., p. 91). Despite the overwhelming evidence that Laudemer's vehicle was slow-moving and nonthreatening, Defendant Hall still filed a frivolous motion requesting summary judgment.

Defendant Hall's motion even mischaracterized their own expert's findings to argue that Laudemer Arboleda was driving 14 mph past Defendant Hall when he opened fire. (Doc. 94, Def. Mtn, at p. 11). A quick review of the expert's report he attached to his motion, states that Laudemer

was traveling at or about 5 mph when Defendant shot him and that the car accelerated after Laudemer was shot.[1] Even Defendant Hall's own departmental policy on use of force stated that he **_should not_** fire his weapon at a moving car. (Buelna Decl., **Ex. 6 –** Use of Force Policy).

Nevertheless, Defendant Hall has moved for summary judgement and the very case law he cites (_Orn_, _Mullenix_ and _Villanueva_) mandates that their motion be DENIED. Indeed, _Orn, Mullenix_ and _Villaneuva_ stand for the principle that officers who shoot at slowly moving cars, such as Laudemer's, are unquestionably liable for unreasonable force and _not entitled to qualified immunity_. _See Villanueva v. California,_ 986 F.3d 1158, 1170 (9th Cir. 2021) ("[W]e have found use of deadly force against a stopped or slow-moving vehicle reasonable _only when_ the driver was trying to evade arrest in an _aggressive manner_ involving attempted or actual acceleration of the vehicle."); _Orn v. City of Tacoma_, 949 F.3d 1167 (9th Cir. 2020) (denying qualified immunity where officer shot a man who had clipped an officers' car in an attempt to get away in a nearly identical situation to this incident); compare with, _Mullenix v. Luna,_ 136 S. Ct. 305, 306, 309 (2015) (where the driver drove over 100 miles per hour and threatened to shoot officers).  Indeed, this case is _nearly identical_ to _Orn v. City of Tacoma_ where the Ninth Circuit denied qualified immunity and found a dispute of fact remained for a jury to resolve on excessive force where the driver actually clipped the officer's patrol car as he passed it causing an officer to shoot because the car was moving "at just **five miles per hour**" and the officer admitted he "**was able to step backwards and get out of the path of Mr. Orn's vehicle**." _Orn, supra,_ at 1175-1176 [emphasis added].

---

[1] Defendant's Expert calculated the 14 mph by including the top speed of 17.4 mph that the vehicle reached **_after_** Laudemer had passed the officers, when the car was continuing unmanned and eventually crashed - then included it in the total to find the **average speed** of 14 mph. Therefore, the expert did _not_ opine Laudemer was traveling 14 mph when Defendant Hall shot but rather admitted in his own report that Laudemer's "beginning speed appears to be lower but **even at 5 mph** it would move at 7.3 feet per second." (Doc. 94-1, Def Mtn., Ex. A, at p 9)

For these reasons, Plaintiff respectfully requests the Court DENY Defendant Hall's motion in its entirety.

## II.    STATEMENT OF FACTS

### A.  Initial Encounter on Laurel Avenue

On November 3, 2018, on a sunny morning at 11:00 AM, a Danville resident placed a call to police dispatch reporting that a suspicious person rang their doorbell. (Buelna Decl., **Ex. 1** – Dispatch Audio, at 00:05-00:13). They described the suspicious person as being an Asian male, approximately 28 years old, wearing a gray sweatshirt and black pants, weighing approximately 150 pounds and standing 5'7" tall. (Dispatch Audio, 00:13-00:26). Danville Police Officers Sonasi Maka and Nicholas Muller, were riding in the same patrol vehicle and responded to the scene. They learned from dispatch that there had been just a single call placed describing a suspicious person who was walking through a residential area and rang the doorbells of one or two homes. (Buelna Decl., **Ex. 2** – Deposition of Nicholas Muller ["Muller Depo"], at pages 16-18). The officers had received no information that this person had committed any crime whatsoever. (Muller Depo, 17).  Officer Charles Caruso also responded to the scene on Laurel Avenue. (Buelna Decl., **Ex. 3** – Deposition of Charles Caruso ["Caruso Depo"], at pages 25-26).

When Officers Muller and Maka turned onto Laurel Avenue, they saw a man who was later identified as Laudemer Arboleda and parked their patrol vehicle approximately five to six car lengths away from the Honda. (Muller Depo, 22). Officer Maka exited the patrol vehicle while Laudemer was still outside of his vehicle, but Officer Maka did not say anything to him before Laudemer entered his vehicle. (Buelna Decl., **Ex. 4** – Deposition of Sonasi Maka ["Maka Depo"], at pages 17-19). Officer Muller and Maka intended to initiate a **consensual** stop to talk to Laudemer. (Muller Depo, 22-23).

As Officers Maka and Muller got out of their patrol car, Laudemer pulled away from the curb and passed by them. (Maka Depo, 18-19). The officers did not activate their lights or sirens during this encounter on Laurel Avenue. (Maka Depo, 17-18). Around this time, Officer Caruso arrived, got out of his patrol vehicle and joined Officers Maka and Muller. (Caruso Depo, 27). Laudemer proceeded to drive away from the scene; which was his right to do on a consensual stop. (Muller Depo, 23). None of the officers commanded Laudemer to stop as he drove away. (Maka Depo, 23). Laudemer did not make any eye contact with or gestures towards the officers and appeared to be focused on driving. (Maka Depo, 20; Caruso Depo, 32). Laudemer did not peel out or do anything else that would suggest rapid acceleration and Officer Maka did not believe Mr. Arboleda was intending to hit him with his vehicle as he drove off. (Muller Depo, 29; Maka Depo, 22).

Nevertheless, the Officers got back into their patrol vehicle and decided to follow Mr. Arboleda. (Muller Depo, 28-29; Caruso, 32-33). The Officers did not activate their lights or sirens as they simply intended to attempt another consensual stop. (Caruso Depo, 33; Muller Depo 28).

## B.  Contact on Princeton Street

Next, Officers saw Laudemer lawfully sitting in the parked Honda on Princeton Street. (Maka Depo, 27). Similar to the first attempted contact, the Officers parked their patrol car several car lengths away from Laudemer. (Muller Depo, 31-32). Officer Maka exited the vehicle and began walking towards the Honda. (Maka Depo, 27). As Officer Maka began walking in Mr. Arboleda's direction, Laudemer pulled away and drove in Officer Maka's direction. (Maka Depo, 28). Similar to how he drove on Laurel Avenue, Laudemer drove slowly on Princeton Street. (Maka Depo, 28-29). At this point, officers agree Laudemer was free to drive away and had no legal obligation to speak with the officers or stay at the scene. (Muller Depo, 34).

Officer Maka was standing in the road on Princeton Street as Laudemer drove towards him. (Maka Depo, 29). Laudemer never looked in Officer Maka's direction or made eye contact with him. (Maka Depo, 29). As Laudemer drove by Officer Maka, his vehicle came within a foot and a half of Officer Maka. (Id). Officer Maka did not believe Laudemer was attempting to strike him with his vehicle. (Id). Officer Maka never unholstered his weapon, much less discharged it, even though the Honda came within just a couple feet of him since he did not for his safety. (Maka Depo, 29-32).

From Princeton Street, Laudemer then made a left turn onto Brookside Lane. (Maka Depo, 33). Still standing in the street, Officer Maka saw Laudemer run a stop sign as he made the left turn onto Brookside Lane. (Id). Officers made a U-turn on Princeton Street and pursued Mr. Arboleda. (Maka Depo, 34). During this time frame, radio dispatch announced that the silver Honda was registered to Laudemer, was not reported stolen, and was not associated with any outstanding crimes. (Caruso Depo, 35).

## C. Two Additional Brief Stops

The next time Officer Maka saw Laudemer, he was driving normally on Glen Arms Drive and obeying all traffic laws. (Maka Depo, 35-36). Officer Maka activated the patrol vehicle's lights and sirens in order to initiate a traffic enforcement stop. (Maka Depo, 36). Laudemer yielded and pulled his vehicle over to the right-hand curb. (Muller Depo, 38). Officers Maka and Muller pulled behind him. (*Id*).

Officer Caruso, who was not present during the encounter on Princeton Street, rejoined Officers Maka and Muller, pulling his patrol vehicle behind theirs. (Caruso Depo, 36). Officers Maka and Muller exited their patrol vehicle to approach Laudemer's vehicle. (Muller Depo, 38). Before the Officers reached the Honda, Laudemer drove away, turning onto Laurel Avenue. (Caruso Depo, 37).

Officer Caruso, who had not exited his vehicle, then activated his lights and sirens and began pursuing Laudemer. (Caruso Depo, 42). Still on Laurel Avenue, Laudemer drove under a freeway overpass. Officer Caruso radioed that Laudemer had thrown something out of his car. (Caruso Depo, 47-48). However, Officer Caruso did not actually witness Laudemer throw anything out of his vehicle and was just repeating what his ride along who was sitting in his vehicle told him. (Caruso Depo, 48). After driving under the overpass, Laudemer's vehicle began to slow while still on Laurel Avenue and Officer Caruso began to get out of his vehicle. (Caruso Depo, 46) Laudemer continued to drive away before Officer Caruso was fully out of the car. (Caruso Depo, 46-47).

**D. Contact at the Dead End of Hartz Way**

Next, Laudemer turned off of Laurel Avenue onto Hartz Way. (Muller Depo, 43-44). Hartz Way is a dead end that leads into a parking lot of an apartment complex. (Muller Depo, 44-45). Laudemer started to make a U-turn while on Hartz Way and stopped his Honda in the middle of the street. (Muller Depo, 43-44). Officers Maka, Muller, and Caruso all exited their vehicles at this point and unholstered their guns. (Muller Depo, 46-47). Officers ordered Laudemer to stop the car. (Muller Depo, 47). Officer Caruso commanded Laudemer to show him his hands, and he complied. (Caruso Depo, 51). Officer Muller approached the driver's door, grabbed its handle to open it, but it was locked. (Buelna Decl., **Ex. 5** – Nicholas Muller Body-Worn Camera ["Muller BWC"], at 06:11-06:13). Officers continued to command Laudemer to stop the vehicle as he slowly backed up in order to complete the U-turn.  (Muller BWC, 06:11-06:15; Muller Depo, 48).

Officer Muller was within an arm's length of the Honda when it began moving. (Muller Depo, 49). He maintained a close distance with the car, walking forward as it backed up. (Muller BWC, 06:11-06:16). Although the vehicle was slowly rolling back while Officer Muller was next to it, he nonetheless told Officers Maka and Caruso "don't shoot him, don't shoot him". (Muller BWC, 06:14-

06:17). Officer Muller did not want the other officers to shoot because he did not feel like he was in danger. (Muller Depo, 50).

Mr. Arboleda began driving forward placing Officer Maka directly in front of the vehicle. (Maka Depo, 40-41). Officer Muller yelled at Maka to get out of the way. (Maka Depo, 40). Officer Maka estimated the vehicle was approximately 10 feet away from him before he got out of the way. (Maka Depo, 41). Officer Maka told Officer Caruso to step out of the car's path so that he would not be hit. (Caruso Depo, 52). Officers Maka and Caruso did not fire their weapons as the car came towards them because they did not fear for their own lives or the lives of other officers. (Maka Depo, 41-42; Caruso Depo, 52).

### E.  Subsequent Pursuit and Joining Officers

Officers Muller and Maka got back in their vehicle to continue the pursuit, as did Officer Caruso. (Muller Depo, 53). Officer Muller put out via radio dispatch that they had the Honda at gunpoint, and it drove around them. (Muller BWC, 06:31-06:34). He also reported the traffic was light and the vehicle speed was 30 miles per hour. (Muller BWC, 06:37-06:39).  The Officers followed Laudemer onto Front Street. (Muller Depo, 54). In this approximate time frame, Sergeant Chris Martin, who was the patrol sergeant for the shift, decided to leave the police department and join the pursuit after listening to the radio transmissions. (Buelna Decl., **Ex. 7** – Deposition of Chris Martin ["Martin Depo"], at pages 25-26).

Defendant Officer Andrew Hall was out on patrol at the time of the pursuit but was in a different location conducting a traffic stop. (Buelna Decl., **Ex. 8**– Deposition of Andrew Hall ["Hall Depo"], at page 37). He attached himself to the call after finishing the traffic stop and was listening to the radio traffic in order to determine the direction of the pursuit. (Hall Depo, 38-39). He only knew that Laudemer had failed to yield to a traffic enforcement stop, the driver had thrown some

unidentified object out of the window, and not stopped for officers when they had him at gunpoint. (Hall Depo, 41, 45, 49). He had not learned any information that Laudemer had committed a felony or any crimes of violence. (Hall Depo, 41, 45, 49, 52). No one told Defendant Hall the Honda had damaged or vandalized any property or was in possession of any weapons. (Hall Depo 45, 54) Likewise, he had no information that the Honda had tried to hit anyone during the pursuit. (Hall Depo, 52). In fact, he did not know the reason why the other Officers had drawn their guns. (Hall Depo 45).

As Defendant Hall drove down Diablo Road towards the intersection with Front Street, he crossed Sergeant Martin's path at such a speed that Martin had to quickly brake in order to avoid colliding with Defendant Hall. (Martin Depo, 45; Buelna Decl., **Ex. 9** – Chris Martin Dashboard Camera ["Martin Dash Cam"], at 01:21-01:23). Sergeant Martin did not direct any of the officers to conduct a high risk stop or to take any specific measures to bring the slow pursuit to a conclusion. (Martin Depo, 72).

While still on Diablo Road, Defendant Hall saw Laudemer driving on Front Street, trailed by two police vehicles. (Hall Depo, 66). It was not a high-speed pursuit. (Hall Depo, 66-67).

Defendant Hall did not have a lot of experience conducting pursuits. (Hall Depo, 64-65) Nevertheless, Defendant Hall determined to conduct a high-risk traffic stop on Laudemer. (Hall Depo 62, 79) Defendant Hall had neither communicated his intent nor coordinated with anyone to conduct a high-risk stop. (Hall Depo, 62,69).

**F. Fatal Shooting at the Intersection of Front Street and Diablo Road**

Defendant Hall proceeded to drive into the oncoming lane of traffic in order to go around two cars that were stopped in the left-hand turn lane and made a left turn onto Front Street. (Martin Dash Cam, 01:25-01:31). He then directed his vehicle into the middle lane of Front Street, the same lane in

which Laudemer was traveling at normal speed. (Hall Depo, 67-70). Defendant Hall brought his patrol vehicle to a stop in front of Laudemer's car, with the front ends of the vehicles facing each other. (Hall Depo, 70). As Defendant Hall pulled his patrol vehicle into the path of Mr. Arboleda, either Officer Maka or Muller exclaimed "Oh God! Watch out, watch out, watch out!" (Buelna Decl., **Ex. 10** – Nicholas Muller Dashboard Camera ["Muller Dash Cam"], at 08:37-08:39).

Defendant Hall did not believe he had sufficient information to justify completely blocking Laudemer's path or pin his vehicle. (Hall Depo, 72-73). He also knew that Laudemer may not yield to the officers. (Hall Depo, 72). As such, he intended to leave a path for Laudemer to continue driving if Laudemer wanted to drive away. (Hall Depo, 70). Moreover, Defendant Hall was trained to not use deadly force in any misdemeanor case and to not shoot into moving vehicles. (Buelna Decl., **Ex. 13** – PMK on Deadly Force [Johnson Depo] pp. 24, 31) He was further trained to avoid shooting into a moving car because there would be no control over the car. (Johnson Depo, 31-32) Defendant Hall was taught that fear alone does not justify the use of deadly force and that homicide by a police officer may not be justified when pursuing nonviolent felons. (Johnson Depo, 23)

After Defendant Hall brought his patrol vehicle to a stop and Laudemer stopped his car, Laudemer slowly maneuvered the car to his left and around Defendant Hall's police car just as Hall expected. (**Ex. 10** - Muller Dash Cam, 08:39-08:43).

At or about the same time, Sergeant Martin pulled his SUV onto Front Street, directly blocking Mr. Arboleda's path of travel. (*Id*). In these same few seconds, Defendant Hall got out of his police vehicle, and ran around to the back of his vehicle. (*Id*) As Laudemer drove slowly around the police vehicle and Defendant Hall got out of his patrol car, one of Officers Maka or Muller exclaimed "Don't do it!" (Muller Dash Cam, 08:40-08:41).

As Defendant neared the trunk of his vehicle, he unholstered his weapon and saw Sergeant Martin bring his vehicle to a stop. (Hall Depo, 80-81). Defendant Hall knew that the gap between his vehicle and Sergeant Martin's was the only path Mr. Arboleda could drive in order to continue. (Hall Depo, 83-84). Defendant Hall pointed his gun at Laudemer while standing near the back of his patrol car, (Hall BWC, 02:49-02:51). During an interview taken just hours after the incident, Defendant Hall admitted that he did not use the best tactics during this incident. (Hall Depo, 86).

Indeed, Defendant Hall did not believe Laudemer was trying to run him over or was even accelerating at a rapid speed but instead was driving at a normal speed. (Hall Depo, 86-87). The Honda "was not spinning its tires or anything to that effect." (Hall Depo, 86). Defendant Hall described Laudemer's facial expression as looking very dazed and Hall did not believe Laudemer was aware of what was going on. (Hall Depo, 91).

As Laudemer slowly drove between the two police vehicles, Defendant Hall opened fire at Laudemer while walking backwards away from the Honda and toward the trunk of his patrol car. (Hall Depo, 87; Hall BWC, 02:50-02:53; Muller Dash Cam, 08:43-08:46). Defendant Hall walked out of the car's path as he fired. (Hall Depo, 89). Laudemer's vehicle never made contact with Defendant Hall or Sergeant Martin's vehicles. (Muller Dash Cam, 08:39-08:45). Watching the incident from his patrol vehicle, Officer Muller exclaimed, "Oh shit, he shot him" after Defendant Hall unlawfully fired his weapon. (Muller BWC, 07:29-07:31; Muller Dash Cam, 08:44-08:46).

Defendant Hall shot Laudemer while he stood at the side of the vehicle, walking backwards as the vehicle passed him. (Muller Dash Cam, 08:43-08:46). He continued firing into the Honda as it drove away, shooting through the front and back passenger side windows. (Hall BWC, 02:52-02:55).

In total, Defendant Hall fired 10 rounds as the car slowly drove past him even though his own departmental policy on use of force stated that he *should not* fire his weapon at a moving car.

(Buelna Decl., **Ex. 6** – Use of Force Policy). (Hall Depo, 94).  Sergeant Martin was in the backdrop and feared that Defendant Hall was going to shoot him as well. (Martin Depo, 61). After being fatally shot, Laudemer lost control of the vehicle, accelerated and struck a car stopped at the intersection. (Hall BWC, 02:54-02:59).

Defendant Hall was interviewed within hours of the incident. (Hall Depo, 63-64). He gave two separate and conflicting statements during the interview. (Buelna Decl., **Ex. 12** – Hall Homicide Interview ["Hall Homicide"]; Hall Depo 92). During the first interview he claimed he fired two volleys at the Honda. (Hall Homicide) He claimed he fired the first volley because the car was coming towards him. (Id.) He then fired a second string of gunshots because the Honda had turned away from him and toward Sgt. Martin whom he stated was standing outside of his patrol SUV. (Id.) He fired his gun the first time in defense of himself and the second time in defense of Sgt. Martin. (Id.) After providing that rendition of the story he took a break from questioning. (Id.)  After taking break, he sat for further questioning and changed his story. (Id.)

During the second interview he renounced his original claim the Honda changed its path and veered away from Defendant Hall and back toward Sgt. Martin and that it was that movement which prompted him to fire a second volley of gunshots. (Id.) Instead, he claimed that he fired only a single continuous volley of gunshots and that he only fired in defense of himself and not Sgt. Martin. (Id.)

### III.    ARGUMENT

### A.  LEGAL STANDARD

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment...." *Anderson*, 477 U.S. at 255.

## B.  DEFENDANT HALL USED EXCESSIVE FORCE

Since Plaintiff is the nonmoving party, all evidence must be viewed in the light most favorable to her and all justifiable inferences from the evidence must also be drawn in her favor. It is with this favorable standard in mind that the Court must evaluate Defendant Hall's use of force under the following fact pattern: Defendant Hall did not suspect Laudemer of any serious or violent crimes and in his own words, did not believe he had enough information to even block the path of Laudemer's car with his own, that Laudemer was simply driving slowly around Defendant's car and had made no movements that suggested to Hall that Laudemer intend to hit him with his car or harm him. Nevertheless Defendant Hall opened fire on Laudemer as he slowly and carefully drove around the officers' cars. Laudemer was not a deadly threat as Defendant Hall was able to simply walk back and away out of the Honda's path.

In evaluating a Fourth Amendment claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor,* 490 U.S. 386, 397 (1989).  This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8 (1985).  First, the court must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'"  *Glenn v. Washington Cnty.,* 673 F.3d 864, 871 (quoting *Espinosa v. City & Cnty. of S.F.,* 598 F.3d 528, 532 (9th Cir. 2010)). Second, the court must evaluate the government's interest in the use of force under the totality of the circumstances. *Glenn, supra*, 673 F.3d at 871 (citing *Graham*, 490 U.S. at 396). Third, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion."  *Glenn*, 673 F.3d at 871 (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

### 1.   The Government's Intrusion Was at the Highest Level

"The intrusiveness of a seizure by means of deadly force is ***unmatched***. The use of deadly force implicates the ***highest level*** of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *A.K.H. by & through Landeros v. City of Tustin,* 837 F.3d 1005, 1011 (9th Cir. 2016) *quoting Tennessee v. Garner,* 471 U.S. 1, 8 (1985) (internal quotations omitted) (emphasis added).

Defendant Hall used deadly force so it is the highest level of intrusion conceivable in the analysis for excessive force.

### 2.   The Government Interest for the Intrusion Under the Totality of the Circumstances

Next, the court must consider the government's interest for the intrusion under the totality of the circumstances. In *Graham*, the Supreme Court noted courts should consider such factors as (a) whether the suspect posed an immediate threat to the safety of the officer or others; and (b) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

### a.   Immediacy of the threat

The Ninth Circuit has repeatedly stated that "the most important of these factors is whether the suspect posed an immediate threat to the safety of the officer or others." *George v. Morris,* 736 F.3d 829, 838 (9th Cir. 2013) quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotations omitted).

Here, the immediacy of the threat Laudemer presented was non-existant and did not justify the use of deadly force. Defendant Hall's own statements illustrate the absence of threat posed by Laudemer —he did not believe Laudemer was trying to accelerate the car to hit him. (Hall Depo, 87).

### b.  Severity of the Crime

Mr. Arboleda was initially pursued by City of Danville Police Officers in connection to the report of a suspicious person knocking on people's doors on a Saturday morning, which is not a crime at all. After Laudemer declined the officers' multiple attempts to consensually contact him; which was well within his rights, they began stalking and surveilling him without cause, during which time he violated a minor traffic law. At best, Laudemer was guilty of failing to pull over for the officers after they tried to initiate a minor traffic stop, a misdemeanor under California Vehicle Code 2800.2. Thus, the severity of the "crime" involved was minimal.

### 3.  Balancing the Factors

Finally, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion."  *Glenn*, 673 F.3d at 871 (quoting *Miller,* 340 F.3d at 964).

As noted above, the intrusion of deadly force is "unmatched" and at the "highest level", where a government actor shoots and kills its own citizens. Furthermore, the court must consider "not only when a seizure is made, but also how it was carried out" because even if an officer has probable cause to seize a suspect, it still may be unconstitutional to do so by using deadly force. *Garner,* 471 U.S. at 8, 11. Here, Defendant Hall killed an unarmed driver who was suspected of knocking on people's doors on a Saturday morning and not coming to a complete stop at a stop sign.

In addition to the *Graham* factors, the Ninth Circuit considers the availability of less intrusive alternatives to the force employed, whether proper warnings were given, and whether it should have been apparent to officers that the person they used force against was emotionally disturbed, as additional factors in its analysis.  *See, e.g. Deorle v. Rutherford,* 272 F.3d 1272, 1282-83 (2001).

For example, in *Gonzalez v. City of Anaheim,* 747 F.3d 789, 792 (9th Cir. 2014), officers attempted to restrain the driver of a parked vehicle. A physical struggle ensued in which the driver

was able to shift the car into drive; as it moved forward, the front passenger door shut, and an officer was stuck in the vehicle. *Id*. at 792-93. According to the officer, the driver ignored his commands to stop the car and swatted his hand away as he tried to turn off the ignition or put the car into park. *Id*. at 793. The officer then shot the driver in the head from less than six inches away, killing him. *Id*. The Ninth Circuit still found that this would constitute an unreasonable use of deadly force because of factual disputes regarding the speed of vehicle at the time the driver was killed and overturned qualified immunity because the officer failed to give a verbal warning. *Id*. at 797. Defendant Hall never warned Laudemer that he would shoot or gave commands to stop the car. (Hall BWC, 02:48-02:51).

Here, Defendant Hall faced significantly less danger than the officer in *Gonzalez. In Gonzalez*, the officer was stuck inside the vehicle with the suspect as the car moved forward, here Defendant Hall simply stepped back in order to avoid any danger. He was not trapped inside Laudemer's car, nor had he engaged in a physical struggle with Laudemer.

Therefore, each and every factor demonstrates that Defendant Hall used unreasonable and deadly force without warning when Defendant was never at risk of suffering serious bodily harm or injury but prematurely and unlawfully shot and killed a man who was driving approximately 5 mph (per Defendant's expert) and not even looking at him.

## C. DEFENDANT IS NOT ENTITLED TO QUALIFIED IMMUNITY

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted). The two-pronged qualified immunity analysis queries: (1) whether there was a deprivation of a constitutional or statutory right, and (2) whether that constitutional or

statutory right was "clearly established" at the time of the incident. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *Pearson*, 555 U.S. at 232.

Again, at summary judgment, the Court reviews the facts in the plaintiff's favor but the plaintiff bears the burden to show that the law is "clearly established" against the defendants. *Saucier*, 533 U.S. at 201; *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059– 60 (9th Cir. 2006). Since Plaintiff has already addressed the Fourth Amendment deprivation at great length in Section B, she will address the "clearly established" prong of the Qualified Immunity doctrine now.

## 1. Clearly Established

"'[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." ' *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted)). As the Supreme Court explained in *Hope v. Pelzer*, 536 U.S. 730 (2002), qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) quoting *Saucier v. Katz*, 533 U.S. 194, at 206 (2001).  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell v. Forsyth*, 472 U.S. 511, 535, n. 12 (1985); but it is to say that in the light of pre-existing law the unlawfulness must be apparent."*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Some specificity is required, "[b]ut general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has not previously been held unlawful." *Hope*, supra at 740-741

quoting *Anderson*, supra at 640 (quotations omitted).  Defendants **are not entitled** to qualified

immunity "**simply because there is no case on all fours** prohibiting this particular manifestation of

unconstitutional conduct," *see San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*,

492 F.3d 962 (9th Cir. 2005) [emphasis added].

For the last 35 years, it has been clearly established the Fourth Amendment prohibits law

enforcement officers from using deadly force where the suspect poses no "immediate" and significant

threat of serious bodily harm or death to the officer or others.  See *Tennessee v. Garner*, 471 U.S. 1,

11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the

harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

"The most important" factor is "whether the suspect posed an immediate threat" of serious bodily

harm or death to law enforcement officers or others. *A.K.H. v. City of Tustin*, 837 F.3d 1005 (9th Cir.

2016). It has been further clearly established that a moving vehicle may constitute an immediate

threat of seriously bodily harm that may justify deadly force *only if* the car is driven in a manner so

dangerous that it risks the lives of pedestrians, officers or other motorists. *Orn v. City of Tacoma*, 949

F.3d 1167, 1176-77 (9th Cir. 2020); *compare with, Mullenix v. Luna*, 136 S. Ct. 305, 306, 309 (2015)

(where the driver drove over 100 miles per hour and threatened to shoot officers).

Indeed, The Ninth Circuit recently announced the following rule in motorist cases: "[W]e

have found use of deadly force against a stopped or slow-moving vehicle reasonable *only when* the

driver was trying to evade arrest in an *aggressive manner* involving attempted or actual acceleration

of the vehicle." *Villanueva v. California,* 986 F.3d 1158, 1170 (9th Cir. 2021).

Coincidentally, *Orn v. City of Tacoma* is a case *nearly identical* to this incident. In *Orn,*

officers were involved in a slow-speed pursuit of the plaintiff following a minor traffic violation. 949

F.3d at 1171-72. When the officers tried to block the plaintiff in, he attempted to drive between the

police cars at approximately **5 miles per hour**. *Id.* at 1172-73.  The plaintiff veered to avoid a collision when another police vehicle attempted to stop his path, causing him to hit the two parked police vehicles between which he had been navigating and Court used the following image to demonstrate (which is nearly identical to this incident):



*Id.* at 1173.

An officer then ran around his vehicle and began shooting the plaintiff through the passenger side window and rear windshield as he drove away from him. *Id*. The Ninth Circuit stated that even if the jury did accept the shooting officer's statement that he was in the vehicle's path, the use of deadly force still could be unreasonable because the officer could have avoided the danger by stepping out of the vehicle's path. *Id.* at 1175. Unlike in *Orn,* here Mr. Arboleda never hit any police vehicles. Thus, Defendant Hall has even less basis than the officer in *Orn* to claim he had an objectively reasonable fear for his life. *see also Adams v. Speers*, 473 F.3d 989, 992-93 (9th Cir. 2007) (holding it was unconstitutional for the officer to fire through the front windshield of a car being driven away from him).  Furthermore, Defendant Hall was equally on notice that his use of deadly force against a slow-moving vehicle from which, under his own admission, he could step out of the way, was excessive force.

Defendant Hall confirmed that Laudemer was not doing anything else that suggested acceleration or that Laudemer was a threat to him. (Hall Depo, 86). Laudemer never collided with any police vehicles or officers. Defendant Hall can cite to no evidence similar to that in the

aforementioned cases that would establish his use of deadly force was reasonable because this killing was plainly unconstitutional. Video evidence from Defendant Hall's own body-worn camera confirms this as well, showing Mr. Arboleda maintaining a consistent and low speed before being killed which provided him time to walk safely out of the slow-moving car's path. (Buelna Decl. **Ex. 11 -** Hall BWC, 02:51-02:54). Perhaps most important of all, Defendant Hall stated after the incident that he did not believe Mr. Arboleda was accelerating to run him over.  (Hall Depo, 87). Thus, video evidence of the encounter and Defendant Hall's own statements illustrate that there is no question of acceleration, in contrast to *Villanueva,* much less so, if the evidence is taken in a light favorable to Plaintiff.

Finally, "to warrant the use of deadly force, a motorist's prior interactions with police must have demonstrated that he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around." *Orn,* 949 F.3d 1177 quoting *Latits v. Phillips*, 878 F.3d 541, at 548 (6th Cir. 2017) (internal quotation marks omitted).

None of Laudemer's prior interactions with officers demonstrated that he "either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around." *Orn,* 949 F.3d at 1174. Multiple times during the pursuit of Laudemer, officers were very close to his vehicle, but the actions of Defendant Hall's fellow officers demonstrated that Laudemer never drove in a manner that suggested a willingness to injure an officer or make them reasonably fear for their lives.

In addition, Defendant Hall, himself, told investigators hours after the incident that he did not believe Laudemer was attempting to run him over in the moments before he fired his gun. (Hall Depo, 87). According to Hall, it did not appear that Laudemer was even aware that the officers were

there. (Hall Depo, 86-87). There is no reasonable interpretation of this evidence that demonstrates that Laudemer was willing to injure officers that got in the way of his escape and his own department use of force policy mandated that he should *not fire his weapon* at a moving vehicle. Defendant Hall had no reason to believe Laudemer had done anything to suggest he was aggressive. (Hall Depo, 52).

Moreover, Laudemer also did not persist in extremely reckless behavior that threatened other's lives. *See Orn,* 949 F.3d at 1177. He drove at low speeds and was attempting to slowly maneuver around Defendant Hall's vehicle when he was killed. Compare with *, e.g, Mullenix,* 136 S. Ct. at 306, 309 (where the driver drove over 100 miles per hour and threatened to shoot officers); *Scott,* 550 U.S. at 374-75 (where the driver drove more than 30 miles per hour over the speed limit and collided with an officer's vehicle during the pursuit); *Monzon v. City of Murrieta,* 978 F.3d 1150, 1161 (9th Cir. 2020) (where undisputed evidence showed that the driver repeatedly pressed the gas pedal down between 80 and 99 percent as he drove at officers in the seconds before he was shot and rammed a police vehicle while going at least 17 miles per hour); *Wilkinson v. Torres,* 610 F.3d 546, 551-52 (9th Cir. 2010) (where an officer had slipped and fallen next to the car, officers could hear the car revving the engine and spinning its tires, and the car was moving at a slow rate of speed only because it was slipping in a muddy yard off the road); *Plumhoff v. Rickard,* 572 U.S. 765, 776-77 (2014) (where the officers could tell the driver was stepping on the accelerator because his wheels were spinning less than three seconds after colliding with a police vehicle). Furthermore, Defendant Hall *did not even provide a verbal warning* prior to using deadly force. The Ninth Circuit's decision in *Gonzalez v. City of Anaheim,* 747 F.3d 789, 797 (9th Cir. 2014) stands for the principle that an officer may not use deadly force against a person driving a slow-moving vehicle, especially without verbal warning. Therefore, Defendants are not entitled to qualified immunity.

### D.  PLAINTIFF'S FOURTEENTH AMENDMENT CLAIM MUST PROCEED

Plaintiff's Fourteenth Amendment claim for right to familial relationship should proceed because Defendant's killing of an unarmed, slow-moving man who was being pursued simply because he was an unfamiliar face in an affluent neighborhood, loudly shocks the conscience. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998), *as amended* (Nov. 24, 1998) (noting parents and children of the decedent may assert such claims after a killing by law enforcement). The Fourteenth Amendment's substantive due process clause protects against "government power arbitrarily and oppressively exercised." *Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998). "The Supreme Court has made it clear . . . that only official conduct that shocks the conscience is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137. (9th Cir. 2008) (internal quotation marks omitted). "The relevant question . . . is whether the shocks the conscience standard is met by showing . . . deliberate indifference or requires a more demanding showing [of] a purpose to harm [decedent] for reasons unrelated to legitimate law enforcement objectives." *Id.* Here, per Defendant's own testimony, he did not believe Laudemer was trying to harm him yet he shot him several times as his car moved slowly past and had plenty of time to deliberate like his colleagues did. Furthermore, Defendant is not entitled to Qualified Immunity to bar the 14th Amendment claim for the same reasons he is not entitled to Qualified Immunity on Plaintiff's 4th Amendment claim. *See Nunez v. City of San Jose*, 381 F.Supp.3d 1192 (N.D. 2019) (denying qualified immunity and permitting Fourteenth Amendment claim to proceed because a jury could find officers had time to deliberate before shooting a young man holding a gun on his front porch); *see Nieto v. City and County of San Francisco,* 2015 WL 7180609 (denying qualified immunity and permitting Fourteenth Amendment claim to proceed because a jury could find officers had time to deliberate before shooting a young man officers thought was pointing a gun at them).

### E. PLAINTIFFS' STATE CLAIMS MUST PROCEED[2]

### 1. PLAINTIFF'S NEGLIGENCE AND ASSAULT CLAIMS MUST PROCEED

Similar to the Fourth Amendment analysis: "[P]ublic employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions." *Hayes v. Cty. Of San Diego*, 57 Cal. 4th 622, 628-29 (2013). Thus, to support a negligence finding, a plaintiff must show that the defendant public employee had a duty to exercise due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury. *Id.* The California Supreme Court "has long recognized that peace officers have a duty to act reasonably when using deadly force." *Id.* at 629. And "[t]he reasonableness of an officer's conduct is determined in light of the totality of the circumstances." *Id.* "In police cases, as well as others, the conduct in question 'must always be gauged in relation to all the other material circumstances surrounding it and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care such doubt must be resolved as a matter of fact rather than of law." *Young Han v. City of Folsom*, 695 F. App'x 197, 198-99 (9th Cir. 2017) (quoting *Grudt v. City of Los Angeles*, 86 Cal. Rptr. 465, 468 (1970)).

The California Supreme Court also reaffirmed long-standing precedent that when an officer's pre-shooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, negligence "liability can arise if the tactical conduct and decisions leading up to the use of deadly force *show*, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes,* 57 Cal.4th at 632. "In short, California recognizes that peace officers have a

---

[2] Defendants curiously argue the Court lacks subject matter jurisdiction (Doc. 93, Def. Mtn, p. 26) and cites *Reynolds v. Cty. of San Diego,* 84 F.3d 1162, 1171 (9th Cir. 1996). Plaintiff suspects that Defendants mean that if the Court were to find the federal claims were dismissed then the Court need not exercise supplemental jurisdiction over the state claims (which is what the *Reynolds* court ruled). Obviously, if there were no federal claims it is within the Court's discretion to assert supplemental jurisdiction. However here, it is obvious that Plaintiff's constitutional claims must proceed.

duty to act reasonably when using force, and reasonableness is determined in light of the totality of the circumstances, including consideration of tactical and pre-shooting actions." *Young Han v City of Folsom*, 695 Fed.Appx. 197, 198 (9th Cir. 2017). As discussed, Defendant used unreasonable force and, per his own testimony, bad tactics when he shot and killed Laudemer.

Frankly, Defendant makes a silly argument about causation, which Plaintiff will address briefly. Defendant Hall claims that he could not foresee Laudemer traveling around his car and so Laudemer's decision to slowly drive around his car was an intervening cause that cuts off his liability. This is barely a straight-faced argument.

In order to show proximate cause Plaintiff need only show Defendant's shooting of Laudemer was a substantial factor in causing Laudemer's harm and that when Defendant fired his weapon that he reasonably foresaw it would cause Laudemer's harm. *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052; see Rest.2d Torts, § 431; see CACI 430. Defendant Hall argues that he could not reasonably foresee shooting Laudemer would cause his death. It is hard to address this argument with anything less than incredulity. Defendant nevertheless argues that Defendant Hall did not foresee Laudemer driving around his car, but yet his sworn testimony was that he expected this chain of events and even made the particular decision to not completely block Laudemer's car because he believed he had no legal basis to do so. Therefore, Defendant foresaw this chain of events unfolding, purposefully placed himself into a position closer to Laudemer's car and then when the events he foresaw started to take place shot and killed Laudemer, causing obvious harm.

### 2. DEFENDANT'S STATE IMMUNITIES DO NOT APPLY EITHER

Defendant claims immunities under Penal Code section 196 and 835(a). Neither of these immunities apply here. The test for immunities Sections 196 and 835 (a) is the same as that governing the reasonableness of deadly force under the Fourth Amendment. *Brown v. Ransweiler*, 171 Cal.

App. 4th 516, 527 (2009). In both, a plaintiff must prove that the peace officer's use of force was unreasonable. *Brown*, 171 Cal. App. 4th at 533 (quoting *Martinez v. Cty. of Los Angeles*, 47 Cal. App. 4th 334, 349 (1996)); *Foster v. City of Fresno*, 392 F. Supp. 2d 1140, 1159 (E.D. Cal. 2005). For the same reasons, Defendants are liable under the Fourth Amendment and cannot be afforded that immunity here.

### 3.  PLAINTIFF'S BANE ACT CLAIM MUST PROCEED

The Tom Bane Civil Rights Act (Section 52.1) civilly protects individuals from all conduct aimed at interfering with rights that are secured by federal or state law where the interference is carried out "by threats, intimidation or coercion." *Venegas v. County of Los Angeles* (2007) 153 Cal. App. 4th 1230, 1242. Claims under section 52.1 may be brought against public officials who are alleged to have interfered with protected rights, including police officers. *Simmons v. Superior Court* (2016) 7 Cal.App.5th 1113. The *Cornell* Court found the "threat, intimidation or coercion" element of the claim ***does not*** have to be "transactionally independent" from the constitutional violation alleged, and found that the "the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the [defendant] had a specific intent to violate the [plaintiff's civil rights], not by whether the evidence shows something beyond the coercion 'inherent' in the [violation]." *Cornell v. CCSF,* 17 Cal.App.5th 766 at 801-802 (Ct. App. 2017).

The *Cornell* Court explained that the application of the "specific intent standard is straightforward" and contains two requirements: 1) a purely legal question (for the court) of whether the right at issue is clearly delineated and plainly applicable under the circumstances, and 2) the purely factual question (for the jury) of whether the defendant committed the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right. (*Id.*, at 803.) "If both requirements are met, even if the defendant did not in fact recognize the

[unlawfulness] of his act, he will be adjudged as a matter of law to have acted [with the requisite specific intent]—i.e., 'in **reckless disregard** of constitutional [or statutory] prohibitions or guarantees.'" (Id. at 766 (quoting *People v. Lashley* (1991) 1 Cal.App.4th 938, 948–949).

In the context of an unreasonable use of force case, the jury must find that the Defendants 'intended not only to use the force, but its unreasonableness, its character is 'more than necessary under the circumstances.'" (*Reese v. County of Sacramento*, (9th Cir. 2018) 888 F.3d 1030, at 1045.) Here, Defendant shot and killed an unarmed, fleeing and nonviolent man for no legitimate reason, in violation of decades of civil rights law and in complete and utter disregard for Laudemer's constitutional right to be free from unreasonable force.  Therefore, Plaintiff's Bane Act claim must proceed. For the same reasons describe above and per Defendant's own admissions, he used bad tactics, was not in fear for his life, yet decided to kill a man which substantiates Plaintiff's assault claim.

### 4.  PLAINTIFF'S DAMAGES CLAIM MUST PROCEED

Defendant argues that some of his shots that killed Laudemer were reasonable and Plaintiff cannot prove which was the unreasonable one. But this is not so, each and every shot from Defendant was unreasonable when he opened fire on Laudemer despite Hall not being in fear and Laudemer not appearing to even know that Hall was present. For the same reasons, Defendants attempt to dismiss punitive damages are nonsensical. Per Defendant's own admissions, he used bad tactics, was not in fear for his life, yet decided to kill a man.[3]

### IV.    CONCLUSION

Plaintiff Jeannie Atienza respectfully requests this Court DENY Defendant's Motion.

---

[3] addition to facing multiple felony charges for unlawfully killing Mr. Arboleda, Defendant Hall is currently awaiting a prosecutorial decision regarding another man he shot and killed earlier this year. It should be noted that Defendant Hall is responsible for 100% of the officer homicides in the Town of Danville in the over the past decade.

Dated: **June 17, 2021**                    Respectfully submitted,


                                            **POINTER & BUELNA, LLP**

                                            **LAWYERS FOR THE PEOPLE**


                                            /s/ Patrick Buelna
                                            PATRICK M. BUELNA
                                            COUNSEL FOR PLAINTIFF