IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

JEANNIE ATIENZA,         )
individually and as      )
successor-in-interest to  )
Decedent LAUDEMER ARBOLEDA, )
                            )
      Plaintiffs,     )
                            )
         vs.       )CASE NO.: 3:19-cv-03440 RS
                            )
ANDREW HALL, individually;  )
PHILLIP ARBOLEDA,       )
individually, as         )
Successor-in-interest to  )
Decedent LAUDEMER ARBOLEDA, )
and DOES 1-50, inclusive,  )
                            )
      Defendants.     )
_____)  CERTIFIED COPY


VIDEOCONFERENCE

DEPOSITION OF DEPUTY NICHOLAS MULLER

TUESDAY, DECEMBER 3, 2020

1:39 p.m. - 3:37 p.m.


Martinez, California


REPORTED BY:  ADRIANA P. ROBLES, CSR NO. 14212

1

INDEX OF EXAMINATION

WITNESS:  NICHOLAS MULLER

EXAMINATION                                        PAGE

By Mr. Pointer                                       6


                        --o0o--


Appearance Page                                      3

Exhibit Page                                         4

Location                                             5

Declaration of Witness                              72

Reporter's Certificate                              73

Disposition                                         74

Witness Letter                                      75

Deposition Errata Sheet                             76

Attorney's Notes                                    77

                        --o0o--












                                                     2

```
 1                    APPEARANCES OF COUNSEL

 2

 3   For the Plaintiff:

 4        BY:  ADANTE POINTER, ATTORNEY AT LAW
             POINTER & BUELNA, LLP
 5           LAWYERS FOR THE PEOPLE
             Wells Fargo Center
 6           1901 Harrison Street, Suite 1140
             Oakland, California 94612
 7           (510)929-5400
             apointer@lawyersftp.com
 8

 9

     For the Defendants:
10
             BY:  JASON MAUCK, DEPUTY COUNTY COUNSEL
11           OFFICE OF CONTRA COSTA COUNTY COUNSEL
             1025 Escobar Street, 3rd Floor
12           Martinez, California 94553
             (925)655-2290
13           jason.mauck@cc.cccounty.us

14

     Also Present:
15
             D. CAMERON BAKER, ESQ.
16

17

18                        --o0o--

19

20

21

22

23

24

25

                                                         3
```

1       INDEX TO EXHIBITS

2

3        EXHIBITS

4       (None marked.)

5

6        --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                 4

1    Deposition of NICHOLAS MULLER, taken on behalf of

2  the Plaintiffs, via Zoom with the witness located

3  in Martinez, California, beginning at 1:39 p.m.,

4  and ending at 3:37 p.m., on Thursday, December 3,

5  2020, before Adriana P. Robles, Certified Shorthand

6  Reporter, No. 14212.

7                        --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1      MARTINEZ, CALIFORNIA, THURSDAY, DECEMBER 3, 2020

2                    1:39 p.m. - 3:37 p.m.

3

4                    NICHOLAS MULLER,

5    called as a witness by and on behalf of the Plaintiffs,

6    and having been first duly sworn by the Certified

7    Shorthand Reporter, was examined and testified as

8    follows:

9

10                        EXAMINATION

11   BY MR. POINTER:

12      Q    Good afternoon, Deputy.  My name is Adante

13   Pointer.

14      A    Nice to meet you.

15      Q    Nice to meet you as well.  I'm here today --

16   I'm going to be taking your deposition in this case

17   regarding the death of Laudemer Arboleda.

18           Can you please state and spell your full name

19   for the record?

20      A    Nicholas Muller, N-i-c-h-o-l-a-s M-u-l-l-e-r.

21      Q    Deputy, have you ever given a deposition

22   before?

23      A    No.

24      Q    Okay.

25           Have you testified in court before?

                                                              6

1      A    Yes.

2      Q    I take it a number of times over your career?

3      A    A few times, yes.

4      Q    It's sort of similar to court, but a little

5  different in some ways.  There's no judge here.

6  There's no empire to call it a ball or strike, if you

7  will.

8      A    Sure.

9      Q    It's informal in that way; however, the oath

10  you took is the same as if you were in a court of law

11  on the witness stand testifying.  Do you understand

12  that?

13      A    Yes.

14      Q    Okay.  Cool.

15          I'm going to go over some guidelines or

16  admonitions with you before we get started just so we

17  can be on the same page and this can be a little bit

18  more efficient, all right?

19      A    Sounds good.

20      Q    All right.  The first thing we have to do and

21  keep in mind, so far we're doing pretty well, although

22  that can change as we get into the deposition, is we

23  have to speak one at a time, meaning I'm going to ask

24  you questions and I'll allow you to finish.  I ask that

25  you allow me to complete my question and then I'll

                                                        7

1  return the same courtesy and favor by allowing you to

2  answer before I lodge my next question.

3      A   Sure.

4      Q   All right.

5          Like I said, it happens, you know, in the

6  course of normal conversation.  If it happens all the

7  time where we talk over one another or if I think we

8  step on each other, I might stop or rephrase or ask you

9  to repeat your answer or I will apologize if I'm the

10  one.

11         With that being said, there is a court reporter

12  who is typing up everything that's going to be said

13  here today.  In order for that to be accurate, A, we

14  need to speak one at a time, and B, we need to make

15  sure that all of your responses are audible and in

16  words.  Meaning, the things we typically do in the

17  course of common conversation, shrugs of the shoulders,

18  nods of our head, and things like that, the court

19  reporter would have to guess and we do not want her to

20  guess.

21         Do you understand that?

22      A   Yes.

23      Q   Likewise, if for whatever reason it happens,

24  you know, it's a normal conversational piece, then I

25  might ask you, is that a "yes" or "no" or "What do you

8

1    mean by that?"

2         Do you understand?

3    A    Yes.

4    Q    I'll be asking you a number of questions here

5    today.  You are to give or provide an answer or

6    response unless your counsel tells you not to.

7         Do you understand that?

8    A    Yes.

9    Q    Okay.

10        During the course of today's deposition, it's

11   not an endurance test.  If you need to take a break for

12   whatever reason, just let me know and we'll find a good

13   spot to take a break, okay?

14   A    Okay.

15   Q    I think we mentioned we don't want you to guess

16   or speculate.  If you don't know something, you don't

17   remember, just let us know and either I may just move

18   on to another question, I might try to refresh your

19   memory by showing you something, telling you something,

20   but if that doesn't work and you still don't know,

21   that's a perfectly fine answer.  Just say "I don't

22   know."

23   A    Okay.

24   Q    Great.

25        Because it's Zoom, internet and connections and

9

1    stuff, it might get choppy at times.  Frankly, just

2    being transparent, at times I'll have a question and

3    then I'll think of two more words to add to it for

4    whatever reason.  If that happens, I'll go back and

5    I'll try to start the question again from the beginning

6    so it's clear, okay?

7        A    I might have dogs barking at some point, so I

8    apologize.

9        Q    Not a problem.

10            With that being said, in terms of if for

11   whatever reason just internet and so on so forth if

12   it's not clear, the same rules apply in terms of, if I

13   ask you a question and you don't know what I'm driving

14   at, just let me know and I'll see if I can clarify it,

15   restate it, rephrase it, or I might even repeat it or

16   move on completely because when you provide a response

17   to any of the questions, we will presume that you

18   understood the question and your answer or your

19   response was to that question, do you understand?

20       A    Yes.

21       Q    Great.

22            From time to time, there may be objections.

23   Your counsel might say, "I object for whatever reason."

24   As I mentioned before, there's no empire here.  There's

25   no referee to say whether I'm right with my question or

                                                    10

1  if they're right with their objection.  You're still to

2  answer unless your attorney tells you not to.

3      Do you understand that?

4  A   Yes.

5  Q   Okay.  Great.

6      So can I have -- did you already state and

7  spell your full name for the record?

8  A   Yes.

9  Q   All right.  We'll move pass that.

10     Now, I understand -- I'm not sure if you're at

11 home or wherever you're at, it doesn't matter to me, I

12 want to make sure you're in a physical location where

13 you feel like you can give your deposition.  We

14 understand about dogs, that's not a biggy.

15 A   Yes, I'm at home.

16 Q   Also, you know, I don't know if fresh off of a

17 shift, going to shift, or whatever else, but are you in

18 a mental space to be able to give your deposition here

19 today?

20 A   Yes.

21 Q   So my understanding is as of today's date

22 you're still employed by the Contra Costa Sheriff's

23 Department; is that correct?

24 A   Yes.

25 Q   What is your current position?

11

1     A   Officer in Danville.

2     Q   What is your assignment, if you will?  Do have

3 you a particular assignment?

4     A   I'm in the patrol division.

5     Q   For how long have you been a deputy?

6     A   Just over ten years.

7     Q   Okay.

8     Did you attend the Contra Costa Sheriff's

9 Police Academy?

10    A   Yes.

11    Q   And during the course of that academy, you were

12 trained on the POST learning domains; correct?

13    A   Yes.

14    Q   And you were tasked with learning them as well

15 as taking tests and passing those tests demonstrating

16 that you understood the learning domains; correct?

17    A   Yes.

18    Q   All right.

19    After graduating from the academy, it's my

20 understanding that sheriff deputies continue to receive

21 refresher courses and things like that training, if you

22 will, in order to make sure that you don't lose your

23 perishable skills; correct?

24    A   Yes.

25    Q   I'm going to jump to the incident.  When I say

12

1    "incident," I'm talking about -- concerning

2    Mr. Arboleda and the day that he was shot and killed.

3    Okay?

4         A    Okay.

5         Q    Now, my understanding is this took place on a

6    Saturday; correct?

7         A    Yes, Saturday.

8         Q    Okay.

9              And it's also my understanding, and correct me

10   if I'm wrong, you were on patrol that day; right?

11        A    Yeah.  Yes.

12        Q    Okay.

13             And it's also my understanding that this took

14   place essentially Saturday morning, if you will, or

15   going towards midday towards noon approximately

16   11:00 a.m. or something?

17        A    Yes.

18        Q    And did you have a partner that day?

19        A    I did.  I have a number of partners on my

20   shift, but yes.

21        Q    Let's back up a little bit.  Let's talk about

22   that.  On that day, do you recall how many officers

23   were actually out on patrol?

24        A    Officer Hall, Sergeant Martin, we had an

25   overtime spot there.  I believe it was Deputy Reed and

                                                    13

1    then myself and Maka, Deputy Maka, sorry, and Officer

2    Caruso.

3        Q    At the time of this incident, Deputy Maka was

4    still in his field training program; correct?

5        A    Yes, shadow phase.

6        Q    Which is the last phase?  Essentially, he would

7    be able to patrol as a solo deputy or officer?

8        A    Yes.

9        Q    It was your job, amongst many other jobs I'm

10   sure, to evaluate him and make sure he was performing

11   satisfactorily so he could move to the next phase of

12   patrolling as a solo officer; correct?

13       A    Yes.

14       Q    I want to direct your attention to the first

15   time you essentially learned about an incident that

16   ultimately brought you into contact with Mr. Arboleda,

17   okay?

18       A    Okay.

19       Q    So can you tell me just what was the

20   information or what -- how did you learn -- or how was

21   your attention directed towards Arboleda?

22       A    Prior to the radio call, if I remember

23   correctly, we left a traffic stop and we were talking

24   about getting food and we got dispatched via the radio.

25       Q    When you got dispatched via the radio, you mean

14

1  you were told about a call for service?

2      A    They call our call sign, we answer, and they

3  give us details about what call we were going to -- or

4  dispatched to.

5      Q    What was your call sign that day?

6      A    21X3.

7      Q    Now, in terms of seniority, setting aside

8  Sergeant Martin, who, to your understanding, was the

9  most senior officer on patrol that day?

10          MR. MAUCK:   Objection.  Vague.  Go ahead.

11          THE WITNESS:  Out of our group, I would be the

12  most senior officer that day.

13  BY MR. POINTER:

14     Q    Is Sergeant Martin -- when I say senior, I

15  meant just tie.  Not in terms of status or, you know,

16  assignment or whatever, just in terms of who had been

17  working the longest for the sheriff's department.

18  Would that have been you?

19     A    Not counting Sergeant Martin?

20     Q    Yes.

21     A    On our shift, yeah, I believe it would be me.

22     Q    When I -- your counsel made a good objection.

23  As I tried to clean up here, seniority might mean

24  different things to different people.

25     A    Yeah, it does.  I agree.

15

1    Q   I'm not familiar with your system, so it was a

2  good objection.

3         To ask it another way, including Sergeant

4  Martin, who had been employed by the sheriff's

5  department the longest in terms of the people who were

6  on patrol that day?

7    A   Including Sergeant Martin, Sergeant Martin

8  would be.

9    Q   Sergeant Martin was the patrol supervisor that

10 day?

11   A   Yes.

12   Q   Is it fair to say that Sergeant Martin was your

13 direct -- I don't know if you call it direct reporting

14 officer or direct supervisory officer?

15   A   Yes.

16   Q   Let's clean that up.  It's fair to say Sergeant

17 Martin was your direct supervising officer?

18   A   He's not considered an officer.  He's a

19 sergeant.  Yes, if I understand what you're asking me.

20   Q   Okay.

21        We're going back.  You said that you heard this

22 call for service come through dispatch; right?

23   A   Yes.

24   Q   What information was provided to you about the

25 call?

16

1      A   We were dispatched to a suspicious subject

2  wearing black framed glasses, gray sweatshirt, and dark

3  pants.  He had rang a doorbell or two and was walking

4  up and down the street.  A citizen called and said it

5  felt suspicious to them.

6      Q   When you were told about this call for service

7  about a suspicious person, no information was provided

8  that this person had committed a crime; correct?

9      A   No.  Not at that point, no.

10      Q   Right.

11          And the person who may be -- thought to be

12  suspicious, is not in and of itself a criminal act;

13  correct?

14      A   No.

15      Q   But I take it calls for service about somebody

16  or something that somebody perceives as being

17  suspicious is not an uncommon call to get as a police

18  officer; right?

19      A   No, not at all.

20      Q   I take it you investigate that stuff pretty

21  frequently; right?

22      A   Yes.

23      Q   I take it, as well, when you go out to

24  investigate a call, no matter if it's about a

25  suspicious person or about a supposed heinous crime

17

1    that's taking place, until you get there, you don't

2    know whether or not the person committed a crime or

3    not; right?

4        A    Yes.

5        Q    You respond to the scene to investigate and

6    then make a determination, if you can, whether or not a

7    crime has, in fact, been committed; correct?

8        A    Yes, depending on the circumstances of what

9    happens when we get there, absolutely.

10       Q    Okay.

11            So you mentioned you were dispatched out to

12   this call about the suspicious person.  Can you explain

13   what that means when -- the dispatch part of it?

14       A    We were driving in the car.  We have a radio.

15   Dispatch receives a phone call from a citizen or

16   multiple citizens and they call our call sign, we

17   answer back, they give us details to the call and --

18   either on the computer we put ourselves in route or

19   dispatch puts us and we start driving to that location.

20       Q    And this particular call that ultimately

21   brought you into contact with Mr. Arboleda, did you

22   receive any information from dispatch that there were

23   multiple calls or more than one person who reported

24   Mr. Arboleda as being suspicious?

25       A    No, at the time I believe it was only one.

18

1    Q    And when you were dispatched out to this call

2  for service, that communication -- that information was

3  all communicated over the -- essentially the police

4  radio, for a layperson?

5    A    It comes over the radio and then the dispatch

6  call on the screen actually lists pretty close verbatim

7  what we're told over the radio.  Something we can refer

8  back to if we needed to.

9    Q    When you say the screen, is that the mobile

10  digital terminal?

11    A    MDC, it's like a computer.

12    Q    A laptop attached to your car?

13    A    Yeah, pretty much.

14    Q    So you hear -- audibly hear the call -- strike

15  that.

16         You audibly hear the dispatcher provide

17  information about the call and then, as you said, on

18  your laptop that's in your car, you also get a

19  typewritten, essentially, transcript, if you will, of

20  what dispatch has just told you; right?

21    A    Yes.

22    Q    In that -- what comes up on the laptop, if you

23  will, is more like shorthand information?  It's written

24  in shorthand?  It -- not in full complete sentences;

25  right?

                                                      19

1    A    It depends -- it depends on -- dispatch has

2    call takers, so you go -- you get information.  Usually

3    it's whatever they say on the radio because dispatch is

4    reading it off the screen and then we get essentially

5    that same screen.

6    Q    Understood.  Okay.

7         And so you get this call of a suspicious person

8    who rang a doorbell on foot in this neighborhood and

9    you've been dispatched out to the call.  I take it that

10   you as well as Deputy Maka both go?

11   A    Me and Maka are in the same vehicle.

12   Q    Had you responded prior to this day -- had you

13   responded to a suspicious call with Deputy Maka before?

14   A    Yes.  Yeah.

15   Q    And when you responded to that -- I'm sorry,

16   the attorney in me.

17        How many times have you responded to a call

18   with Deputy Maka concerning a call for service related

19   to a suspicious person?

20   A    I could not tell you how many numbers.  I don't

21   remember.

22   Q    Okay.  Fair enough.

23        So you had done it before in terms of

24   responding to a call with Deputy Maka.  I take it on

25   one or more of those calls, correct me if I'm wrong,

                                                        20

1    you responded to investigate -- person had not actually

2    committed any type of crime; correct?

3        A    It's possible.  I don't remember.

4        Q    Okay.

5            So on the incident concerning Mr. Arboleda, you

6    and Officer Maka go to the location where this person

7    had been reported as ringing the doorbell, correct?

8        A    We drove to the area, yes.

9        Q    Did you drive to the area Code 3?  Lights and

10   sirens?

11       A    No.  I'm sorry to interrupt.  No.

12       Q    That's okay.  That was one of those times it

13   sounded like I finished.  I'll back up a little bit.

14           Did you respond to the area where the person

15   had rang the doorbell and been described as a

16   suspicious person with your lights and sirens on?

17       A    No.

18       Q    And when you -- I take it you got to the area

19   where this person was reported as being; correct?

20       A    Yes.

21       Q    All right.

22           When you got there, can you describe to me what

23   you observed?

24       A    As I came out Laurel underneath the freeway, we

25   made a right hand turn, it's an S-curve.  We saw, both

21

1    Maka and I, what we believed to be Mr. Arboleda.  I

2    think I'm saying it incorrectly.  The gentleman was

3    starting to get into a silver Honda Civic, if I

4    remember right.

5        Q    When you saw him getting into the Honda Civic,

6    did he appear to be carrying anything?

7        A    I don't remember if he was carrying anything.

8        Q    I take it you didn't see a firearm or anything

9    like that in his hand; correct?

10       A    No.

11       Q    Nothing that you interpreted to be a weapon in

12   his hand; correct?

13       A    No.

14       Q    And when you came to Laurel and you saw

15   Mr. Arboleda getting into the Honda, you stopped your

16   car approximately five or six car lengths away from the

17   Honda; correct?

18       A    I believe so, yes.

19       Q    And at that time, Deputy Maka got out of the

20   patrol car and attempted to contact Mr. Arboleda

21   correct?

22       A    Yeah, he tried to wave him down just to talk to

23   him just to see if that was the person who was

24   described in dispatch that we wanted to talk to.

25       Q    Okay.

                                                        22

1      When Deputy Maka tried to make this contact

2   with Mr. Arboleda, did you also get out of the car at

3   that time?

4      A   I did.  I was a little slower and got out --

5   made my way around the front of the patrol car, if we

6   contacted him, just to talk to see what was going on.

7      Q   And at this stage of the interaction, in your

8   mind, was this just a consensual stop?

9      A   Yes.

10     Q   Okay.

11         So it's fair to say Mr. Arboleda had no

12  obligation to stop and converse or respond to any of

13  the overtures that were being made to him to engage in

14  the conversation; correct?

15     A   In a consensual stop, he didn't have to stop.

16     Q   He was free to drive away; right?

17     A   Yes.

18     Q   Which is what he did?

19     A   Yes.

20     Q   My understanding is some time at or about the

21  time Mr. Arboleda was driving away, Officer Caruso

22  actually came to the scene as well; correct?

23     A   Yes, he arrived behind us.  Yeah.

24     Q   Did you know that Officer Caruso was coming to

25  the scene as well?

23

1      A    Yes.  Shortly after we got dispatched, he

2  attached to the call via -- I don't remember if it was

3  via the computer or over the radio.  I don't remember.

4      Q    Okay.

5           So just kind of going back to the chain of

6  events.  Mr. Arboleda leaves Laurel in his Honda,

7  passes yourself, Officer Maka, as well as Officer

8  Caruso and doesn't stop, doesn't talk to you guys;

9  right?

10     A    Yes.

11     Q    Did any residents come out at that point in

12 time and provide you or any of the other officers

13 additional information about the suspicious person?

14     A    Not that I know of.

15     Q    And I take it you didn't see anybody, any

16 residents, or anyone else in the area that appeared to

17 be in distress or anything like that; right?

18     A    I wasn't looking for anything like that.  I

19 don't recall anybody.

20     Q    And so who was driving the patrol car that you

21 were in that day?

22     A    The patrol car that I was in?

23     Q    Yes.

24     A    Deputy Maka.

25     Q    So you're in the front passenger seat, I take

                                                      24

1   it?

2        A    Yes, sir.

3        Q    Now, I know some officers kind of have a

4   division of labor where the person driving concentrates

5   on driving, the other person might put out dispatch or

6   transmissions.  Did you all have any type of division

7   of labor in terms of the way in which you were to

8   divide up the police functions?

9        A    No.

10       Q    And so after Mr. Arboleda drove away, you and

11  Officer Maka got back into the patrol car; right?

12       A    Yes.

13       Q    Was there any conversation as to what you were

14  going to do at that point?

15       A    We made a U-turn just to see if we can find him

16  again and talk to him to see what was going on.

17       Q    Now, let me ask you this, back up a little bit

18  out of the story, what, if anything, did you review to

19  prepare for your deposition today?

20       A    I watched the video a while back, and I read my

21  initial interview from the day of the incident.

22       Q    Okay.

23            When you say the video a while back, was it a

24  single video or multiple videos or more than one video?

25       A    It was kind of a video that was all put

                                                        25

1    together of different camera angles and different

2    scenes.

3        Q   Is that the video -- tell me, if you know, is

4    that the video where they have, like, a gentleman in

5    the suit who makes an announcement before it goes into

6    the video?

7        A   If I remember correctly, maybe.  I'm not a

8    hundred percent sure because I just went through the

9    videos, fast-forwarded, I guess you would say.

10       Q   I understand.

11           To the actual incident itself?

12       A   Yeah.  Yes.

13       Q   How long ago did you see that video?

14       A   I don't recall.  I mean, it's been a while.

15       Q   Several months ago?

16       A   Yes.

17       Q   Okay.

18           What about the dispatch audio, have you

19    listened to that?

20       A   No.

21       Q   Okay.

22           Now, my understanding is your car was outfitted

23    with a video camera, the dash cam, as well as the

24    camera -- I don't know where it's at on the --

25       A   Out the windshield and one that faces the rear

26

1  seat where you would put an in-custody.

2      Q    And then I also understand that you were

3  outfitted with a body-worn camera as well?

4      A    Yes.

5      Q    And during the course of the incident, your

6  body-worn camera was on and recording things during

7  portions of the incident?

8      A    Yes.

9      Q    As well as you understand that your car was

10  also recording portions of this incident as well;

11  correct?

12      A    Yes.

13      Q    Had you listened or watched your own body-worn

14  camera?

15      A    Yeah, in the past.

16      Q    Did you review it in preparation for your

17  deposition?  For example, like, your inquest -- not

18  your inquest, but when you testified at the inquest?

19      A    I don't remember if I watched it or not.

20      Q    Okay.

21          We may have gone over this previously, you did

22  testify at the inquest into the death of Mr. Arboleda;

23  correct?

24      A    Yes.

25      Q    Now, have you watched or listened to the

27

1    body-worn camera footage from Officer Maka?

2        A    Maka's camera individually, I don't remember.

3    It's possible.

4        Q    Okay.

5            Going back to the incident itself.  So we have

6    Mr. Arboleda leaving or driving down Laurel after there

7    was an attempt to have a consensual contact?

8        A    Uh-huh.

9        Q    Yourself and Officer Maka wind up getting back

10   into your patrol car.  There's some conversation as to,

11   "Hey, let's make another attempt to contact

12   Mr. Arboleda"; correct?

13       A    Yes.

14       Q    And leading up to when you had that

15   conversation with Officer Maka, you had also told

16   Officer Maka, "We're just going to have a consensual

17   stop"?

18       A    I believe so.

19       Q    Words to that effect, but not those exact

20   words?

21       A    I believe so.

22       Q    Okay.

23           And so you get back into the patrol car, Maka

24   is driving, you're in the passenger seat, what took

25   place next?

                                                              28

1        A    We made a U-turn, made the turn to go back

2    underneath Laurel and we saw a gray car at the end of

3    Laurel which is quite a way down, made a left, we

4    thought that might have been Arboleda's car, so we went

5    toward that car.  It ended up not being his car.

6        Q    Now, I understand what you're saying.  I

7    reviewed the body-worn camera and dash cams.  I want to

8    ask you, when you saw Mr. Arboleda's car leaving

9    Laurel, was he driving erratically?  Like, moving the

10   car in and out of the lane?

11       A    I couldn't tell because I was on the passenger

12   side of the patrol car.  The SUV is taller than I am so

13   I don't know what his driving habits were at that

14   point.

15       Q    Okay.

16            Did you hear the engine racing or being gunned,

17   like, you know --

18       A    I don't recall any of that.  I don't know if it

19   happened or not.

20       Q    As you sit here today, you have no memory of

21   it; right?

22       A    No.

23       Q    What about -- did you hear, for example, like,

24   sometimes when cars take off quick from a stop -- from

25   a standstill, a better word sometimes, the driver is

                                                        29

1    putting -- "smashing," my word, on the gas and you can

2    hear the tires squeal.  Did you hear anything like

3    that?

4         MR. MAUCK:  I'm going to interject, just for a

5    second.  Are we talking about when he initially left

6    the scene or is this when they're after Caruso -- or

7    excuse me, after Muller and Maka turnaround and see

8    Arboleda?

9         MR. POINTER:  Good question.  I'm just focusing

10   on the point in time where Mr. Arboleda was just

11   leaving Laurel.  The first attempt at contact, if you

12   will.

13        MR. MAUCK:  Okay.

14        MR. POINTER:  We'll try to get it a little

15   cleaner.

16   BY MR. POINTER:

17        Q    When you saw Mr. Arboleda leaving Laurel at the

18   first attempt at contact, did you hear his tires

19   screech or burn rubber?

20        A    From the curb where he pulled away from to

21   where I lost sight of the car, I did not hear anything.

22        Q    Now, we're at the part of the story where you

23   said yourself and Officer Maka made a U-turn, you tried

24   to catch up to Mr. Arboleda, you thought you saw -- you

25   saw a car which you thought was him, got close to that

                                                        30

1  car and realized it's not him; right?

2      A    Yes.

3      Q    Okay.

4          Fair to say after that you start canvassing the

5  area looking for Mr. Arboleda; right?

6      A    Yes, if we could find him again, yeah.

7      Q    At some point it in time you guys found him

8  again; right?

9      A    Yes.

10     Q    When you saw him again, can you describe either

11 what he or the Honda was doing?

12     A    It was parked on, I believe, Princeton, if I

13 remember correctly, facing eastbound.

14     Q    And at that point in time where you saw it

15 parked on Princeton, were there any other patrol cars?

16 Like, for example, behind it as if they had pulled the

17 car over or anything like that?

18     A    No.

19     Q    So the car is just parked next to the curb like

20 a regularly parked car?  Nothing unusual about that;

21 right?

22     A    Yes, nothing unusual.

23     Q    Okay.

24          And I take it you guys closed the distance

25 between yourself and Mr. Arboleda and the Honda;

31

1    correct?

2         A    Yes, similar to on Laurel.

3         Q    But you maintained some distance from the

4    Honda; right?

5         A    Yes.

6         Q    And is that the way you've been trained?

7         A    Yes, more of an officer safety thing because we

8    don't know who we're dealing with yet.

9         Q    You've been taught to maximize time and

10   distance; correct?

11        A    Yes.

12             MR. MAUCK:  Objection.  Vague.  Go ahead.

13             THE WITNESS:  Yes.  I mean, we don't --

14   depending on the circumstances, we don't want to get

15   close unless we actually have to.

16   BY MR. POINTER:

17        Q    Okay.

18             When you see Mr. Arboleda on Princeton, what

19   was he doing, if you know?

20        A    I believe he was still sitting in the car.

21        Q    Okay.

22             Did Officer Maka stop your car?  Like, pull it

23   to the curb?

24        A    Yes, we pulled over to the right-hand curb

25   facing west, so we were facing each other again.

                                                      32

1      Q    Describe what took place next, if anything?

2      A    Officer Maka got out and tried to wave the

3  subject down again, just tell him we wanted to talk to

4  see what was going on.

5      Q    And do you recall if the Honda's windows were

6  up or down at this point in time?

7      A    I'm sorry, I don't.

8      Q    And so when Officer Maka tried to make contact

9  with Mr. Arboleda, did you hear him verbally respond to

10  Officer Maka's overtures?

11      A    Did I hear?

12      Q    Did he say anything?

13      A    I did not hear him -- his voice?  No, I don't

14  recall that.

15      Q    And so Officer Maka is trying to wave out to

16  Mr. Arboleda.  What took place next, if anything?

17      A    As Deputy Maka got out and tried to wave him

18  down, the vehicle [Unintelligible audio.]

19           THE REPORTER:  I'm sorry, can you repeat your

20  answer?

21           THE WITNESS:  When Deputy Maka got out of the

22  car to wave him down, he accelerated away from the curb

23  going past us going east.

24  BY MR. POINTER:

25      Q    I believe you said he left the curb.  Did I

                                                        33

1    hear you say he exploded from the curve?

2        A    Accelerated.

3        Q    I'm sorry.

4        A    It's all right.

5        Q    Okay.

6            For the second time now during the second

7    consensual stop or contact?

8        A    Yes.

9        Q    Once again, Mr. Arboleda didn't have any

10   obligation to engage you or Officer Maka or Officer

11   Caruso at that point?

12       A    Yes.

13       Q    You hadn't received any additional information

14   that he committed any crime?

15       A    Not that I recall.

16       Q    No information nor did you observe anything

17   that made you believe that he was -- he was on his way

18   to commit a crime at this point in time?

19       A    What do you mean on his way to commit a crime?

20       Q    Like I understand, correct me if I'm wrong,

21   like, if an officer believed crime is afoot, you can

22   actually detain somebody; right?

23       A    Right.

24       Q    So you didn't have a basis at that point in

25   time to believe crime was afoot in order to detain him

34

1  which was why it was a consensual stop; correct?

2      A   Yes.

3      Q   So Mr. Arboleda leaves, I think this is

4  Princeton, what happens next?

5      A   He makes the left onto Brookside which leads to

6  Laurel.  We turn around and start to follow him again

7  to see what was going on, see if we can just contact

8  him again.

9      Q   Now, at some point in time, correct me if I'm

10  wrong, at some point the lights and sirens on the car

11  were turned on; correct?

12     A   Yes.

13     Q   Okay.

14         MR. MAUCK:  I'm assuming you're talking about

15  Maka and Muller's car?

16         MR. POINTER:  That's okay.  Yes, I am.

17         MR. MAUCK:  Go ahead.  I'm sorry.

18  BY MR. POINTER:

19     Q   What, from your understanding, is the basis as

20  to why the lights and the sirens were cut on?

21     A   The turn behind us at Brookside and then the

22  speed down Glen Arms that we were traveling at the

23  time.

24     Q   When you say Brookside, I don't want to say

25  you, but it's been reported that Mr. Arboleda didn't

35

1    stop at a stop sign?

2       A    Yes.

3       Q    Did you personally see that happen where he did

4    not stop at the stop sign?

5       A    I don't recall if it was me or somebody else or

6    Maka.

7       Q    As you sit here today, you don't have a memory

8    of him not stopping at that stop sign?

9       A    I don't remember if it was me or him, no.

10       Q    During the course of this incident, and kind of

11    expanding from when you first made contact or tried to

12    make contact with Mr. Arboleda up and until the

13    shooting took place, Mr. Arboleda was essentially

14    behind the wheel of the Honda until the window was

15    broken and he was pulled out after he was shot; right?

16            MR. MAUCK:   I'm sorry.  Can you rephrase that?

17    What are you asking?

18            MR. POINTER:   Yeah, sure.  I can make it

19    simpler.

20    BY MR. POINTER:

21       Q    While yourself and Officer Maka were either

22    trying to do the consensual stops or after you believed

23    you had a basis to effectuate a traffic enforcement

24    stop, up and until the point Mr. Arboleda was shot, you

25    saw Mr. Arboleda driving the Honda; right?

                                                    36

1      A    We saw what we believed was the guy in the

2   description driving the Honda in the first contact, the

3   second contact, and thereafter.

4      Q    Right.

5           In following him or pursuing him, whatever word

6   you want to use, you did see the Honda signal when it

7   would make turns from time to time; correct?

8      A    I don't remember.

9      Q    Okay.

10          You mentioned that his speed, was of some

11  concern to you; correct?

12     A    It was 25 miles at some point, if I remember.

13     Q    He was driving 25 miles per hour?

14     A    Arboleda -- I keep pronouncing the name wrong.

15  I apologize.  At one point I felt that he was going

16  over the speed limit.

17     Q    I remember at some point in time listening to

18  the dispatch audio and some of these body-worn cameras,

19  I heard someone mention that -- or at least it was

20  reported -- that he was going 30 miles per hour; is

21  that what you're referring to?  There was --

22     A    It very well could be, yes.  It might have

23  been -- that might have been after.  I don't recall

24  what was said on Glen Arms.

25     Q    Okay.

                                                        37

1          Now, while Mr. Arboleda is driving from Laurel

2    to Princeton to Brookside and Glen Arms, did you put

3    out any radio transmissions?

4          A    I believe so.

5          Q    And did you put out any radio transmissions

6    letting your fellow officers or dispatch know what the

7    basis was for believing that you could now do a traffic

8    enforcement stop on him?

9          A    No, that would not be normal to say over the

10   radio what the reason we were stopping the car for was.

11         Q    Okay.

12         Now, after he's -- I guess he's driving to Glen

13   Arms, can you tell me what happened next?

14         A    We effected a traffic enforcement stop.  The

15   lights and -- were activated and, again, I apologize

16   Arboleda pulled to the right-hand curb a couple car

17   lengths away from the stop sign.  At that time, we got

18   out we and went up to talk to him at the car which he

19   drove away from us.

20         Q    At this time, as opposed to the other times

21   when you tried to make contact with him, your patrol

22   car was actually behind him; right?

23         A    Yes.

24         Q    He drove off from the attempted traffic

25   enforcement, and at that point in time, Officer Caruso

38

1  took the lead in pursuing Mr. Arboleda; correct?

2     A   Yes.

3     Q   When he got out of the car -- when he pulled

4  over -- I'm sorry.

5         What street was that on?

6     A   What street was that on?  The enforcement stop?

7     Q   Yes.

8     A   Glen Arms.

9     Q   When Mr. Arboleda pulled over on Glen Arms and

10 you were attempting to do the traffic enforcement stop

11 and he leaves and pulls away and doesn't stop, did he

12 once again -- was the -- did you hear the car tires

13 screech or burn rubber?

14    A   I don't remember the tires squealing, but he

15 accelerated at a high rate of speed away from us and

16 made a turn and ran the stop sign.

17    Q   What is your best estimation?

18        MR. MAUCK:  Objection.  Vague as to time.

19        THE WITNESS:  I couldn't estimate the actual

20 speed.  It was not a rolling start.  It was like a --

21 he gave it a lot more gas, I would say.

22 BY MR. POINTER:

23    Q   And so -- and then you said he then made the

24 right turn without stopping at the stop sign?

25    A   Yes, at Glen Arms and Laurel.

                                                    39

1    Q    Okay.

2         Setting aside not yielding all the traffic

3    violations committed at this point, whether it's five

4    miles over the speed limit or thereabout, or not

5    stopping at a stop sign, those are all essentially

6    driving infractions; right?

7    A    Yes.

8    Q    And --

9    A    You're talking about the first initial traffic

10   stop not afterwards?  I can't remember what you just

11   said.

12   Q    No problem.

13   A    The way you phrased it.  We're talking about

14   the actual traffic stop where we initiated the first

15   traffic stop?

16   Q    I'll reask it again.  I think it was a little

17   screwy of a question.

18        Starting from when you tried to make the first

19   initial stop on Laurel up and until the point where you

20   have lights and sirens and he pulls over on Glen Arms

21   and drives away just before he drove away for the

22   traffic enforcement stop, all the things that

23   essentially he did wrong, if you will, lawfully wrong,

24   would have been traffic infractions; right?

25   A    Yes.

40

1    Q    When he drove away from the traffic enforcement

2  stop, that is a misdemeanor; correct?

3    A    Yes.

4    Q    Okay.

5         So when he made the right turn and didn't stop

6  at the stop sign, that too was a traffic infraction;

7  right?

8    A    Yes.

9    Q    And Deputy Caruso took the lead and you're now

10  two cars -- or a car behind Mr. Arboleda; right?

11    A    Yeah, we would be the second patrol unit.

12    Q    Thank you.

13         What happened next, if anything?

14    A    We made the right turn.  I did made some radio

15  traffic and said Arboleda left the traffic stop as we

16  were trying to enforce that.  I don't remember

17  verbatim, but I believe I said something to the effect

18  of that we were in pursuit north on Laurel going

19  underneath the freeway maybe.

20    Q    And as you -- going underneath the freeway, you

21  hear a radio transmission put out that he had thrown

22  something out the window; right?

23    A    Yeah.  Officer Caruso said he threw something

24  out the window, an object or something.

25    Q    I was going to ask, did you see whatever it was

                                                    41

1    that was thrown out of the window?

2        A    I did not.

3        Q    Okay.

4            Officer Caruso didn't put out a description of

5    what was reportedly thrown out of the window either;

6    correct?

7        A    I don't recall.  I don't recall if he described

8    the item or items.

9        Q    So that, Officer, assuming something was thrown

10   out of the window, that is littering.  That too is a

11   ticket -- an infraction; right?

12       A    It could be, yes.  If we actually found the

13   item, sure.

14       Q    Right.  Evidence is important.

15       A    That's true.

16       Q    So I take it you continued to follow or pursue,

17   whatever word you want to use, Mr. Arboleda.  He goes

18   underneath the freeway and what takes place next?

19       A    At the time he makes a right, and initially in

20   my first interview, I don't remember if he stopped or

21   not until later I found out, you know, through watching

22   the video that we actually stopped two more times.

23           I did not recall that at the time of the

24   incident.  Essentially, he pulled over, I believe, two

25   more times and then kept going -- or tried to pullover.

                                                        42

1      Q   You didn't mention that during your initial

2  interview hours after the shooting, but you realized

3  that that had taken place once you reviewed the video

4  of the incident either on the dash cam or body camera;

5  correct?

6      A   Yeah, later on.

7      Q   Okay.

8          And what took place next?

9      A   At which point?  I don't remember those little

10 stops.

11     Q   Okay.

12         We can -- unless -- let me ask it this way, so

13 we can cover those stops.

14         Did Mr. Arboleda do anything unusual during

15 those two stops other than just not stopping,

16 essentially, pit stopping and keep driving?

17     A   Not that I can remember from the video, no.

18     Q   Okay.

19         And so we essentially covered the two times he

20 looked like he was going to stop and yield and then

21 drove off; right?

22     A   Uh-huh.  Yes.

23     Q   What happened after that, if anything?

24     A   Arboleda made a right on to Hartz Way going

25 east from Laurel and got towards the end of the street

                                                    43

1    and started to make a U-turn and stopped kind of in the

2    middle of the street.

3        Q   Okay.

4            Did you -- leading up to that point in time,

5    did you form the opinion as to whether or not he was

6    lost?

7        A   I think he was trying to get to the freeway

8    maybe.  I don't remember exactly if I said anything out

9    loud or not, but I believe he was looking for a way to

10   leave the area and realized it was a dead end.

11       Q   Okay.

12           Now at some point in time during all of this,

13   Mr. Arboleda's plates to the Honda were ran?  That's my

14   word.  I don't know what you call it.

15       A   Yeah.  Checked in the system.  Sure.  Yes.

16       Q   No information came back that either he or the

17   Honda had any outstanding warrants; correct?

18       A   I don't recall anything about that, just the

19   vehicle information.

20       Q   Going back to -- I think it was a dead end or

21   cul-de-sac; is that fair to say?

22       A   It's a dead end that has a driveway to the

23   right that if you went all the way to the wall would

24   open to an apartment complex.  It's not a circle

25   cul-de-sac.  You have to do, like, a turn to get out.

                                                          44

1     Q   It's at that point in time where he's in this

2  dead end cul-de-sac?

3        MR. MAUCK:  Are you referring to Hartz Way, or

4  are we referring to Glen Arms -- not Glen Arms, excuse

5  me.  The other street where he attempted to turn

6  around, River Rock?

7        THE WITNESS:  That's all in the same location.

8        MR. MAUCK:  I'm trying to figure out what does

9  he mean by "cul-de-sac."

10 BY MR. POINTER:

11    Q   You and I both maybe have similar thoughts, but

12 that's -- I was trying to -- I wanted to use the

13 language that we could agree on.  I was saying a

14 cul-de-sac, but if it's not -- it sounds like it has

15 another street?

16    A   If I can describe it.  A cul-de-sac, to me,

17 would be a circle, like a court.  This is more of a

18 road that dead ends into a sign that says "Dead End."

19 It has driveways to the right against the wall and I

20 believe it's River Rock or River Road to the left prior

21 to that.  I would use the word "dead end."  The street

22 ends.

23    Q   Okay.  Fair enough.  In depositions --

24 cul-de-sac -- I don't know.

25    A   I get it.

45

1    Q    This is -- what street is this now?

2    A    This is Hartz Way.

3    Q    Let's -- Mr. Arboleda gets to the dead end of

4  Hartz Way.  It appears to you some type of turn to go

5  back up Hartz Way?

6    A    Yes, that's what it looked like to me.

7    Q    Deputy Caruso is still in the lead in the terms

8  of closest to Mr. Arboleda; correct?

9    A    Yes.

10   Q    Deputy Caruso stops his car essentially across

11 the driveway that would lead into townhomes or down the

12 street that you just mentioned?

13   A    Yes, River Rock to the left, north side.

14   Q    Officer Maka also pulls in on this dead end and

15 brings the patrol car to a stop; correct?

16   A    Yes.

17   Q    At that point in time you got out of the car;

18 right?

19   A    Yes.

20   Q    Deputy Maka did as well; correct?

21   A    Yes.

22   Q    And also Officer Caruso; right?

23   A    Yes.

24   Q    Prior to yourself getting out of the car, you

25 told Deputy Maka you're going to make a felony stop?

46

1    A    Yes, we're going to conduct a felony stop.

2    Q    Which is -- also another term for high-risk

3 stop?

4    A    Yes.

5    Q    When you all got out of the cars, did you

6 unholster your gun?

7    A    Yes.

8    Q    Same with Officer Maka; correct?

9    A    I believe so he did.

10    Q    As well as Officer Caruso; correct?

11    A    I believe so.

12    Q    All right.  And you're giving orders to

13 Mr. Arboleda telling him to stop the car or words to

14 that effect?

15    A    Yes.

16    Q    Now, at that point in time, Mr. Arboleda is

17 still in the passenger seat, he has -- you haven't

18 heard him make any type of verbal -- you haven't heard

19 him say anything; right?

20    A    No, he was in the driver's seat.

21    Q    And you actually went up to the driver's door

22 and tried to open it; correct?

23    A    Yes, telling him to stop the car.

24    Q    And was the door locked?

25    A    Yes.

47

1     Q    Okay.

2          And at that time, three officers essentially

3    have guns pointed at Mr. Arboleda; right?

4     A    When I was looking at Arboleda in the car, I

5    could not visually see in my peripheral.  I believe

6    they did.

7     Q    Understood.

8          And when you're at the driver's door window,

9    did you actually see Mr. Arboleda's face?

10    A    Yeah, I can see him sitting in the car.

11    Q    Did he look up or look towards you?

12    A    I don't remember if he looked at me or not.

13    Q    All right.

14         You don't have a memory of him looking

15   essentially towards your face or towards his face?

16    A    I don't remember if I made actual eye contact

17   with him or not.

18    Q    Now, what happened next, if anything?

19    A    Continued to pull the door handle telling him

20   to stop the car, put the car in park, I believe.  I

21   don't remember what I said verbatim.  I apologize.

22         Then he had already made part of the turn so he

23   was just backing up slowly to kind of straighten up to

24   continue the opposite direction that I believe he

25   wanted to go.

                                                        48

1    Q   Do you remember him having his hands up at some

2   point in time or at least not on the steering wheel in

3   the car?

4    A    Sorry.  I believe both hands were on the

5   steering wheel at the time.  Other than shifting the

6   car, but I didn't see that.  I'm sure he shifted.

7    Q   How close were you to the car when you were

8   trying to open the car door?

9    A   I was holding the door handle, you know, with

10  my outstretched arm.  I don't know what my arm length

11  is.  Two feet-ish.

12   Q   The car started moving while you were

13  essentially at or about the driver's side door; right?

14   A   Yes.

15   Q   At that time -- it's my understanding Officer

16  Maka was towards the front of the car?

17   A   I don't know where Maka was positioned at all.

18  I was concentrating on -- my vision was pretty much the

19  window of the car.  The driver's side window.

20   Q   Right.  You're trying to make sure you don't

21  get hit; right?

22   A   Yes, asking him to stop.

23   Q   I take it you want to make sure you don't get

24  hit by the car; right?

25   A   Yeah.

1    Q    And looking at Mr. Arboleda and making sure he

2    doesn't have a weapon pointing at you or toward you;

3    right?

4    A    Sure.

5    Q    Didn't see any weapon in his hand or anywhere

6    in the car at that point in time?

7    A    I don't recall anything.

8    Q    Okay.

9         And then the car starts reversing; right?

10   A    Yeah, just rolling backwards slowly.

11   Q    As it's rolling backwards slowly, you told Maka

12   and Caruso not to fire; right?

13   A    I believe I said something to the effect of "If

14   he has somewhere to go, let him go."  I said -- I maybe

15   said it twice, "Don't shoot, Don't shoot" for a few

16   different reasons.

17   Q    A few different reasons, what were those

18   reasons?

19   A    I personally didn't feel like I was in danger.

20   I was on the side of the car.  I didn't want any

21   sympathetic fire from them thinking I was in danger.

22   Q    In terms of the three of officers, yourself,

23   Maka, and Caruso, would you have considered yourself to

24   be the primary officer?

25   A    I don't understand what you're asking me.  As

                                                      50

1  in seniority, or are you asking, like, on scene?

2      Q   Yeah, on scene.  Put it another way, who -- who

3  was the leader -- who is in control of this situation,

4  if you will?

5      A   The situation is very fluid.  I'm at the car

6  door so maybe at that point I am.  Just prior to that,

7  Caruso would be the guy who's seen the most.  I would

8  refer to him because he's in front of us and the car is

9  blocking my view.  That constantly changes.

10         There's no hierarchy when that stuff is going

11  on.  It's just a fluid situation, so I couldn't say who

12  was in charge.

13      Q   Okay.  In terms of your mind, forget what

14  everybody else is saying, in terms of your mind when

15  you're in this cul-de-sac right here, who is the lead

16  officer in that situation?

17      A   I can barely --

18         MR. MAUCK:  Objection.  Asked and answered.

19         Go ahead.

20         THE WITNESS:  Sorry.  I can barely -- what were

21  you were asking me?  You were --

22  BY MR. POINTER:

23      Q   Sure.  No problem.

24         I was trying to figure out about when you're in

25  this -- at the end of the road and the car is backing

51

1    up and you're trying to open the car door, trying to do

2    an enforcement stop -- high-risk felony stop, who, in

3    your mind, was the lead or primary officer during this

4    portion of the incident?

5         MR. MAUCK:  Same objections.

6         THE WITNESS:  I was at the window giving

7    commands the closest to him, so I would assume that

8    they're going to listen to me because I'm the closest,

9    but if that changed, I would refer to Caruso or Maka if

10   they were in the same -- being the closest.  I'm giving

11   commands, they're going to hear my commands.

12   BY MR. POINTER:

13        Q    Understood.

14        A    Is that -- I don't know if that answers your

15   question or not.

16        Q    It does.  Thank you.

17        A    I wouldn't say I'm the end all be all.

18        Q    As circumstances change, whoever the primary or

19   the lead might change?

20        A    Roles constantly change.

21        Q    Mr. Arboleda makes the turn at the dead end and

22   leaves the scene; right?

23        A    Yeah, he drove away from both me and Maka and

24   Caruso.

25        Q    Okay.

                                                            52

1           And when he's driving away, to your knowledge,

2    did he make contact with any of the three of you?

3        A    Physical contact with him or the car?

4        Q    The car, yes.

5        A    No.  Other than me grabbing the door handle,

6    no.  I don't recall anything else.

7        Q    Okay.

8           You didn't see anybody have to jump out of the

9    way to avoid being hit, did you?

10        A    Not that I can recall from that incident.

11    Again, I was not paying attention to my partners.  I

12    was looking at Arboleda in the car.

13        Q    Now, you see the car leaving from this dead

14    end, what took place next?

15        A    Maka got back in the driver's seat, I got back

16    in the passenger seat, we started to pursue the car.  I

17    guess that would be the second or third time down to

18    Front Street where Arboleda made a right turn.

19           MR. MAUCK:  It's been about an hour, can we

20    take a brief break since we're at a pause between

21    episodes?

22           MR. POINTER:  Yeah, sounds cool.  How long do

23    you need?

24           MR. MAUCK:  Maybe just five minutes or so.

25           MR. POINTER:  Cool.  Come back in five minutes.

                                                        53

1                    (Recess was taken.)

2    BY MR. POINTER:

3        Q    Are you -- in your mind, Officer, do you know

4    where we're at in this chain of events?

5        A    Yes, sir.

6        Q    Okay.  Great.

7             So guess what I'm going to ask you?  What

8    happened next?

9        A    We made a right turn on to Front, continued on

10   Front Street, put out radio traffic that we were

11   driving north on Front.  I believe I maybe did some --

12   some of our normal radio traffic, like, speeds,

13   conditions, road conditions, that stuff.

14       Q    The road conditions, you said, was light

15   traffic; right?

16       A    I believe so.

17       Q    Speed 30 miles per hour; right?

18       A    30, 35 maybe.

19       Q    And so it's fair to say that moving forward in

20   the chain of events, this is all coming up towards the

21   shooting; right?  Essentially Front Street leading up

22   to Diablo Road; correct?

23       A    Yes.

24       Q    So once again I'll direct your attention to

25   essentially that portion of the incident.  Let's go

                                                        54

1    over the order of the cars.  You have the silver or
2    gray Honda with Mr. Arboleda in front, you have -- I'm
3    sorry, are you the second or are you the car
4    immediately behind Mr. Arboleda or is there another
5    police car between yourself and Mr. Arboleda's Honda?
6         A    We are the first car behind him.
7         Q    So you're the -- you're the first car behind
8    Mr. Arboleda.  Essentially he's driving up towards
9    Front Street and as you all are approaching Front
10   Street, did you see any other cars on your side of the
11   street or your side of the road?
12        A    I believe there was a car in the turn lane as
13   we approached Front Street.
14        Q    Now, you said the turn lane, you mean the
15   right-hand turn lane or the left-hand turn lane?
16        A    I don't recall if it was the right-hand turn
17   lane or the straight lane.
18        Q    Okay.
19             And as you're approaching the intersection --
20   or I should say, Mr. Arboleda is approaching the
21   intersection, you see a patrol car turn onto Front
22   Street; correct?
23        A    Yes, Officer Hall was coming westbound in the
24   area in front -- in the area where we were.
25        Q    So Officer Hall turns on to Front Street and

                                                      55

1    essentially he brakes and Mr. Arboleda brakes; right?

2    Like, they stop their cars; right?

3        A    Yes.

4        Q    They are almost nose to nose?

5        A    Yes.

6        Q    Tell me what takes place just in terms of

7    Mr. Arboleda's car?  What took place after Officer Hall

8    pulls onto Front Street and Mr. Arboleda stops and

9    Officer Hall stops and their cars are nose to nose?

10   What took place next?

11       A    If I remember correctly, I remember Officer

12   Hall getting out of his car and going around -- started

13   to go around the back of his car.  I don't know

14   exactly -- the exact chain of events what happened

15   first.  Arboleda started to go to the left a little bit

16   to maybe go around the front of Hall's car.

17       Q    What took place as Mr. Arboleda was going to

18   the left to go around Officer Hall's car?

19       A    Sergeant Martin arrived on scene and drove into

20   the southbound lane of Front Street from Diablo.

21       Q    Essentially the other lane of traffic going in

22   the opposite direction?

23       A    That would be opposing lane of traffic or in

24   that area.

25       Q    And what did the Honda do at that point in

56

1  time?

2      A   I don't remember if the Honda stopped or not

3  immediately and turned to the right and drove between

4  Sergeant Martin and Hall's vehicle.

5      Q   Okay.

6          And you mentioned that you saw Officer Hall

7  essentially get out of his patrol car and then go

8  around essentially the back of his car rounding the

9  trunk; correct?

10     A   Yes.

11     Q   Okay.

12         When you saw Officer Hall doing that, did you

13  see if he had his gun in his hands at that point?

14     A   I don't recall if I saw him actually have his

15  handgun out as he got out of the car.  I don't -- I

16  don't know.

17     Q   When you were watching, you actually stayed in

18  your car because you thought Mr. Arboleda might back up

19  and try to ram -- strike that.

20         You stayed in your car because you thought

21  Mr. Arboleda would try to ram the SUV or Officer Hall's

22  car; is that correct?

23     A   I don't remember exactly which car.  I just

24  felt that if I stayed in the car, in case he did back

25  into us, we would be safer in the car than outside of

57

1    the vehicle at that time for myself.

2        Q   You just -- these are the decisions you were

3    making for yourself; correct?

4        A   Yes.  Yeah.

5        Q   You hadn't had any -- strike that.

6            Was there any communication from the --

7    sorry -- from the dead end until Officer Hall pulled

8    his car onto -- or turned his car on Front Street

9    between yourself and any of the other officers as it

10   relates to what the plan was going to be to bring this

11   pursuit to a conclusion?

12       A   Not that I recall.  It was fluid so there's not

13   a lot of time to formulate a plan.

14       Q   In listening to the body cam, I hear someone --

15   I don't know if it's you or Officer Maka, you can tell

16   me, say words to the effect of "Wow, God, don't do it."

17   Did you hear that when you listened to the body cam or

18   do you remember saying anything like that?

19       A   I don't remember any of that.

20       Q   Do you remember the Honda ever backing up when

21   it was essentially at or about the intersection of

22   Diablo and Front Street?

23       A   I don't recall if the car actually physically

24   backed up.  I know that was in my mind if it backed up

25   it would hit us, but I don't recall if I actually saw

                                                          58

1  reverse lights or anything of that nature.  I don't

2  remember.

3      Q    As you sit here today, you don't have a memory

4  of that; correct?

5      A    That the car -- I don't.  I don't remember.

6      Q    Now, I think you already testified to there was

7  a space between Officer Hall's patrol car and Sergeant

8  Martin's?

9      A    Yeah, there was space between the two cars.

10     Q    That was the space that at some point in time

11  you saw Officer Hall standing in; correct?

12     A    Yes, he went around the back of his car to that

13  area.

14     Q    So he was on the passenger side of his car at

15  some point in time there on in the intersection of

16  Front and Diablo; correct?

17     A    Yes.

18     Q    Did you ever see Officer Hall backpedaling or

19  stepping -- walking backwards, if you will?

20     A    The time when I saw him backing up was as the

21  car was accelerating at him in his direction and he was

22  firing walking backwards, but I couldn't tell if he

23  had -- I lost sight of him around the back of the car.

24  I don't know if he was at a standstill or on the ground

25  at that point.

59

1    Q   When you -- how do I say this?  So if I hear

2  you correctly, what you just said was you saw him

3  backpedaling or walking backwards or moving

4  backwards -- let me ask it a different way.

5       Did you actually see his feet moving backwards

6  during any point in time?

7    A   I could tell at some point he was moving

8  backwards by his upper body -- maybe -- depending on my

9  view what it was, it was blocking a little bit.

10   Q   Okay.

11       When you saw him from, what you say, his upper

12 body appeared to be moving backwards, could you

13 actually see his gun?

14   A   Yes.

15   Q   Did you see muzzle fire from his gun?

16   A   It was daytime so it's hard to see muzzle

17 flash, but I don't recall seeing muzzle flash, but you

18 would usually have muzzle flash if you were firing.

19   Q   Did you see the gun recoiling?

20   A   It was fast, but, yeah.  I mean, that's

21 something that would happen when you fire a firearm.  I

22 don't recall physically seeing the sliding of it, no.

23   Q   Do you recall seeing -- layperson -- I

24 assume -- you're supposed to be better than me.  If I'm

25 firing a gun, but the gun -- I call it a recoil, but

60

1    the gun is moving as it's discharging cartridges?

2        A    I saw him firing and you could see the chips on

3    the window.  I remember all that stuff.

4        Q    Okay.

5            You said the car accelerated, when you say

6    that -- did you see the car talk off from a -- like a

7    stop and then start moving, or are you saying that the

8    car was going at a speed and then it went faster?  Can

9    you be more descriptive?

10       A    I mean, was it a standstill stop at a drag race

11   where he nails the gas and goes or was he rolling, I

12   don't recall.  I want to say he started -- I can't say

13   for sure if it was standing still start or rolling

14   start, but it accelerated between the two cars

15   Officer Hall.

16       Q    In that acceleration, was that prior to you

17   hearing any gunshots or after?

18       A    Yeah, there was a little bit of acceleration at

19   the direction of Officer Hall prior to gunfire, if I

20   remember correctly.

21       Q    When you -- when you say -- did you hear --

22   strike that.

23            Could you hear the engine revving?

24       A    I don't recall if I heard the engine revving.

25   I don't recall that.  I don't know if it happened or

                                                          61

1    not.  I don't remember hearing engine noises.  It's a

2    Honda Civic, so it's not super loud.

3        Q    You mentioned you were able to see portions or

4    chips or pieces of the windshield?

5        A    That's what it appeared to be at the time.

6        Q    Did you see any pieces of the front passenger

7    window also being impacted by bullets?

8        A    I don't recall exactly seeing the passenger

9    window.  I'm thinking that's the passenger window.  It

10   happened very quickly.  I couldn't say "Oh, that's the

11   passenger window."  I don't remember saying that to

12   myself.

13       Q    I take it it would be the same with the back

14   passenger window too?  You don't have a clear thought

15   in your mind, "Oh, these bullets are also hitting the

16   back passenger window as well"?

17       A    I don't remember ever thinking that.

18       Q    However, after the incident, you did see that

19   both the front passenger window and the back passenger

20   window were broken and shattered; correct?

21       A    I remember the front -- the door window was

22   shattered.  I don't recall the back one, so the

23   windshield -- the front windshield and the driver's

24   door I do remember seeing shattered.

25       Q    All right.

                                                          62

1      Now, you said -- going back to the chain of
2 events, the Honda is approaching Front Street -- I
3 mean, Diablo Road.  Officer Hall pulls his car almost
4 nose -- essentially nose to nose with the Honda and he
5 gets out of his car and runs around the back of his car
6 that essentially -- he was closing the distance between
7 himself and the Honda; right?

8      A    I don't know what his thought process was in
9 what he did.  I couldn't answer that.

10     Q    That would be speculation.

11     A    I don't know what tactics he was thinking or
12 what he felt was safe for him to do.  I couldn't answer
13 that.

14     Q    Just physically, he closed the distance?
15 There's less distance between him and the Honda on the
16 passenger side between him and the driver's side;
17 right?

18          MR. MAUCK:  Objection.  Vague as to time.

19          Go ahead.

20          THE WITNESS:  I don't know if I can measure in
21 distance.  It was -- you'd have to lay it all out and
22 measure that.  I couldn't tell you what was closer and
23 what wasn't.  I don't know.  I don't know how you want
24 me to answer that.

25 ///

63

1    BY MR. POINTER:

2        Q    Well just --

3        A    To me, I would say it was relatively the same

4    distance if he was on the one side of the car or the

5    other depending on where Arboleda was.

6        Q    Okay.

7        All right.  You think it's equal distance from

8    the driver's side to the passenger side relative to the

9    Honda?

10       A    It could be.

11       MR. MAUCK:  Objection.  Vague as to time.  Go

12   ahead.

13       THE WITNESS:  I don't know if that distance is

14   the same or not and where they're sitting.  Hall moving

15   and the car moving, that distance is changing.  I

16   couldn't tell you.

17   BY MR. POINTER:

18       Q    Did you give Officer Hall any signals directing

19   him to approach the Honda at that point in time?

20       A    Not that I recall, no.

21       Q    Did Officer Hall give you any signals or

22   communications that he was getting out of his car and

23   approach the Honda?

24       A    No, not that I recall.

25       Q    The Honda never made contact with your car when

                                                        64

1  it was at the intersection of Front and Diablo;

2  correct?

3          MR. MAUCK:  Objection.  There was a double

4  negative to make it sound like there was contact.

5  Sorry.  Go ahead.

6  BY MR. POINTER:

7      Q   Let's ask it this way, was there any contact

8  between the Honda and your car at or about the

9  intersection of Front and Diablo?

10     A   No, our vehicles never came in contact with

11  each other.

12     Q   Did you see the Honda make contact with either

13  Officer Hall's car or Sergeant Martin's car?

14     A   No, not that I could see from my vantage point.

15     Q   Now, when Officer Hall was firing his gun, you

16  were getting out of your car; right?

17     A   I believe the door was ajar, but I was not

18  exiting the vehicle, if I remember correctly.

19     Q   Okay.

20         You were, as we already talked about, you were

21  interviewed by investigators the day of the incident?

22     A   Yes.

23     Q   They took you through the series of events just

24  like kind of what we went through here today and they

25  had asked you a series of questions about

                                                    65

1   Mr. Arboleda's driving.  You made the statement that,

2   at least from your opinion, it wasn't reckless driving.

3   Do you remember making that statement?

4       A   I don't remember verbatim that I said

5   reckless -- it wasn't reckless driving, but the driving

6   was not at a speed or any of that nature that would

7   cause me to stop pursuing him, I guess you would say.

8       Q   But the pursuit wasn't to the level of where

9   you felt the need to barricade him in; correct?

10      A   What do you mean "barricade"?

11      Q   Yeah, you hadn't directed any officers or there

12  hadn't been any conversation about blocking Arboleda in

13  any of these times where you had been pursuing or

14  following him during the course of this incident?

15      A   No.  There was no preplan of blocking somebody

16  in, no.

17      Q   There hadn't been any discussion of it either;

18  correct?

19      A   Not that I recall.

20      Q   I mean, in fact, when he was in that -- the

21  dead end, you told the officers, "If he's got a way

22  out, let him.  Don't shoot.  Don't shoot"?

23      A   Yup.  Yes.  Sorry.

24      Q   And you told investigators hours after the

25  incident, "I'd rather -- in my mind, I rather pursue

                                                        66

1  him than shoot him because he wasn't going very fast so

2  far.  I mean, he just wasn't stopping"; correct?

3     A   Yeah, I believe that's what I said.

4     Q   Now, obviously Mr. Arboleda was shot and his

5  car continued to go straight; right?

6     A   Yes, at an angle across Diablo.

7     Q   Did you ever see his car veer towards Sergeant

8  Martin's SUV after you started hearing gunshots?

9     A   What do you mean "veer"?

10    Q   Turn towards officer Martin's SUV after you

11 started hearing gunshots?

12    A   I don't recall or remember if he turned right

13 or left after that.

14    Q   Now, the direction that his car wound up

15 traveling crashed into a civilian's car.  If you're

16 looking northbound on Front Street, he moved to the

17 right?

18    A   Yeah, it would be like a 2:00 position.  1:00,

19 2:00 position.

20    Q   That's generally the same position that he was

21 taking in order to travel between Sergeant Martin's SUV

22 and Officer Hall's police cruiser; right?

23    A   Yes.

24    Q   And at some point in time, Mr. Arboleda's

25 pulled out of his car; right?

1     A    Yes.

2     Q    Do you recall an officer saying he's got

3 nothing on him after he was pulled out of the vehicle?

4     A    I do recall that.  It very well could have been

5 me.  I think it was.  His hands -- he doesn't have

6 anything in his hands.  I pulled him out of the car

7 with help, I guess you could say.

8     Q    After he was pulled out the Honda, I'm not sure

9 if it was you or other deputies, deputies cut his shirt

10 open and saw some bullet wounds?

11     A    Yes, I started to perform life-safe saving

12 measures on him.  I cut his shirt off of him and found

13 his wounds, cut his sleeve off, found some more, and

14 began rendering first aid.

15     Q    Now, somebody brought over a machine.  Do you

16 remember some type of medical device?

17     A    AED.

18     Q    What is that?

19     A    It's a defibrillator.  If someone's heart was

20 stopped, it would give them an electric pulse to

21 restart their heart depending on the information we had

22 and checking his pulse and all that.

23     Q    Do you know -- I think he was -- use layman's

24 terms, he was hooked up to the machine?

25     A    Yes, I remember that.

68

1     Q    Was the machine actually turned on and used?

2     A    Yes, it ran through its sequence and then it

3  tells you to either stand clear for shock or begin CPR

4  by hand.

5     Q    Do you know what it said on this occasion?

6     A    It said to continue CPR.

7     Q    After the shooting, Officer Hall was emotional;

8  correct?

9     A    I could not tell you.  I don't remember.  I

10  just started to do -- after fire arrived, I started to

11  do other duties and help my sergeant controlling the

12  scene, preserving evidence, standard stuff we do after

13  an incident.  I don't remember seeing Hall at all,

14  actually, just briefly and then that was it.

15     Q    Did you ever see him having difficulty or what

16  would appear to be difficulty breathing after the

17  incident?

18     A    No, I don't recall that.

19     Q    Did you hear anybody tell him to essentially

20  calm down and get out of the evidence scene?

21     A    I don't remember if I said anything to him, if

22  at all, or somebody else did.  I don't recall any of

23  that.

24          MR. POINTER:  Let's take a quick break.  I

25  think we're going to wrap up.

69

1                    (Recess was taken.)

2    BY MR. POINTER:

3        Q    We're back on the record, Deputy.  Same rules

4    apply, still under oath.  I'm going to ask you some

5    questions about after the shooting kind of aftermath,

6    if you will.

7        A    Okay.

8        Q    Now the fire department arrived on the scene;

9    right?

10       A    Yes.

11       Q    And you remember having some conversations with

12   them; correct?

13       A    I don't remember what we talked about.

14       Q    I understand you don't remember the discussion

15   or whatever you talked about, you remember having some?

16       A    Yeah, usually it's kind of common practice on

17   any call we tell them to brief, like, "Hey, X, Y, Z,

18   happened.  He's over here.  This is what we've done,"

19   so they don't maybe redo what we already done or at

20   least they have an idea of what we've done.

21       Q    Understood.

22            You also had some interaction with

23   Sergeant Martin afterward?  You had a quick exchange

24   with him?

25       A    I'm sure I did.

70

1     Q   I'm trying to find in the transcript here.  I

2  guess I can just ask you, do you remember having a

3  quick exchange with Martin after the shooting?  You

4  told him you had some questions?

5     A   No, I don't remember that.

6         MR. POINTER:  That's it.  Thank you for coming

7  for your deposition today.

8         THE WITNESS:  Not a problem.

9         MR. MAUCK:  No questions.

10         MR. POINTER:  We're done.

11         THE REPORTER:  Would you like a copy?

12         THE WITNESS:  Yeah, whatever Cam ordered

13  earlier, same.

14

15  (Whereupon at 3:37 p.m. the deposition was concluded.)

16

17                       --o0o--

18

19

20

21

22

23

24

25

                                                    71

1                    DECLARATION OF WITNESS

2

3          I, NICHOLAS MULLER, do hereby declare under

4     penalty of perjury that I have read the foregoing

5     transcript; that I have made any corrections as appear

6     noted, in ink, initialed by me, or attached hereto; that

7     my testimony as contained herein, as corrected,

8     is true and correct.

9     EXECUTED this _____ day of _____,

10    2020, at _____, _____.
                      (City)                (State)

11

12

13

14          _____
                      NICHOLAS MULLER

15

16

17                    --oOo--

18

19

20

21

22

23

24

25

                                                    72

1    UNITED STATES DISTRICT COURT   )

                                      : Ss.

2    NORTHERN DISTRICT OF CALIFORNIA )

3        I, Adriana P. Robles, Certified Shorthand Reporter

4    in and for the State of California, Certificate No.

5    14212, do hereby certify:

6        That the witness in the foregoing deposition was by

7    me first duly sworn to testify the truth, the whole

8    truth, and nothing but the truth in the foregoing

9    cause; that the deposition was taken before me at the

10    time and place herein named; that said deposition was

11    reported by me in shorthand and transcribed, through

12    computer-aided transcription, under my direction; and

13    that the foregoing transcript is a true record of the

14    testimony elicited at proceedings had at said

15    deposition.

16        I do further certify that I am a disinterested

17    person and am in no way interested in the outcome of

18    this action or connected with or related to any of the

19    parties in this action or to their respective counsel.

20        In witness whereof, I have hereunto set my hand

21    this 16th day of December, 2020.

22

23                  __/s/Adriana P. Robles_____

                      Adriana P. Robles

24                    CSR No. 14212

25

                                                    73

DISPOSITION

Upon completion of the foregoing transcript, the witness was notified it was ready for signature, but the deposition was not signed by the witness for the following reason:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

BARBARA J. BUTLER & ASSOCIATES

The sealed original will be forwarded to the deposing attorney's office.

--o0o--

74

```
 1                        WITNESS LETTER
         TO:  Deputy Nicholas Muller        Date: 12.17.20
 2            Attn:  Jason Mauck, Deputy County Counsel
              CONTRA COSTA COUNTY COUNSEL'S OFFICE
 3            1025 Escobar Street, 3rd Floor    Depo: 12.03.20
              Martinez, CA 94553               Ref. #20120397C
 4
         RE: Jeannie Atienza v. Andrew Hall, et al.
 5
         Dear Deputy Muller:
 6
             Please be advised that the transcript of your
 7       deposition taken in the above matter has been completed
         and is now available at this office for your reading and
 8       signing.
             Please contact our office between the hours of 9:30
 9       a.m. and 4:30 p.m. Monday-Friday, to schedule an
         appointment.  Or, if you prefer, contact the attorney to
10       review and sign the copy of your deposition under
         penalty of perjury.
11           Read the transcript making any changes necessary.
         In making any changes, please use the following guide:
12           1. DO NOT WRITE on the original transcript.
             2. SIGN UNDER PENALTY OF PERJURY at the end of the
13              Deposition on the Declaration of Witness Page.
             3. List each change on the Deposition Errata Sheet
14              following this page. Signature is required at
                the bottom of the Errata Sheet.
15           4. Forward the signed Declaration of Witness Page
                and signed Errata Sheet in addition to a copy of
16              this letter to:
                     Barbara J. Butler & Associates
17                   Certified Court Reporters
                     P.O. Box 3508, Santa Clara, CA  95055
18                   (510) 832-8853 or (408) 248-2885.
             Upon receipt of items requested in this letter, I
19       will forward copies of same to all Counsel.
             In the event you have not reviewed your deposition
20       within 35 days or by trial date, whichever is sooner,
         the original transcript will be sealed pursuant to
21       applicable laws and thereafter mailed to the deposing
         attorney.
22
                            Sincerely,
23
                            /s/Barbara J. Butler
24                          Barbara J. Butler, CSR
25       cc:  All Counsel
```

75

1        DEPOSITION ERRATA SHEET

2    RE: Jeannie Atienza v. Andrew Hall, et al.
         Depo:  12.03.20              Ref. #20120397C
3
     Page No. _____ Line No. _____
4
     Change:_____
5
     Reason for change:
6    _____

7    Page No. _____ Line No. _____

8    Change:_____

9    Reason for change:
     _____
10
     Page No. _____ Line No. _____
11
     Change:_____
12
     Reason for change:
13   _____

14   Page No. _____ Line No. _____

15   Change:_____

16   Reason for change:
     _____
17
     Page No. _____ Line No. _____
18
     Change:_____
19
     Reason for change:
20   _____

21   Page No. _____ Line No. _____

22   Change:_____

23   Reason for change:

24   _____

     _____        _____
25   NICHOLAS MULLER                     DATE

                                                        76

1                           ATTORNEY'S NOTES

2        Page # Line #

3        _____/_____/_____

4        _____/_____/_____

5        _____/_____/_____

6        _____/_____/_____

7        _____/_____/_____

8        _____/_____/_____

9        _____/_____/_____

10       _____/_____/_____

11       _____/_____/_____

12       _____/_____/_____

13       _____/_____/_____

14       _____/_____/_____

15       _____/_____/_____

16       _____/_____/_____

17       _____/_____/_____

18       _____/_____/_____

19       _____/_____/_____

20       _____/_____/_____

21       _____/_____/_____

22       _____/_____/_____

23       _____/_____/_____

24       _____/_____/_____

25       _____/_____/_____

77