IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

JEANNIE ATIENZA,              )
individually and as          )
successor-in-interest to     )
Decedent LAUDEMER ARBOLEDA,  )
                             )
          Plaintiffs,        )
                             )
             vs.             )CASE NO.: 3:19-cv-03440 RS
                             )
ANDREW HALL, individually;   )
PHILLIP ARBOLEDA,            )
individually, as             )
Successor-in-interest to     )
Decedent LAUDEMER ARBOLEDA,  )
and DOES 1-50, inclusive,    )
                             )
          Defendants.        )
_____)   CERTIFIED COPY


VIDEOCONFERENCE

DEPOSITION OF DEPUTY CHARLES CARUSO

MONDAY, NOVEMBER 30, 2020

1:32 p.m. - 4:22 p.m.


Martinez, California




REPORTED BY:  GINA GLANTZ, CSR No. 9795, RPR, RMR

1

```
1                    INDEX OF EXAMINATION

2
    WITNESS:  CHARLES CARUSO
3

4   EXAMINATION                                    PAGE

5   By Mr. Pointer                                   6

6
                        --o0o--
7

8   Appearance Page                                  3

9   Exhibit Page                                     4

10  Location                                         5

11  Declaration of Witness                          94

12  Reporter's Certificate                          95

13  Disposition                                     96

14  Witness Letter                                  97

15  Deposition Errata Sheet                         98

16  Attorney's Notes                                99

17

18                      --o0o--

19

20

21

22

23

24

25
                                                     2
```

```
 1                   APPEARANCES OF COUNSEL

 2

 3   For the Plaintiff:

 4        BY:  ADANTE POINTER, ATTORNEY AT LAW
             POINTER & BUELNA, LLP
 5           LAWYERS FOR THE PEOPLE
             Wells Fargo Center
 6           1901 Harrison Street, Suite 1140
             Oakland, California 94612
 7           (510)929-5400
             apointer@lawyersftp.com
 8           (Videoconference appearance.)

 9

10   For the Defendants:

11        BY:  D. CAMERON BAKER, DEPUTY COUNTY COUNSEL
             OFFICE OF CONTRA COSTA COUNTY COUNSEL
12           1025 Escobar Street, 3rd Floor
             Martinez, California 94553
13           (925)655-2290
             Cameron.Baker@cc.cccounty.us
14           (Videoconference appearance.)

15

16

17   Also Present:

         ANDREW HALL
18       (Videoconference appearance.)

19                       --o0o--

20

21

22

23

24

25
```

                                                                3

INDEX TO EXHIBITS

MARKED                    DESCRIPTION                    PAGE

Exhibit 1        Color-copied photograph                88
                 (OIS_18-14203_Panos-2-5)


--o0o--

4

1          Zoom videoconference deposition taken pursuant

2     to Subpoena and on Monday, November 30, 2020,

3     commencing at the hour of 1:32 p.m., thereof, before

4     me, GINA GLANTZ, CSR No. 9795, a Certified Shorthand

5     Reporter and Deposition Officer of the State

6     of California, there personally appeared:

7                     CHARLES CARUSO,

8     called as a witness by the Plaintiff, who having been

9     duly sworn by me, to tell the truth, the whole truth and

10    nothing but the truth, testified as hereinafter set

11    forth:

12

13                     --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

5

1      REMOTE DEPOSITION OF CHARLES CARUSO

2          Monday, November 30, 2020

3

4              CHARLES CARUSO,

5  having been first duly sworn remotely (due to the

6  Government's order for social distancing), testified as

7  follows:

8

9                  EXAMINATION

10  BY MR. POINTER:

11     Q.   Good afternoon, Officer.  My name is Adante

12  Pointer, I'm an attorney.  I represent the plaintiff in

13  this matter.

14        Would you please state and spell your full name

15  for the record.

16     A.   Charles Caruso, C-h-a-r-l-e-s, C-a-r-u-s-o.

17     Q.   Great, Officer.  Today I'm here to take your

18  deposition in the matter of the shooting death of Laudemer

19  Arboleda.

20        Have you ever had your deposition taken before?

21     A.   I have not.

22     Q.   Okay.  I am going to go over some basic ground

23  rules that will hopefully make today go a little bit

24  smoother, and make sure that we're all on the same page;

25  okay?

6

1     A.    All right.

2     Q.    One of the things which we're doing pretty well

3 now, although in the midst of a deposition it can change a

4 little bit or become more difficult, is that we each have

5 to allow us to speak one at time.  So I will ask you a

6 number of questions today.  I just ask that you give me

7 the courtesy of completing my questions, and I'll give you

8 the same courtesy of allowing you to complete your

9 response; understood?

10     A.    Understood.

11     Q.    Okay.  There's a court reporter who is making a

12 written -- typewritten transcript of everything that's

13 being said here today.  It's important that that

14 transcript be as accurate as possible.  And once again, I

15 just want to make sure that we both allow each other to

16 complete our statements and try not to overtalk one

17 another, although that does happen.  Do you understand?

18     A.    I understand.

19     Q.    You took an oath at the start of your deposition.

20 It has the same force and effect as if we're in a court of

21 law.  Do you understand that?

22     A.    Can you say that one more time?

23     Q.    Sure.  You just took a -- you just took an oath at

24 the beginning of your deposition where you raised your

25 hand and swore to tell the truth.  It has the same force

7

1  and effect as if we were in front of a judge in a court of

2  law.  Do you understand that?

3      A.    Yes, I do.

4      Q.    And what you just did right there was perfect.  If

5  there's ever a time during the course of the deposition

6  where you either don't hear me or you don't understand a

7  question that I pose to you, please let me know, and I

8  will either restate the question -- I may, you know,

9  change it to try to clarify, or I may simply move on;

10 okay?

11     A.    Okay.

12     Q.    And that's important because when you provide a

13 response to any of my questions, we will presume that you

14 understood the question and were answering the question

15 that I had posed to you.  Do you understand that?

16     A.    I understand.

17         THE REPORTER:  Mr. Pointer, off one second.

18         (Discussion off the record.)

19 BY MR. POINTER:

20     Q.    So, Officer, you're here to give your deposition

21 today in this case.  I'm entitled to a response to all of

22 my questions.

23         It's still a lot of feedback now?

24         THE REPORTER:  Echo.  It's okay, I can hear you.

25 BY MR. POINTER:

8

1    Q.   So as I was saying, Officer, you're here to give

2  your deposition here today.  I'm entitled to a response to

3  all of my questions unless you're specifically told by

4  your counsel not to answer the questions.  Do you

5  understand that?

6    A.   I understand that.

7    Q.   Now, I see that you're in your uniform today.  Did

8  you -- are you fresh off of a shift or duty?

9    A.   Technically I'm still on duty.

10    Q.   Okay.  All right.  Is there any reason that you

11  wouldn't be able to give your best testimony here today,

12  for example, you're tired or distracted because you're on

13  duty?

14    A.   No.

15    Q.   No type of medications that would affect your

16  memory or anything like that?

17    A.   No.

18    Q.   Okay, great.  If you need to take a break for any

19  reason, just let us know, and we'll take a break.  Do you

20  understand that?

21    A.   I understand.

22    Q.   Okay.  Great.

23         So my understanding is that you are currently

24  employed by the Contra Costa County Sheriff's Department?

25    A.   Correct.

9

1    Q.   And prior to becoming employed with the Sheriff's

2    Department, did you attend a police academy?

3    A.   Yes, I did.

4    Q.   What year did you graduate from the police

5    academy?

6    A.   I graduated in 2016.

7    Q.   And while you were in the police academy, you

8    studied POST; correct?

9    A.   Correct.

10   Q.   And POST stands for Police Officers Standards and

11   Training?

12   A.   Peace Officers Standards and Training, yes, sir.

13   Q.   Okay.  And in the course of learning about POST,

14   you were taught using learning domains; correct?

15   A.   Correct.

16   Q.   And each one of those domains covered a different

17   aspect of police and law enforcement; correct?

18   A.   Correct.

19   Q.   Since graduating from the academy, you go through

20   annual updates that will keep you up to date on POST

21   training; correct?

22   A.   That is correct.

23   Q.   Now, my understanding is when you were first

24   employed by the Sheriff's Department, you spent some time

25   working in the correctional facilities; is that right?

                                                      10

1      A.    I did, yes.

2      Q.    Okay.  And I understand that you worked at the

3   Martinez facility for a period of time; is that right?

4      A.    That's correct.

5      Q.    And then in the West County Detention Facility as

6   well; correct?

7      A.    Correct.

8      Q.    And then after that, then were assigned to patrol?

9      A.    Yes.

10      Q.    And prior to you beginning your duties as a patrol

11   officer, did you go through a field training program?

12      A.    Yes, I did.

13      Q.    Who was your field training officer?

14      A.    There's multiple.  It's a phased program.

15      Q.    And how many field training officers did you have

16   there?

17          MR. BAKER:  Are you talking about this point in

18   time while he was in patrol?

19   BY MR. POINTER:

20      Q.    Yeah, prior to you -- strike that.

21          My understanding is you go through a field

22   training program prior to you being on patrol on your own.

23   And I'm asking, did you have any field training officers,

24   trainers at that point in time?

25      A.    I was a solo officer at that time.  I had

11

1    completed my FTO program.

2        Q.   Okay.  So when you were going through your FTO

3    program, who was your -- who was the person that trained

4    you?

5        MR. BAKER:  Sorry, Adante, I just want to clarify.

6    So I think he had field training even in the jail.  I

7    think you're asking about when he was getting into

8    patrol --

9        MR. POINTER:  Yes.

10       MR. BAKER:  -- and had field training associated

11   with his patrol duties; right?

12       MR. POINTER:  Yes, sir.

13       THE WITNESS:  Phase I was Deputy Neller, Phase II

14   was Deputy Mudd, Phase III was Officer Neabeack, and

15   what's called our shadow phase was Officer Muller.

16   BY MR. POINTER:

17       Q.   The shadow phase is prior to you actually being

18   able to patrol solo; correct?

19       A.   Correct.

20       Q.   Now, what, if any, documents did you review to

21   prepare for your deposition?

22       A.   I reviewed the transcript of the coroner's

23   inquest, and the transcript of my initial interview the

24   day of the incident.  I believe that's referred to as the

25   LEIFI.

                                                          12

1    Q.   The initial interview, that was taken by deputies,

2  if you will, from your department, homicide?

3    A.   I could read you the names that were there.  So

4  Detective Morris is a deputy, I believe it is Inspector

5  Solzman (phonetic) is with the DA's office.  I'm not

6  certain of that.

7    Q.   Okay.  So you were interviewed by -- strike that.

8         You were interviewed and there were people present

9  from a number of different agencies; correct?

10   A.   I'm not sure, because I'm not sure who Solzman is

11  with.

12        MR. BAKER:  He's with the DA's office?

13        THE WITNESS:  Yeah.

14        MR. BAKER:  Then, yes, that would be correct.

15  BY MR. POINTER:

16   Q.   I'm not quite sure -- Inspector Solzman, is that

17  from the Contra Costa Sheriff's Department or a different

18  agency, your department?

19   A.   He's with the DA's office.  So it's Contra Costa

20  County, but -- so it's not the sheriff's office.  It's the

21  district attorney's office.

22   Q.   Do you recall if you were questioned by anybody

23  from your own department, Sheriff's Department?

24   A.   Detective Morris is in investigations with the

25  Contra Costa County Office of the Sheriff.

13

1    Q.   Is that going to happen every time we say his

2  name?  Is that a little perq that he has?

3    A.   The train whistle?

4    Q.   Yes.  Anyway.

5         Okay.  Did you have legal counsel present with you

6  while you gave your interview?

7    A.   Yes, I did.

8    Q.   And other than the two transcripts of the inquest

9  as well as the interview you gave on the day of the

10  incident, did you review any other documents?

11    A.   No, I did not.

12         MR. BAKER:  Adante, are you asking about written

13  documents or electronic documents, things like that, or

14  just -- I mean, are you -- is that what you're thinking,

15  written things or -- because technically, like an audio

16  recording is a document, electronic -- any kind of

17  electronic recording is also considered a document.

18         MR. POINTER:  We'll just allow the officer to tell

19  us.

20    Q.   What documents other than the two transcripts --

21  what materials other than the two transcripts did you

22  review to prepare for your deposition today?

23    A.   I reviewed body cam footage.

24    Q.   And when you say "body cam footage," was it your

25  own or other officers'?

                                                          14

1    A.    Both.

2    Q.    So what body cam footage did you review?

3    A.    I think over the course since the incident, I've

4  reviewed --

5         MR. BAKER:  He's just asking for this deposition.

6         THE WITNESS:  Oh, for this deposition?  I reviewed

7  my body cam, and I was shown the clip from -- I was shown

8  a different clip of body cam footage.

9  BY MR. POINTER:

10   Q.    Okay.  And I don't --

11        THE REPORTER:  I didn't hear.

12 BY MR. POINTER:

13   Q.    I'm sorry, I cut you off.  If I heard you

14 correctly, you were shown a clip of body cam footage but

15 you didn't -- you're not sure as to whose body cam it is;

16 is that correct?

17   A.    Yes.

18   Q.    And the clip that you reviewed, that was from a

19 body cam other than your own, what portion of the incident

20 did it capture?

21   A.    It shows where the suspect was driving at Officer

22 Hall, and it showed an angle to the side of Sergeant

23 Martin's vehicle.  To the passenger side, I'm sorry, of

24 the Martin vehicle.

25   Q.    So the clip that you were shown actually contained

                                                          15

1    the shooting?

2        A.    I don't recall if it did, because I was focused on

3    a different portion of the video.

4        Q.    What portion of the video were you focused on?

5        A.    The space on the passenger side of Sergeant

6    Martin's vehicle, between that and the sidewalk.

7            MR. BAKER:    I think that was actually a dash cam

8    video, video cam.

9            THE WITNESS:    It might have been a dash cam video.

10   BY MR. POINTER:

11       Q.    So you're unsure whether or not the clip you were

12   shown was dash cam or body cam; is that correct?

13       A.    Correct.

14       Q.    And this clip that you were shown, you were

15   focused on looking at, if I heard you correctly, the left

16   side of Sergeant Martin's vehicle, which was a portion of

17   his vehicle toward the curb?

18       A.    It would be more appropriate to say the passenger

19   side of Sergeant Martin's vehicle, not the left side,

20   because that depends on which way you're looking at it.

21       Q.    Okay.  And after reviewing this portion of body

22   cam or vehicle cam, what opinions, if any, did you arrive

23   at?

24       A.    That there's multiple avenues where the suspect

25   could have driven.

16

1    Q.   In arriving at the conclusion that there were

2  multiple avenues, what were the multiple avenues that you

3  determined that the suspect could have driven?

4    A.   Based on my viewing of it, so in my opinion, he

5  could have driven to the passenger's side of Sergeant

6  Martin's vehicle, or, as he chose to, he drove at Officer

7  Hall.

8    Q.   When you say it's the passenger's side of Sergeant

9  Martin's vehicle, I take it what you're meaning -- you can

10 correct me if I'm wrong -- that based on your opinion,

11 there was space for his car to travel on the street

12 between Sergeant Martin's -- passenger side of Sergeant

13 Martin's vehicle and the curb?

14   A.   Yes, based on my opinion.

15   Q.   And you formed that opinion after seeing this

16 video; correct?

17   A.   Correct.

18   Q.   When did you see that video?

19   A.   Last week.

20   Q.   So prior to last week, you didn't have this

21 opinion --

22        THE REPORTER:  No, I didn't get it.  The sound is

23 just horrible.  I didn't get it.

24        MR. POINTER:  Sure, no problem.

25   Q.   Prior to last week, you did not have this opinion

                                                          17

 1   that you just expressed; correct?

 2       A.   Correct.

 3           MR. POINTER:  I think I have some juice on my

 4   computer.  Let's go off record real quick, and see if I

 5   can help us here.

 6           (Interruption in the proceedings.)

 7   BY MR. POINTER:

 8       Q.   So, Officer, before we took a break to try to get

 9   our stuff technically together, we were going over the

10   materials you reviewed in preparation for your deposition.

11   You mentioned that you looked at your interview

12   transcripts, whether that was from the inquest or on the

13   day of the incident when you were interviewed by

14   investigators.  You also mentioned that you looked at

15   body-worn camera or dash camera either from yourself

16   and/or from another officer; is that correct?

17       A.   That is correct.

18       Q.   All right.  And you mentioned that about a week

19   ago, you looked at some video footage, whether it was from

20   a body-worn camera or from a patrol car, and you were

21   looking at space, essentially, between the passenger side

22   of Sergeant Martin's patrol SUV and the curb; correct?

23       A.   Correct.

24       Q.   And you determined, based upon looking at that

25   footage, that Mr. Arboleda had enough space to where he

                                                            18

1    could have driven on the passenger side of Sergeant

2    Martin's vehicle as opposed to driving down the space

3    between the driver's side of Sergeant Martin's vehicle and

4    the passenger side of Officer Hall's vehicle; is that

5    right?

6        A.   Based on my opinion, yes, it looked like he could

7    have gone down that.

8        Q.   Have you reviewed anything else?

9        A.   No.

10       Q.   Did you review any policies or anything of the

11   Sheriff's Department?

12       A.   Not in particular preparation for this, no.

13       Q.   Did you review anyone else's transcript in

14   preparation for your deposition here today?

15       A.   No, I did not.

16       Q.   Have you talked to any other of your fellow

17   deputies about your deposition here today?

18       MR. BAKER:  Outside of the presence of counsel; is

19   that right?

20       MR. POINTER:  Yes.

21       THE WITNESS:  I've told fellow deputies that I

22   have a deposition, just so they know where I'm going, but

23   I have not talked to them about any of the specifics of

24   the deposition.

25   BY MR. POINTER:

19

1    Q.    Okay.  Understood.

2          I take it you knew Defendant Hall would be present

3    at your deposition today, though; correct?

4    A.    Correct.

5    Q.    Now, you talked earlier about your time in the

6    academy and learning about the POST learning domains; you

7    remember that?

8    A.    I do.

9    Q.    Okay.  And one of the learning domains that you

10   were tasked with familiarizing yourself and understanding

11   was about leadership, professionalism, and ethics;

12   correct?

13   A.    Correct.

14   Q.    And you would agree that's the foundation of law

15   enforcement; right?

16         MR. BAKER:  Objection.  Vague.

17   BY MR. POINTER:

18   Q.    From time to time today, there may be objections

19   posed by your counsel.  You're still to answer the

20   questions unless he specifically directs you not to answer

21   the question.

22   A.    Okay.  Would you mind repeating the last question?

23   Q.    Sure.  First you had agreed that you remembered

24   that one of the learning domains that you were tasked with

25   familiarizing yourself in understanding was the learning

                                                        20

1    domain that dealt with leadership, professionalism, and

2    ethics; you remember that?

3         A.   I recall those topics.

4         Q.   Do you recall being trained that those are -- that

5    is the foundation of law enforcement?

6              MR. BAKER:  Objection.  Vague.

7              THE WITNESS:  I don't specifically remember that

8    learning domain saying that statement, but I would agree

9    that my opinion is that those are some of the fundamentals

10   of law enforcement.

11   BY MR. POINTER:

12        Q.   Sure.  You also were trained on the learning

13   domain pertaining with use of force; correct?

14        A.   Correct.

15        Q.   And you were trained that effective communication

16   is a basic element of the use of force; correct?

17        A.   Correct.

18        Q.   You're also trained that one of the goals of law

19   enforcement is voluntary compliance without having to

20   resort to the use of force; correct?

21        A.   Correct.

22        Q.   You're also trained on how to give accurate

23   statements; correct?

24        A.   Correct.

25        Q.   Now I'm going to direct your attention to the date

                                                        21

1   of this incident.  Do you recall what day of the week it

2   was that you made contact with Mr. Arboleda?

3       A.   Saturday.

4       Q.   All right.  And my understanding is you were

5   working the day shift on that day; is that correct?

6       A.   Correct.

7       Q.   And that started at about 6:00 a.m. and went to

8   6:40 p.m.; is that correct?

9       A.   That's correct.

10      Q.   And on this particular day, my understanding is it

11  started off, your shift, at the Danville Police

12  Department; is that right?

13      A.   That's correct.

14      Q.   And prior to actually going on patrol, you had

15  a -- use my term -- a meeting prior to actually going out

16  on patrol; correct?

17      A.   Are you referring to our briefing?

18      Q.   It's called different things at different places.

19  Briefing, lineup, I'm not sure.  But a briefing is the

20  term that you use?

21      A.   Yes, yes.  So the officers that were on duty that

22  day met together in the briefing room, yes.

23      Q.   What topics, if any, were discussed during the

24  briefing?

25      A.   I don't recall.

                                                         22

1      Q.    And what was your assignment on that day?

2      A.    Basic patrol, take the calls for service that came

3  out on my beat and drive around.

4      Q.    Okay.  And so my understanding is you actually did

5  those functions, you drove around and made a couple of

6  traffic enforcement stops; is that correct?

7      A.    That sounds correct.  I know I made at least one

8  traffic enforcement stop.

9      Q.    Okay.  And I understand you also covered an

10 officer on a traffic enforcement stop; is that correct?

11     A.    Correct.

12     Q.    And that was for, I believe, somebody who had

13 expired registration tags on their car?

14     A.    I don't recall.

15     Q.    Do you recall there was a vehicle search made of

16 that car?

17     A.    I don't recall.

18     Q.    Do you recall what officer you were providing body

19 cover for during the car stop?

20     A.    Maka and Muller.

21     Q.    And Officer Muller, was that considered your

22 partner on this day?

23     A.    Yes, one of my partners.

24     Q.    And my understanding is that Officer Muller was,

25 on this day, in the process of being the field training

                                                        23

1    officer for Deputy or Officer Maka; is that correct?

2        A.   That's correct.

3        Q.   And so I take you to the point when you first

4    became aware of a call that brought you into contact with

5    Mr. Arboleda; okay?

6        A.   Okay.

7        Q.   So what information did you receive?

8        A.   We were dispatched to a suspicious person call, at

9    a group of townhouses or apartments.

10       Q.   And you received that information by way of

11   dispatch; right?

12       A.   Correct.

13       Q.   And so that's essentially police radio and an

14   operator gave -- provided information about the suspicious

15   person; is that right?

16       A.   That is correct.

17       Q.   And when you received this call about a suspicious

18   person, was any information provided that they had in

19   fact --

20       A.   You cut out on the last part.  Can you repeat

21   that?

22       Q.   Sure.  No problem.

23            When you received the call from dispatch about a

24   suspicious person, was there any information communicated

25   that this suspicious person had, in fact, committed a

                                                            24

1  crime?

2      A.   Not at that point, no.

3      Q.   And my understanding is you assigned yourself to

4  the call and went to the location where the suspicious

5  person had been identified as being; is that correct?

6      A.   Correct.

7      Q.   And where did you go to?

8      A.   What was the address?

9      Q.   Yes.

10     A.   I don't recall the specific address.

11     Q.   Okay.

12     A.   I'd have to look through --

13     Q.   Just as a point of clarification for us, trying to

14  make this a little bit smoother, if you need to refer to a

15  document, whatever it may be, a picture, a report, a

16  video, just let us know what you're referring to.

17     A.   Okay.

18     Q.   Thank you.

19     A.   Should we take a minute to find the address?

20     Q.   You can even give me the street or the general

21  location based upon your understanding.

22     A.   As I recall, it was on Laurel Avenue.

23     Q.   So you got the call about a suspicious person.

24  You then drove to Laurel in order to check out this call

25  for service; is that right?

25

1     A.    That's correct.

2     Q.    And so you drove to Laurel, you get there.  What

3 happens next?

4     A.    I got out of my vehicle, and I heard Maka and

5 Muller trying to talk to somebody, and I realized that

6 there was a person that matched the description and

7 vehicle.

8     Q.    And when you say "a person matched the

9 description," you mean the description that had been put

10 out by dispatch of this suspicious person?

11     A.    Correct.

12     Q.    And when you arrived on the scene and saw Muller

13 and Maka out of their vehicle, where was the person that

14 you identified as being the suspicious person?

15     A.    We pulled up, we would have been northbound on

16 Laurel, and Arboleda was in his vehicle facing southbound.

17     Q.    So when you arrived on the scene, did you ever see

18 Arboleda out of his vehicle?

19     A.    No, I did not.

20     Q.    And when you arrived on the scene, and you saw

21 Officer Maka and Muller out of their vehicle, did they

22 have their guns drawn?

23     A.    No.

24     Q.    Did they have their lights and sirens on?

25     A.    No.

26

1    Q.   And I believe you said you saw Mr. Arboleda in his

2    Honda and he was driving away; is that correct?

3    A.   When I saw him, he was not driving yet.

4    Q.   So the car was still -- strike that.

5         So if I understand you correctly, Mr. Arboleda was

6    in the Honda but the Honda was not moving; is that right?

7    A.   That's correct.

8    Q.   Okay.  And at some point in time, did you actually

9    get out of your car?

10   A.   Yes.

11   Q.   And when you got out of the car, what did you do?

12   A.   I started walking up the street.

13   Q.   And were you doing anything, making any gestures

14   as you were walking?

15   A.   When I started walking, no.  I was just walking up

16   to join Maka and Muller.

17   Q.   And at the time when you were walking up to join

18   Maka and Muller, had you turned on your lights and sirens

19   yet?

20   A.   No.

21   Q.   Now, my understanding is at this point in time

22   when you went to Laurel to investigate the report of a

23   suspicious person, you yourself actually had someone in

24   your patrol car with you as well; correct?

25   A.   Yes, that's correct.

27

1    Q.    You had a ride-along; right?

2    A.    Yes.

3    Q.    Someone who was also looking to apply to become

4    employed as a deputy with the Contra Costa Sheriff's

5    Department; correct?

6    A.    Correct.

7    Q.    And had you given her any instructions prior to

8    you giving out the call as to what you expected her to do

9    while you went and investigated this call about a

10   suspicious person?

11   A.    Yes, I told her on any call that we went to, to

12   stay in the vehicle until I told her it was okay to get

13   out.

14   Q.    Okay.  Understood.

15         At some point in time, did you see the Honda

16   moving when you were there on Laurel?

17   A.    Yes.

18   Q.    Can you describe that?

19   A.    Yeah.  Maka and Muller had approached the vehicle.

20   I don't recall exactly how close they were to it, and the

21   vehicle drove off.  I waved at it to try to get him to

22   stop so we could talk to him, and he drove past me.

23   Q.    And when Maka and Muller were talking to the

24   vehicle, were they yelling, using elevated voices?  Can

25   you describe?

28

1    A.   Definitely elevated voices.  I'm going to estimate

2  I was somewhere between maybe 30 yards away, but I could

3  hear what they were saying.

4    Q.   Okay.  And so from 30 yards away, you could hear

5  what they were saying.  Could you -- did you hear Arboleda

6  make any sounds or speaking?

7    A.   I did not hear anything from him, no.  He was

8  inside the vehicle.

9    Q.   Okay.  Did you hear any music coming from the

10 vehicle?

11   A.   Not that I recall, no.

12   Q.   Any noise coming from Mr. Arboleda's vehicle at

13 that point in time?

14   A.   Other than the engine itself, no.

15   Q.   Now, my understanding is that Mr. Arboleda's

16 vehicle, he was in a gray Honda, actually passed you

17 driving down Laurel; is that right?

18   A.   Correct.

19   Q.   And at that point in time, did you actually see

20 Mr. Arboleda's face, make it out?

21   A.   Yes.

22   Q.   And you saw that he was an Asian man; is that

23 right?

24   A.   That's correct.

25   Q.   Did he make any type of facial expressions which

                                                    29

1    you interpreted as being directed at you?

2        A.   Not that I recall, no.

3        Q.   How would you describe the expression on his face,

4    if any?

5        A.   Would you mind clarifying?  Maybe I can clarify.

6    He didn't -- I didn't make eye contact with him, there

7    were no faces that we made towards each other.  Does that

8    answer?

9        Q.   Sure.  So it doesn't appear -- like you said, you

10   guys didn't make eye contact.  When you saw him drive past

11   you, I'm just asking you to describe the way in which his

12   face was looking, to you, in your opinion.  Did he look

13   angry?  Did he look spaced out?  Did he look, you know,

14   like intent on going somewhere?

15       A.   In my opinion, he just looked focused on --

16   focused on driving.

17       Q.   Okay.

18       A.   His head was just straight ahead down the road.

19       Q.   Sure.  Now, just taking the point in time from

20   when you first heard the dispatch about the call of this

21   suspicious person until the point in time Mr. Arboleda

22   started driving away in his Honda, did you -- was it your

23   intent to detain him?

24            MR. BAKER:  Objection.  Vague.

25            THE WITNESS:  Well, I didn't have an intent, I

30

1    guess, because I wasn't the primary officer, and I wasn't

2    first on scene.  My intent is to just be there as safety.

3    BY MR. POINTER:

4        Q.   Did you say to be there for safety?

5        A.   (No audible response.)

6        Q.   Is that a yes?

7        A.   I'm sorry, yes.

8        Q.   No problem.  It happens to everybody during a

9    deposition.

10           MR. BAKER:  So one of the admonitions is you need

11   to answer in words, not sounds, not gestures.

12           THE WITNESS:  I understand.

13           MR. POINTER:  Sure.

14           THE WITNESS:  I might need a reminder on that as

15   we go along.

16   BY MR. POINTER:

17       Q.   No problem.

18       A.   It won't be intentional.

19       Q.   I won't take it personally.  It happens to

20   everybody.  And if I remind you, please don't take it

21   personally either.  Trying to make sure the court reporter

22   doesn't get mad at either one of us.

23           So you didn't have the intent, if I understand

24   what you're saying, to make a detention at that point in

25   time; correct?

                                                      31

1      A.    Correct.

2      Q.    And I take it neither Officer Muller or Maka

3  communicated with you that they intended to detain

4  Mr. Arboleda at that point in time either; correct?

5      A.    We didn't discuss beforehand.

6      Q.    So there was no plan communicated between yourself

7  or Officer Maka or Muller to detain Mr. Arboleda at that

8  point in time on Laurel Street; correct?

9      A.    Correct.

10     Q.    Just investigating; right?

11     A.    Correct.

12     Q.    Now, as Mr. Arboleda was driving away, and I

13 believe you said you had made gestures or words to try to

14 stop him, did he have a duty to stop at that point in

15 time?

16          MR. BAKER:  Objection.  Vague.

17          THE WITNESS:  No, he did not.

18 BY MR. POINTER:

19     Q.    So in your opinion, it was a consensual stop at

20 that point; correct?

21     A.    Yes, I would agree with that.

22     Q.    And so Mr. Arboleda drove away, down Laurel, past

23 you.  And at that point in time, what decisions did you

24 make, if any?

25     A.    I got back in my vehicle, and I followed Maka and

                                                          32

1    Muller.  They made a U-turn to follow Mr. Arboleda, and I

2    followed them.

3        Q.   Okay.  Did you have any communication with Officer

4    Muller or Maka to continue following Mr. Arboleda before

5    you got into the patrol car?

6        A.   No.

7        Q.   Now, after you got back into your patrol car and

8    decided to follow Officers Maka and Muller in pursuit of

9    Mr. Arboleda, was there any communication between yourself

10   and the other two officers as it relates to what the plan

11   was going to be as it relates to making contact with

12   Mr. Arboleda?

13            MR. BAKER:  Objection.  Vague.

14            THE WITNESS:  Two things.  One, we weren't in

15   pursuit.  It may be a difference between meeting and

16   briefing, which is fine, but we weren't technically in

17   pursuit.  We didn't turn our lights or sirens on or

18   anything.  But as far as communication, Officer Muller

19   said over the radio, directed me to check the first street

20   that we came across, which I believe was Willow, to see if

21   Arboleda had turned down that street.

22   BY MR. POINTER:

23       Q.   Okay.  And when you said you weren't in pursuit,

24   that's fine, what would you call what you were doing at

25   that point in time?

                                                              33

1    A.    I'm sorry, can you say that one more time?

2    Q.    Yeah, sure.  If you weren't in pursuit, what would

3   you consider or what would you call what you were doing at

4   that point in time?

5    A.    Following him.

6    Q.    Okay.  Okay.  So as you were following

7   Mr. Arboleda, it sounds like Officer Muller told you to

8   check down a particular street; correct?

9    A.    Correct.

10    Q.    And you did that; right?

11    A.    Yes.

12    Q.    And you drove down the street, you didn't see

13   Mr. Arboleda; correct?

14    A.    Correct.

15    Q.    You saw some people who were standing out in front

16   of some homes, and you asked them if they had seen

17   Mr. Arboleda; correct?

18    A.    Correct.

19    Q.    They told you that they hadn't; right?

20    A.    Correct.

21    Q.    And you continued to look for Mr. Arboleda;

22   correct?

23    A.    Correct.

24    Q.    And tell me what happened next after you continued

25   looking for Mr. Arboleda.

34

1      A.   There was some radio traffic from Maka and

2 Muller's vehicle, they saw him on another street, and then

3 they initiated a traffic stop, and I caught up with them,

4 or found them as they were making the traffic stop.

5      Q.   Prior to making the traffic stop, Mr. Arboleda's

6 plates had been run; correct?

7      A.   I believe so, but I'm not certain.

8      Q.   As you sit here today, you don't recall hearing

9 the transmission come over dispatch that Mr. Arboleda's

10 car was registered to him as well as Mrs. Atienza out of

11 Newark?

12      A.   As you say that back to me, that sounds familiar.

13 I believe it did come back in that time frame.

14      Q.   You didn't receive -- you didn't receive any

15 information that the car was -- like a be-on-the-lookout,

16 a BOLO, for that car; correct?

17      A.   I don't recall that type of designation, no.

18      Q.   You don't recall receiving any designation that

19 the car or the two people that it was registered to had

20 any wants or warrants out for them; correct?

21      A.   Not that I recall, no.

22      Q.   And the car itself, the gray Honda, wasn't

23 associated with any type of outstanding crime that you

24 were aware of at that point in time; correct?

25      A.   Not that I was aware of, no.

1    Q.   So the car was properly registered; correct?

2    A.   As I recall, yes, it was.

3    Q.   Now, I believe you said you heard, by way of

4    dispatch, that the Honda or Mr. Arboleda had been located

5    for a second time; correct?

6    A.   Via Maka and Muller on the radio.

7    Q.   So Maka and Muller put out over the radio that

8    they had located Mr. Arboleda for the second time;

9    correct?

10   A.   Yes.

11   Q.   And they essentially advised where the location

12   that they saw Mr. Arboleda was at; correct?

13   A.   That's correct, but I just don't recall where they

14   said prior to making their traffic stop.

15   Q.   Okay.  Now, at some point in time, you came upon

16   the scene where Officers Muller and Maka were trying to

17   make contact with Mr. Arboleda; correct?

18   A.   That's correct.

19   Q.   This would be the second time that you yourself

20   had been physically present while Mr. Arboleda had been

21   attempted to be contacted; correct?

22   A.   Correct.

23   Q.   And during the second contact, did you see

24   Officers Muller and Maka out of their car?

25   A.   Yes.

36

1    Q.   Did you get out of your car?

2    A.   No, I did not.

3    Q.   And why did you not get out of your car?

4    A.   Arboleda fled from the traffic stop prior to me

5    getting out.

6    Q.   And when you said Mr. Arboleda fled from the

7    traffic stop, it was your understanding that Officers Maka

8    and Muller at that point in time had tried to make an

9    enforcement stop?

10    A.   Yes, so over the radio, they said that they were

11    making a traffic stop of the vehicle, and when I came upon

12    them, they had their lights on, and the vehicle had

13    stopped.  Then, as I drove up and they were approaching

14    the vehicle, as I drove up, Arboleda fled, so it was my

15    understanding they had stopped the vehicle, they had their

16    lights on, it didn't appear that they had made any contact

17    yet.  And so, instead of getting out of my vehicle, I

18    proceeded to follow Mr. Arboleda.

19    Q.   At that point in time --

20         THE REPORTER:  No, didn't get any of it.

21         (Discussion off the record.)

22 BY MR. POINTER:

23    Q.   At the time you arrived on the scene and you saw

24 Officers Muller and Maka, you said they had their lights

25 on, and essentially, from your position or from your

37

1    perception, pulled over, and the officers were trying to

2    do a traffic enforcement stop, had you been provided any

3    information as to what the basis was for the traffic

4    enforcement stop?

5        A.   I don't recall if that was put out over the radio.

6        Q.   Okay.  By the way, did you listen to any of the

7    radio dispatch transmissions in preparation for your

8    deposition here today?

9        A.   No, not the specific radio transmissions.  In

10   reviewing the body cam, some of the radio transmissions

11   are heard.

12       Q.   What about -- I'm sorry.

13       A.   So I didn't specifically review any transcript of

14   dispatch or listen to an audio recording of the dispatch.

15       Q.   But as you mentioned, listening and watching the

16   body camera, you can hear the dispatch transmissions;

17   correct?

18       A.   Correct.

19       Q.   And so what was your call signal that day, by the

20   way?

21       A.   If I remember correctly, I would have been 21X3.

22       Q.   Now, I'm going to ask you some questions about

23   codes; okay?

24       A.   Okay.

25       Q.   What does the word "tones" mean?

                                                            38

1          MR. BAKER:  I'm sorry, Adante, you're kind of

2     fading in and out.

3          MR. POINTER:  Sure.

4     Q.   What does the word or the code, I'm not sure what

5     to call it, or the phrase, "tones," t-o-n-e-s -- the

6     dispatch said you want tones.  What does that mean?

7     A.   Tones refers to Code 33, which basically means

8     radio silence other than who is on the incident that asked

9     for the tones.

10    Q.   Okay.

11         THE REPORTER:  No.  We have to do something.  It's

12    actually getting worse.  You want to go off for a sec?

13         MR. POINTER:  Sure.  Let's see if we can figure it

14    out.  Off the record.

15         (Discussion off the record.)

16    BY MR. POINTER:

17    Q.   So prior to taking a break here to get our tech

18    together, we were in the part of the incident where I was

19    essentially asking you, during the second contact, if you

20    will, with Mr. Arboleda, what, if any, information did you

21    have as it relates to what violations or crimes he had

22    committed up until that point.

23         MR. BAKER:  You had asked about the traffic stop,

24    what was the purpose of the traffic stop, I think that was

25    your question.

                                                            39

1    MR. POINTER:  I'd like the question, if I can get

2  it, but yeah.

3    Q.   Do you have my question in mind, Officer?  Or I

4  can restate it, not a problem.

5    A.   The last question was about tones.  That was my

6  recollection.  So --

7    Q.   Going back -- sure, let's just start over.

8    You had explained to me what tones meant, and then

9  I was asking you a question now, as it relates to -- what

10  information did you have as it relates to any Vehicle Code

11  violations or crimes that Mr. Arboleda had committed as

12  you were pulling up to the scene of the second contact?

13    A.   Okay.  I don't recall what information came out

14  over the radio about the traffic stop, if Muller had said

15  anything -- Muller, Maka had said anything about it.  It

16  wouldn't be typical to include your reason for a traffic

17  stop as part of our standard radio traffic.

18    Q.   I understand.  So it sounds like, if I hear you

19  correctly, as you sit here today, you don't have any basis

20  or any information in your mind as it relates to why they

21  conducted the traffic stop; is that correct?

22    A.   In my mind, correct.

23    Q.   And none of the documents that you prepared (sic)

24  in preparation for your deposition here today informed you

25  as to the basis upon which -- why they made the traffic

1    stop, the traffic enforcement stop, during that second

2    contact; correct?

3        A.    Not that I recall there being in there, no.

4        Q.    So you mentioned Mr. Arboleda drove away; correct?

5        A.    Yeah, he fled the traffic stop.

6        Q.    And when he fled the traffic stop, were Officers

7    Maka and Muller out of their car?

8        A.    Yes.

9        Q.    Did they have their guns drawn?

10       A.    No.

11       Q.    When you came to the scene of the second contact,

12   did you have your lights and sirens on?

13       A.    As I approached initially --

14       Q.    Yes.

15       A.    -- is that the time frame we're referring to?

16       Q.    Yes.

17       A.    I did not have my sirens on.  I most -- I'm not

18   certain, but I most likely would have at least activated

19   my rear lights as a safety measure.

20       Q.    Do you have a memory of doing it?

21       A.    I do not.

22       Q.    Now, as you said, Mr. Arboleda fled the second

23   contact, and he's driving away.  You mentioned that you

24   then followed behind Mr. Arboleda; correct?

25       A.    Correct.

41

1    Q.   So that put you in -- as it relates to the

2    proximity, that puts you as the car directly behind

3    Mr. Arboleda at this point; correct?

4    A.   Correct.

5    Q.   And you considered -- you continued to pursue

6    Mr. Arboleda; right?

7    A.   Yes, so as he left the traffic stop, he ran a stop

8    sign to turn -- I don't remember what street we were on, I

9    believe it was Glen Arms, and he turned -- he ran a stop

10   sign and turned back onto Laurel.  I activated my lights

11   and sirens and pursued him.

12   Q.   When you say he ran the stop sign, he just -- he

13   didn't decrease his speed; he just ran -- he just drove

14   straight through the stop sign?

15   A.   Correct.

16   Q.   He didn't make a --

17   A.   You cut out there.

18   Q.   He didn't -- let me just go back.

19        It's your testimony that he drove straight through

20   the stop sign; correct?

21   A.   Yes, and he made a right-hand turn.

22   Q.   And he made this right-hand turn onto, I think you

23   said, Glen Arms?

24   A.   No, I believe we were on Glen Arms, and he was

25   turning onto Laurel.

42

1    Q.   Okay.  And you continued to follow him; correct?

2    A.   Correct.

3    Q.   And that was the first traffic violation or crime

4 that you yourself personally saw him commit; correct?

5    A.   That was the first traffic violation that I

6 witnessed, yes.

7    Q.   Okay.  And at that point in time, did you have

8 your lights and sirens already on?

9    A.   Yes.

10    Q.   And at that time, you continued to follow the

11 Honda; right?

12    A.   Correct.

13    Q.   And you were putting out updates over dispatch;

14 correct -- I mean, over your radio; right?

15    A.   Correct.

16    Q.   Which is communicated by way of dispatch to the

17 rest of the officers on that channel; right?

18    A.   Correct.

19    Q.   What is the code that an officer puts out if they

20 want to let dispatch and their fellow officers know that

21 they're making a traffic enforcement stop?

22    A.   1195.

23    Q.   Is there a different code for making a high-risk

24 stop?

25    A.   No, not that I'm I aware of.  Something like that,

43

1    we would typically just use plain speak, saying that we

2    were on a high-risk stop.

3        Q.   Okay.  I mean, I take it you've made high-risk

4    stops in your career; correct?

5        A.   Correct.

6        Q.   Prior to this incident with Mr. Arboleda; right?

7        A.   Prior to the incident with Mr. Arboleda?

8        Q.   Yes.

9        A.   Correct.

10       Q.   And what is your practice?  Would you say, "Hey,

11   I'm making a high-risk stop," or is there another term

12   that you would use?

13       A.   It's a little difficult to answer because every

14   situation is a little different.  Yeah, there's not like a

15   perfect protocol for it, even under perfect circumstances.

16       Q.   Sure.  Well, let me ask you this way.  How were

17   you trained in order to know that you were making a

18   high-risk stop?

19           MR. BAKER:  Objection.  Vague.

20           THE WITNESS:  Let me try to break it down.  Are

21   you referring to radio traffic or positioning or -- that's

22   kind of -- I'm just not sure what information you want

23   from me.

24   BY MR. POINTER:

25       Q.   Sure, no problem.  So I take it you're trained on

                                                              44

1  making stops; correct?

2      A.   Correct.

3      Q.   You're trained on making high-risk stops as well;

4  correct?

5      A.   Correct.

6      Q.   You're trained on the importance of communicating

7  what you're doing in the field to dispatch; correct?

8      A.   Correct.

9      Q.   You're trained on the importance of communicating

10 what you're doing in the field to other officers for

11 officer safety reasons too; correct?

12     A.   Correct.

13     Q.   So I'm trying to figure out, what is the training

14 that you received as it relates to communicating to

15 dispatch as well as your fellow officers when you're going

16 to make a high-risk stop?  Are there particular words you

17 say or certain things that you would -- phrases you would

18 use?  How were you trained?

19     A.   I would say that phrase, that you're on a

20 high-risk stop, or some people say felony stop in

21 progress.

22     Q.   Okay.  All right.  And how were you trained as it

23 relates to what is considered a high-risk stop?

24     A.   That just depends on the totality of the

25 circumstances.  There's some things that inherently would

                                                          45

1    be high risk stops, such as a stolen vehicle or a vehicle

2    involved in pretty much any felony, a kidnapping or a

3    weapons crime.

4        Q.   Okay.   Now, when Mr. Arboleda, to use your term,

5    fled the scene or fled from the second contact of the

6    enforcement stop, what direction was he heading?

7        A.   So initially he would have been on the street the

8    traffic stop occurred on.   He was facing west.   So he

9    drove west through the stop sign, and then turned north on

10   Laurel.

11       Q.   And as Mr. Arboleda was traveling down Laurel, was

12   there another attempt to contact him?

13       A.   Yes.   I don't recall where -- the numbers or block

14   of Laurel, but on Laurel, at one point, he started to slow

15   down, if I recall correctly, and I started to get out of

16   my vehicle and he took off again.

17       Q.   And if I understand you correctly, you weren't

18   completely out of your vehicle during this -- I'll call

19   this the third contact?

20       A.   Yes, that sounds correct.

21       Q.   And when you got out of your vehicle to make the

22   third contact, did you apprise dispatch that you were

23   going to contact Mr. Arboleda?

24       A.   I don't recall if I did.

25       Q.   You don't have a memory of doing that, as you sit

                                                          46

1  here today, do you?

2      A.   I do not have a memory of it as I sit here today,

3  no.

4      Q.   Now, after Mr. Arboleda drove off after the third

5  attempt at contact, did you continue to pursue him?

6      A.   Yes, I believe it was at that point that Maka and

7  Muller leapfrogged me again.  So I leapfrogged them the

8  first time, then they leapfrogged me, and they were behind

9  Arboleda, and I followed them.

10     Q.   Understood.  And at some point in time,

11  Mr. Arboleda drove under a freeway underpass; is that

12  right?

13     A.   Yes, that is correct.

14     Q.   Or I should say a freeway overpass.

15          Now, was that prior to or after the vehicle stop?

16     A.   It was after the first -- it was after the traffic

17  enforcement stop, which we're referring to as the second

18  contact.

19     Q.   Okay.  So if I understand it correctly, between

20  the second contact, which was the traffic enforcement

21  stop, and the third contact where you came up and were in

22  the lead, if you will, of the contact car, Mr. Arboleda

23  had driven underneath the freeway overpass; correct?

24     A.   Correct.

25     Q.   And at or about that time, that's when you put out

47

1    a transmission over the radio that Mr. Arboleda had thrown

2    something out of the car; right?

3        A.   Correct.

4        Q.   But you actually didn't see that take place;

5    correct?

6        A.   Correct.

7        Q.   You received that information from your

8    ride-along; correct?

9        A.   That is correct.

10       Q.   So when you made the police dispatch, you really

11   didn't know what he'd thrown out of the car; correct?

12       A.   Correct.  I just knew -- I was told that he threw

13   something out the window.

14       Q.   Okay.  Now, going back to the third attempted

15   contact where Mr. Arboleda drives away, there was another

16   attempted contact; correct?  And I think this was in a

17   cul-de-sac?

18       A.   Ah, okay, yes.

19       Q.   Now, if I'm skipping a portion of the story, let

20   me know.  This is just the way I understand it, but --

21       A.   I understand.

22       Q.   -- I want to ask you, lead you through so we can,

23   A, speed up the story, and B, get to where we want to get,

24   if you will.

25       A.   Okay.

                                                          48

1    Q.   So forgive me if I have it out of place or out of

2  sorts; okay?

3    A.   Okay.

4    Q.   And please correct me if I do.

5    A.   I understand.

6    Q.   All right.  Thank you.

7         So I understand Mr. Arboleda went to a cul-de-sac,

8  and at that time, there was another attempted contact; is

9  that right?

10    A.   That is correct.

11    Q.   That would be the fourth attempted contact?

12    A.   Yes, that sounds correct.

13         MR. BAKER:  Fourth for you.

14         THE WITNESS:  Yeah.

15  BY MR. POINTER:

16    Q.   I mean the fourth you knew about; right?

17    A.   Yes.

18    Q.   So describe, if you will, what took place during

19  that attempted contact.

20    A.   Mr. Arboleda turned into this cul-de-sac.  I ended

21  up kind of diagonal to him, and at this point, I got out

22  of my vehicle, I drew my weapon, I pointed it at him, told

23  him to keep his hands in view or show me his hands.

24    Q.   Okay.  We'll ask some questions at that point.  So

25  when you got out of your vehicle, pulled your firearm, and

49

1    went over to Mr. Arboleda and pointed it at him, were you

2    the only officer on scene?

3        A.   Yes.

4        Q.   And so when you pointed your firearm at

5    Mr. Arboleda, how far away were you from him?

6        A.   Probably within 10 feet, in front of his vehicle,

7    I would say, approximately.

8        Q.   And when you say the front of his vehicle, do you

9    mean to say like you were in front of the hood, or were

10   you like off to the left or right of the vehicle?  Can you

11   be any more descriptive?

12       A.   Yes, so from the hood of his vehicle, and maybe

13   just to the right of the driver's side at a little bit of

14   an angle.  I try not to put myself directly in front of a

15   vehicle.

16       Q.   And you've been trained not to do that; correct?

17       A.   And based on common sense.

18       Q.   And training; right?

19       A.   Yes, and training.  I didn't mean anything by it.

20   It would be typical not to stand in front of a car.

21       Q.   Learned that as a kid?

22       A.   Correct.

23       Q.   All right.  So as you're there, you have your gun

24   drawn, it's pointed at Mr. Arboleda.  Are you giving him

25   orders?

                                                          50

1    A.   Yes.

2    Q.   And what are you telling him?

3    A.   I told him --

4         MR. BAKER:  Objection.  Asked and answered.

5    BY MR. POINTER:

6    Q.   You can still answer.

7    A.   Okay.  I told him to show me his hands.

8    Q.   Okay.  And did he comply?

9    A.   Yeah, I could see his hands.  I don't recall if he

10   took them off the steering wheel necessarily, but I could

11   see his hands, so in my mind, that was at least a measure

12   that there wasn't anything in them.

13   Q.   Sure.  And so -- and your ride-along is still in

14   your patrol car; right?

15   A.   Correct.

16   Q.   While this is going on, did Officer Maka and

17   Muller arrive on the scene?

18   A.   Yes.

19   Q.   And did they also exit their patrol car with their

20   guns drawn?

21   A.   Correct.

22   Q.   And so if I understand it correctly, you moved

23   towards the front of Mr. Arboleda's car, but, as you say,

24   off to the -- I guess that would be to the right, off

25   center, if you will, from the Honda?

                                                        51

1    A.    From -- yeah, you could use -- from the front of

2    the vehicle, you could use the term to the right, towards

3    the driver's side.

4    Q.    Okay.  And you essentially had Mr. Arboleda at

5    gunpoint.  Where did Officer Maka go?

6    A.    As I recall, the transition of events would have

7    been Arboleda started to drive forward and turned.  Muller

8    went towards the driver's-side door and pulled on the

9    door, and then Maka -- I don't know if he -- he told me

10   and maybe pushed me out of the way of the vehicle so that

11   there wasn't -- so that I wouldn't get hit as it turned.

12   And then Arboleda drove off.

13   Q.    Now, at that point in time, as the Honda is

14   moving, I guess, did you say Maka or Caruso -- sorry, not

15   Caruso -- Maka or Muller pushed you out of the way?

16   A.    Maka was next to me.

17   Q.    Okay.  All right.

18         And why didn't you fire your gun?

19   A.    At that time, I didn't feel my life was in danger.

20   Q.    Okay.  And did you hear Officer Muller tell you

21   not to fire?

22   A.    At one point, yes, I did.

23   Q.    Certain names get the trumpet sound, like sirens.

24         So getting back to it --

25   A.    Give it like ten seconds.

52

1     Q.   Yeah, I was going to say --

2          (Interruption in the proceedings.)

3   BY MR. POINTER:

4     Q.   Kind of take us back to where we were.  Car is

5   moving, you're to the front, off center of the car, to the

6   right, the driver's side, Officer Maka -- yeah, Officer

7   Muller had went up to the driver's-side door and tried to

8   open it; correct?

9     A.   Correct.

10    Q.   Obviously it didn't open; right?

11    A.   Correct.

12    Q.   The car starts moving; is that right?

13    A.   Yes.  I'm already not in that same position.  I've

14  transitioned -- between me moving some and Maka coming

15  over and the car turning away from me, I am more towards

16  the passenger side.

17    Q.   Okay.  And so did the Honda -- Mr. Arboleda's car

18  had made some sort of, I don't know, for lack of a better

19  word, a turn in the cul-de-sac that allowed it to drive

20  back out the cul-de-sac and down the street?

21    A.   Yes, I would say that's a good --

22    Q.   And as far as the car's moving, the three

23  officers, yourself, Officer Maka, Officer Muller, are

24  essentially in, to use my term, close proximity to the

25  car, that's when he told you, "Hey, don't shoot"; is that

                                                        53

1    right?

2        A.   That, and I was pretty much in direct crossfire

3    against Muller.

4        Q.   And I understand one of the other things that you

5    are taught to do in the course of your training at the

6    academy is using your firearm; right?

7        A.   We're trained to use our firearms; was that the

8    question?

9        Q.   Yes.

10       A.   Yes.

11       Q.   And one of the things, one of the factors you use

12   to consider when using your firearm is crossfire; right?

13       A.   Correct.

14       Q.   Backdrop; correct?

15       A.   Correct.

16       Q.   You're cautioned against aiming at something where

17   there might be another officer on the other side of the

18   target; right?

19       A.   Correct.

20       Q.   Now, no shots were fired during the course of this

21   particular part of the incident; right?

22       A.   Correct.

23       Q.   And at some point in time, the Honda went back

24   down the way it came, essentially into the cul-de-sac;

25   correct?

                                                        54

1    A.    Yes, correct.

2    Q.    Now, my understanding is, you know, you're putting

3    out transmissions over your radio, kind of updating

4    dispatch and your fellow officers as to what you're

5    observing and what's going on; correct?

6    A.    Correct.

7    Q.    And at some point in time, you directed your

8    ride-along to jump on -- or directed your ride-along to

9    make orders or commands over the PA system of your car,

10   the loudspeaker of your car; right?

11   A.    Correct.

12   Q.    You told her to tell the car to stop, pull over,

13   it's the police, words to that effect; right?

14   A.    Yes.

15   Q.    And this is as the -- you're continuing to follow

16   the Honda and the Honda is continuing to drive away from

17   you; correct?

18   A.    Yeah, it was prior to the cul-de-sac contact.

19   Q.    It was actually right after going under the

20   overpass; right?

21   A.    Yes.

22   Q.    Do you recall there being an officer putting out a

23   radio transmission saying that they intend to call or stop

24   the pursuit or the chase if Mr. Arboleda and/or his Honda

25   made it to downtown Danville?

55

1      A.    I remember Officer Muller said, I think he said,

2  if he went towards downtown -- I'm paraphrasing a little

3  bit, it's not a direct quote, but Officer Muller said over

4  the radio if he went towards downtown, he would call it.

5  That means -- I took that to mean he would call the

6  pursuit.  Typically the second car, the second police

7  vehicle in a pursuit will call out the directions and

8  updates so that the first car can focus on driving.

9      Q.    Okay.  So you interpreted "call it" to mean he was

10  going to describe the direction where everybody was

11  headed?

12      A.    Correct.

13      Q.    Not end the pursuit; correct?

14      A.    Correct.  Generally we say "terminate the

15  pursuit."

16      Q.    Understood.  Now, what is your training as it

17  relates to when you should terminate a pursuit?

18      A.    It's -- again, it's the totality of the

19  circumstances.  One of the -- going the wrong way, you can

20  almost guarantee to terminate that.  There would have to

21  be -- the President of the United States would have to be

22  kidnapped, basically, in a vehicle to follow someone the

23  wrong way.  So that -- it can be high traffic, high

24  speeds, factors like that.

25      Q.    And what is your training as it relates to --

56

1  well, let me back up.

2        During the course of this incident, who was the

3  primary officer?

4        A.   That would have been Muller and Maka.

5        Q.   Were they also -- to use a term that I'm familiar

6  with, you guys use like the term "officer in charge"?

7        A.   I don't generally -- we don't use that term.  But

8  since it's his beat and he was assigned that call,

9  generally that officer, he would be in charge of the call.

10 Does that answer what you were --

11       Q.   I think it does.  I was trying to figure out, just

12 from an organizational response, who was in charge of this

13 call based upon your understanding and training.  And if I

14 hear you correctly, your understanding --

15       MR. BAKER:  Vague as -- vague and ambiguous as to

16 time.

17 BY MR. POINTER:

18       Q.   My understanding is you were under the impression

19 that Officer Muller was in charge of this call; correct?

20       A.   Yes.

21       Q.   And did that change at some point in time?

22       A.   I'd say it changed every -- like --

23       Q.   You were going to say somebody's name?

24       A.   No, I was going to say the cul-de-sac, so for

25 that, I was in the lead, I was initiating that part of the

                                                        57

1    call, that part of the incident.  So right at that point
2    in time, I'm in charge.
3         And then when we left there, Maka and Muller, they
4    were the first vehicle, and I had to get turned around, so
5    they would have been back in charge because they're the
6    closest to what's going on.
7    Q.   Okay.  Are you trained that you have to get
8    permission to initiate a vehicle pursuit?
9    A.   No.
10   Q.   Are you trained that a sergeant could terminate a
11   vehicle pursuit?
12   A.   Yes.  Anyone can terminate a pursuit.
13   Q.   Now, going back in time to you finished the
14   cul-de-sac, the Honda is now driving off once again.  Did
15   the Honda ever go in reverse in the cul-de-sac?
16   A.   I am not sure.  As I sit here today, I don't
17   recall.
18   Q.   Do you recall the Honda going in reverse at any
19   point in time during the course of this incident?
20   A.   Not that I recall.
21        MR. BAKER:  Hey, Adante, is this a good time to
22   take a break?
23        MR. POINTER:  Yeah, let me ask one more question
24   and then we can --
25        Actually, you know what, let's just take the break

                                                            58

1    now.  Let's take a ten-minute break, please.

2            (Recess 2:58 p.m. - 3:15 p.m.)

3    BY MR. POINTER:

4        Q.   We're back on the record after taking a short

5    break.  I'm going to continue with your deposition.  You

6    understand the same rules and guidelines are in effect,

7    Officer?

8        A.   I understand.

9        Q.   Great.  So going back to the cul-de-sac, where you

10   pulled your gun, Officer Maka and Muller had also got out

11   of the car, they pulled their guns as well, and the car

12   was moving, no one fired a shot, and the car, the Honda

13   that is, went -- essentially made a turn and exited the

14   cul-de-sac; you remember that?

15       A.   Yes.

16       Q.   My understanding is no one blocked the Honda in in

17   that cul-de-sac; right?

18       A.   Correct.

19       Q.   You left a path for the Honda to take if the

20   driver, Mr. Arboleda, decided not to yield; correct?

21       A.   Correct.

22       Q.   And that's consistent with your training; correct?

23       A.   Yes.  If I could clarify a little bit.  It's not

24   that you can't block a vehicle in, we just don't make --

25   we don't make roadblocks.

                                                            59

1      Q.    Okay.  And so a roadblock can be made attendant

2   with -- well, strike that.

3           What do you mean when you say "roadblock"?

4      A.    Put them up with barricades and stuff.  I consider

5   it to be a fine distinction, but that -- put up actual

6   barricades and things.  To say that you can't block in a

7   vehicle means that if a vehicle was parked, you couldn't

8   pull up behind it, blocking it.  But we are trained to do

9   that.  We can absolutely do that.  That's not out of

10  policy.

11     Q.    So the policy that you're referring to, what is

12  that called?

13     A.    There is no policy that says you can't block a

14  vehicle in.

15     Q.    When you were trained on this -- the techniques

16  that you talk about in terms of what you can and cannot do

17  as it relates to blocking a vehicle or placing a

18  roadblock, when was that taught to you?

19     A.    I haven't had training on setting up roadblocks.

20  I don't set up roadblocks, but we can block in vehicles.

21     Q.    So based upon what you just testified to, you're

22  saying that you were trained that a barricade is --

23  setting up actual barricading is called blocking their

24  vehicle.  There's a fine distinction; correct?

25          MR. BAKER:  Objection.  Mischaracterizes the

                                                              60

1   witness's testimony.

2          THE WITNESS:  Would you mind just -- what's the

3   question?

4   BY MR. POINTER:

5      Q.   Yeah, I'm just trying to figure out, you mentioned

6   that -- I asked you you didn't block Mr. Arboleda in.  You

7   said no, you didn't.  And I said is that -- that's because

8   the way you were trained is that you allow the person to

9   have a place to drive, to leave the scene, if they should.

10  So that's the way you were trained.  And then you said

11  something about --

12         I'll just back up, so that we're clear.

13         THE REPORTER:  I'm having a real time hard hearing

14  you again.

15         MR. BAKER:  Yeah, Adante, you're cutting in and

16  out again.

17         (Interruption in the proceedings.)

18  BY MR. POINTER:

19     Q.   Officer, let's back up and ask you this way.  What

20  is your training as it relates to when you can barricade a

21  car that you're in pursuit of?

22         MR. BAKER:  Objection.  Vague.

23         THE WITNESS:  So generally we wouldn't barricade a

24  vehicle.  It's not to say we can't.  I'm not sure if that

25  answers what you're looking for or not.  One of the

                                                          61

1  questions was that did Arboleda have other avenues to

2  leave.  Yes, he definitely did.  From the cul-de-sac,

3  there was multiple ways he could have turned around or

4  left.

5  BY MR. POINTER:

6      Q.   Now, you mentioned -- I asked you earlier, the

7  question was what was your training as to when you could

8  barricade a car that you're pursuing.  So what does your

9  training tell you when you can barricade a car that you're

10 pursuing?

11     A.   There isn't training to -- so if you're pursuing a

12 car, we wouldn't -- like we don't have training in spike

13 strips or something, because that would be a type of a

14 barricade.  We don't use those.  We wouldn't -- if a car

15 is fleeing, we wouldn't just park a car in its path to

16 stop it.

17     Q.   Why is that?

18     A.   That would be dangerous.

19     Q.   What's dangerous about parking a car in a path of

20 a car that's fleeing?

21     A.   So if you were to block a road with vehicles, then

22 a car could run into them.

23     Q.   Injuring the person who is fleeing as well as the

24 police officers or members of the public in the vicinity;

25 correct?

                                                          62

1     A.    Correct.

2     Q.    Is that why you made sure to leave a path for

3 Mr. Arboleda when you were in the cul-de-sac?

4     A.    It didn't really even factor into my thinking in

5 that particular part of the incident.

6     Q.    So you didn't intentionally leave a path for him

7 to drive, when you were in the cul-de-sac?

8     A.    I didn't intentionally block him in.

9     Q.    Is it fair to say you defaulted to your training

10 while you were in the course of this incident?

11        MR. BAKER:  Objection.  Mischaracterizes the

12 witness's testimony.

13        THE WITNESS:  I don't know how to answer that.

14 BY MR. POINTER:

15     Q.    I gotcha.

16        But you had your training in mind while you're in

17 the course of this incident, I take it; correct?

18     A.    Correct.

19     Q.    All right.  And part of that training is what you

20 just testified to, right, which is that it would be

21 dangerous to block the roadway with vehicles or objects

22 during the course of a vehicle stop; correct?

23     A.    Correct.

24     Q.    You didn't do that in the cul-de-sac; correct?

25     A.    Correct.

63

1    Q.   And none of the other officers did that in the

2    cul-de-sac either; correct?

3    A.   Correct.

4    Q.   None of the officers, including yourself, fired

5    their guns in the cul-de-sac; correct?

6    A.   Correct.

7    Q.   Even though you were, to use your words,

8    relatively in front and off to the right of Mr. Arboleda's

9    car after it was driving; correct?

10   A.   Correct.

11   Q.   Within several feet of the car as well; correct?

12   A.   Of my position to the car?

13   Q.   Yes.

14   A.   I'm just trying to stay on your track.  You jumped

15   one question to the next, so can you repeat the last

16   question?

17   Q.   Sure.  You did not fire your gun even though you

18   were within feet of Mr. Arboleda's car -- I believe you

19   said 10 feet of Mr. Arboleda's car, my apologies, as it

20   was moving?

21   A.   Correct.

22   Q.   And none of the other officers fired their gun

23   either; correct?

24   A.   Correct.

25   Q.   And, in fact, Officer Muller was at the driver's

64

1   side of the Honda as it began to move; correct?

2     A.   Correct.

3     Q.   So he was even closer to the Honda than you were;

4   correct?

5     A.   Yes, I would say correct.

6     MR. BAKER:  Vague as to time.

7   BY MR. POINTER:

8     Q.   While you were in the cul-de-sac, did you get

9   closer to the Honda than Officer Muller did when he tried

10   to open the Honda door?

11     A.   My hesitation is it's a difference of feet, so,

12   no, I think Muller would have been -- ended up eventually

13   the closest to the vehicle.

14     Q.   Okay.  Now, going back to your training, I had

15   asked you whether or not -- or strike that.

16     I had asked you what was your training as it

17   relates to when you can barricade a suspect, a fleeing

18   suspect in a car.  You remember that?

19     A.   Yes.

20     Q.   Okay.  Have you received any training that

21   counsels you or has taught you, that you've learned, when

22   you should avoid barricading a fleeing car?

23     A.   Not specifically, no.  As a general sense, in

24   everything we do and related to pursuits, of totality of

25   the circumstances.

  65

1    Q.    So given that you're to keep in mind the totality

2    of the circumstances, were you ever trained as to what

3    circumstances you should keep in mind?

4    A.    Yes.  That's -- I say yes, but every situation is

5    different, is what I want to say, is what I'm saying.

6    Q.    Sure.  So given that every situation is

7    different -- and I take it you're still on patrol?  On

8    duty now; right?

9    A.    Correct.

10    Q.    When you go back on duty tomorrow, the next time

11    you're on shift, you may have to deal with someone who is

12    fleeing and not yielding during a traffic stop; right?

13    A.    Possibly, yes.

14    Q.    You have to be prepared for all the range of

15    possibilities that you may have to deal with as a police

16    officer; right?

17    A.    Correct.

18    Q.    In the course of preparing for all of those

19    possibilities, you received training in the police

20    academy; correct?

21    A.    I've received training in the police academy, yes.

22    Q.    You've received training from the Sheriff's

23    Department since you've been a sheriff's deputy; right?

24    A.    Correct.

25    Q.    All of this training is to help you to perform

66

1   your job lawfully and safely; correct?

2       A.   Correct.

3       Q.   All right.  And so given that you're still on

4   patrol, you may be confronted with a fleeing car, I'm

5   trying to understand, what are the circumstances of the

6   factors that you've been trained to keep in mind as to

7   when you're not to barricade a fleeing car?

8           MR. BAKER:  Objection.  Asked and answered.

9           THE WITNESS:  But I still need to answer; right --

10  or correct?

11  BY MR. POINTER:

12      Q.   Say it again.

13      A.   I still need to answer; right?

14      Q.   Yes.

15      A.   Okay.  I say when the risks outweigh the rewards

16  or vice versa.

17      Q.   Okay.  And so when do the risks outweigh the

18  rewards, what have you been trained?

19      A.   It depends on the specifics of the situation.

20      Q.   Okay.  And so what are some factors that you need

21  to keep in mind to help you make the right decision?

22          MR. BAKER:  Objection.  Asked and answered.  This

23  is like the third time you've asked that question, Adante.

24          THE WITNESS:  Things like time of day, the amount

25  of traffic, that can be vehicle traffic or pedestrian

                                                    67

1    traffic in an area, the amount of resources available, the

2    crime that's involved, and, you know, a big one I think

3    of, you keep talking about would you barricade, would you

4    not barricade a car, if a car doesn't stop -- and to make

5    it specific, if they called in to dispatch and said "My

6    car is out of control and I can't stop," we might set up a

7    barricade to stop that car, because we have information

8    that it can't stop on its own, and so in that case, a

9    calculated risk might be worth a reward of stopping that

10   vehicle.  So even that, I can't say that we would do that,

11   without being in the situation.

12   BY MR. POINTER:

13       Q.   So it sounds like you were trained to have several

14   factors in mind that you are to consider or to weigh as it

15   relates to whether or not you can or cannot barricade a

16   fleeing car; is that correct?

17       A.   That's correct.

18       Q.   One of the factors you mentioned is time of day or

19   night; right?

20       A.   Correct.

21       Q.   Which may influence whether or not there's a lot

22   or a little traffic?  Traffic meaning vehicle traffic as

23   well as pedestrian traffic; right?

24       A.   Correct.

25       Q.   I take it you've been trained that if there's a

                                                              68

1   lot of pedestrians or vehicle traffic, not a good idea to

2   barricade the car at that point; right?

3       A.   In general, I would agree.

4       Q.   One of the other factors you mentioned is keep in

5   mind what type of crime you think the fleeing suspect or

6   the fleeing car has been involved in; correct?

7       A.   Correct.

8       Q.   I believe you mentioned high-risk stop, felonious

9   activity; right?

10      A.   Can be -- yes, can be a high-risk stop.

11      Q.   Kidnapping, somebody has committed a murder, you'd

12  weigh that as something that warrants stopping that car,

13  right, barricading the car; right?

14      A.   You mean the type of stop you make or --

15      Q.   If you had --

16      MR. BAKER:  He's asking you would you be

17  interested in -- would you stop and barricade a car if the

18  guy is a murderer?

19      THE WITNESS:  See, I don't know.

20  BY MR. POINTER:

21      Q.   So your training is that if a person has committed

22  a murder, you wouldn't barricade -- you wouldn't stop the

23  car and barricade?

24      A.   So you're asking two different things as part of

25  the same question, and that's kind of what's confusing me.

69

1    Q.   Okay.

2    A.   Would I want to stop that car and catch that

3    murderer?  Yes.  Would I barricade that car?  Not

4    necessarily.

5    Q.   So even a murderer you would still consider

6    whether or not you should barricade the car, based upon

7    all the other factors that you've testified to; right?

8    A.   Correct.

9    Q.   Okay.  Now, my understanding is after the

10   cul-de-sac incident, to use my term, the Honda drove away.

11   What happened next, if anything?

12   A.   Muller and Maka were the lead vehicle, and I got

13   back in my vehicle and followed them, or I should say I

14   went in their direction.  They had already -- they were a

15   little distance away from me.

16   Q.   And you sped up in order to catch up to them;

17   right?

18   A.   Correct.

19   Q.   And so just take me through what happened next.

20   Then I'll stop and ask more detailed questions.

21   A.   Sure.

22        MR. BAKER:  Objection.  Calls for a narrative.

23        THE WITNESS:  He went westbound on Hartz Way, and

24   he turned onto Front Street, going north.  Arboleda did,

25   and Muller followed them, and I followed Muller.

70

1   BY MR. POINTER:

2       Q.   And as the Honda is going up Front Street, you're

3   the second car behind the Honda, did you see any other

4   cars on the road on Front Street?

5       A.   Cars that were driving?

6       Q.   Yes.

7       A.   I don't recall there being any cars, because I

8   don't recall having to go around any cars, and I don't

9   recall any cars coming towards us.

10      Q.   And the Honda proceeded up Front Street towards

11  the intersection of Diablo; correct?

12      A.   Correct.

13      Q.   And at some point in time, as the Honda was

14  approaching Diablo, you saw Defendant Hall come onto --

15  turn onto Front Street; correct?

16      A.   Turn onto Front Street from Diablo, yes.

17      Q.   Okay.  And he turned onto the street, essentially

18  onto the side of the street that you, as well as the

19  Honda, were traveling on; correct?

20      A.   I'm trying to visualize in my head.

21      Q.   Sure.

22      A.   By the time I caught up, the Honda had already

23  moved some into the oncoming lane, as I recall.

24      Q.   So did you mean to say you didn't see Officer --

25  or Defendant Hall's car come to a stop on Front Street?

                                                            71

1       A.    I don't recall if I saw it, if I saw it stopped.

2       Q.    As you sit here today, you don't have a memory of

3  the car stopped, Officer Hall's car stopped, correct, on

4  Front Street?

5       A.    Correct.

6       Q.    Okay.

7       A.    From my memory, as I sit here today, I can tell

8  you where the vehicles were from my memory, but the

9  specifics of when a car stopped, I'd have to -- I don't

10 have it in my memory specifically, you know, exactly.

11      Q.    So you don't have a memory of Officer Hall

12 bringing his car to a stop, and then Mr. Arboleda moving

13 his car in order to avoid colliding into Officer Hall's

14 car?

15      A.    I don't have a memory of that.

16      Q.    Okay.  Do you have a memory of Officer Hall

17 opening the driver's door of his car?

18      A.    Yes.

19      Q.    So you don't have a memory of the car stopped, of

20 Defendant Hall's car stopping, but you have a memory of

21 him getting out of the driver's side of his car; correct?

22           MR. BAKER:  I'm going to object as vague from --

23 as to what you're classifying as his memory.  From the

24 memory of the scene or whether he saw it on video?  It's

25 all very vague.

72

1    THE WITNESS:  So I'm trying to make sure that I

2  give you the statement from what I specifically have in my

3  head --

4  BY MR. POINTER:

5    Q.   Please.

6    A.   -- as opposed to -- because there's a video out

7  there of everything, from a lot of different angles, so

8  I'm trying to make sure that I only give you what I

9  remember in my head specifically and not what I've seen in

10  a video.

11    Q.   Sure.

12    A.   If that helps.

13    Q.   That's -- we want your memory.  The videos, as

14  they would say, speak for themselves.  But I wasn't there,

15  you were.  And your perspective is important, because you

16  may be called in as a witness in this matter if it ever

17  goes to trial, and for a whole host of other issues.  So I

18  do want your memory.  So if you have -- if you're relying

19  upon something else other than your memory, as I think I

20  told you when we first started, just let me know.  It's

21  fine, that's all good, you can do that, but just let me

22  know when you're relying upon something else other than

23  your memory; okay?

24    A.   Okay.

25    Q.   Cool.  So as you sit here -- strike that.

73

1    You don't have a memory of seeing Officer Hall's

2  car come to a stop; correct?

3    A.   Correct.

4    Q.   You do have a memory of seeing him get out of his

5  patrol car; right?

6    A.   Correct.

7    Q.   You don't have a memory -- or strike that.

8    Do you have a memory of the Honda coming to a stop

9  at Front Street at or about the time you saw Officer Hall

10  getting out of his patrol car?

11    A.   Not specifically, no.

12    Q.   Here's the fun part about hanging out with

13  lawyers.  When you say "not specifically," do you have a

14  general memory of some sort?

15    A.   Yes.

16    Q.   Okay.  Describe for me what the general memory is

17  of the sequence of events here.  Just -- we're talking

18  about the Honda coming to Front Street, Officer Hall

19  turning onto Front Street.  I'm trying to understand what

20  you recall, what you saw take place.

21    A.   Okay.  Sergeant Martin's vehicle was in the

22  oncoming lane of Front Street --

23    Q.   Yes.

24    A.   -- kind of at an angle.  Hall had turned off of

25  Diablo, and I want to say made a V, a little bit with --

74

1    or angle with Sergeant Martin's vehicle.  When I came up,

2    Maka and Muller's car was just to the side, to my driver's

3    side, I want to say.  I came up and stopped.  I remember

4    Hall exiting his vehicle and going around, and Arboleda

5    driving around his vehicle, and hearing gunshots and

6    seeing glass from Arboleda's windshield.  The vehicle --

7    Arboleda's vehicle continued towards the intersection.

8    And then I went around the edge of Front Street on the

9    right-hand lane, went around those vehicles and followed

10   into the intersection.

11      Q.   So I'm going to break that down a little bit.

12   Thank you.

13           So as you're the second car back from Arboleda in

14   the Honda, what is your first memory of a police car

15   turning onto Front Street?

16           MR. BAKER:  Assumes facts not in evidence.

17           THE WITNESS:  I don't have a specific memory of

18   Hall or Sergeant Martin turning off of Diablo onto Front

19   Street.

20   BY MR. POINTER:

21      Q.   Okay.  Is it fair to say that your first memory of

22   Hall or Officer -- or Sergeant Martin and their vehicles

23   on Front Street is that their vehicles were already

24   stopped?

25      A.   No, I wouldn't say that's fair to say --

75

1    Q.    Okay.  So --

2    A.    -- because I don't have a memory of it.

3    Q.    Okay.  So you have no memory of either Sergeant

4    Martin or Officer Hall bringing their vehicles to a stop;

5    fair?

6    A.    That's fair to say, yes.

7    Q.    Do you have a memory of the Honda coming to a stop

8    in front of Officer Hall's patrol car?

9    A.    I do not.

10   Q.    Do you have a memory of the Honda moving to the

11   left or further to the passenger side of Officer Hall's

12   patrol car?

13   A.    Yes.

14   Q.    Okay.  Do you have a memory of, as the Honda moved

15   to the left, that there was an SUV to the Honda's left, if

16   you will, to the passenger's side of Sergeant -- of

17   Officer Hall's patrol car?

18   A.    Yes.

19   Q.    And that SUV was Sergeant Martin's vehicle;

20   correct?

21   A.    Correct.

22   Q.    Did you see the Honda then move back towards the

23   lights, which would have been towards the passenger side

24   of Officer Hall's patrol car?

25   A.    Yes.

76

1    Q.   Did you see that there was space between the SUV,

2  Sergeant Martin's SUV, and Officer Hall's patrol car?

3    A.   I couldn't see how much space there was.

4    Q.   Okay.  But did you see --

5    A.   I could tell there was space there.

6    Q.   Okay.  You saw the Honda go through that space,

7  right, drive through that space; right?

8    A.   Correct.

9    Q.   At that point in time, when you saw the Honda

10 proceeding through that space, did it appear to you that

11 it had struck Sergeant Martin's SUV?

12   A.   It did not appear to me that it had.

13   Q.   Did it appear that it had struck Officer Martin's

14 patrol car?

15   A.   Officer Hall's --

16   Q.   Officer Hall's patrol car.

17   A.   Gotcha.  It did not appear to me that it had.

18   Q.   Did it appear that the Honda had struck Officer

19 Muller or Officer Maka's patrol car?

20   A.   No.

21   Q.   It proceeded through the space, the gap, to use my

22 term, between Sergeant Martin's SUV and Officer Hall's

23 patrol car; right?

24   A.   Correct.

25   Q.   Did you actually see Officer Hall firing his gun?

                                                        77

1    A.    No, I don't have a memory of seeing him firing his

2    weapon.

3    Q.    You do have a memory of glass, I think you said

4    windshield glass, essentially flying off the car due to

5    the impact of bullets; right?

6    A.    Yes.

7    Q.    Now, we had gone through this a little bit

8    earlier.  But I'm going to ask it a different way, just so

9    we're clear.  What was the first -- what is the first

10   memory you have of Officer Hall being outside of his car

11   there on Front Street?

12   A.    First memory, as I sit here today, is him getting

13   out of his car and going around behind it.

14   Q.    And when you saw him getting out of his car and

15   going behind it, to use your words, did he have his gun

16   already drawn?

17   A.    I don't recall.

18   Q.    Okay.  No memory of that either way; right?

19   A.    Correct.

20   Q.    Prior to you hearing -- strike that.

21   When you were making the observation of seeing the

22   glass come off the windshield -- I take it at that point

23   in time, you were hearing the gunshots?

24   A.    That is correct.

25   Q.    When you're hearing the gunshots, seeing the glass

78

1    come off, are you -- do you also see Officer Hall --

2    essentially the recoil from his gun, like the gun firing?

3        A.    No, I don't recall seeing Officer Hall at all.

4        Q.    So you don't know where he was standing at when he

5    was firing?

6        A.    Correct.

7        Q.    What about Sergeant Martin, do you know where he

8    was at when Officer Hall was firing his gun?

9        A.    At the time, I did not.

10        Q.    You've since learned that he was in his patrol

11    SUV; right?

12        A.    That is correct.

13        Q.    And given that you've looked at some of the videos

14    of this incident, I take it now you have -- you tell me,

15    do you have a different understanding as it relates to the

16    sequence of events that took place?

17        A.    Not -- it's pretty close to the sequence of

18    events.  There may be -- as I said, with my memory, there

19    may be small differences of when exactly a car stopped.

20    You know, Arboleda, if he actually -- like I don't

21    remember him coming to a stop.  I remember him going

22    around the front of Hall's vehicle.  He may have come to a

23    stop, I just don't remember it.  So some nuances may be

24    different from my memory versus the video, but basically

25    where the cars were and the sequence of events match up.

                                                        79

1    Q.   I was just going to say, you know, comparing --

2    you've given a statement, you know, within hours of this

3    incident taking place, that was recorded, you reviewed

4    that.  Is there anything different in that statement

5    versus what you now understand or believe the facts to be

6    as it relates to how this incident took place?

7         MR. BAKER:  You're asking if he would change

8    anything in his LEIFI statement; is that what you're

9    asking?

10        MR. POINTER:  I don't know if he would change it.

11   Q.   But is there anything different from your

12   statement, based upon your understanding now, having

13   reviewed videotapes and looked at transcripts and whatever

14   else?

15   A.   Oh, okay.  I understand what you're asking.  Well,

16   actually, let me clarify a little bit.  So are you asking,

17   from my memory is something different?  Or are you asking

18   is my understanding different?  Because my LEIFI statement

19   was based off my memory, I hadn't reviewed anything at the

20   time or talked to anyone.  But by now, I've also given an

21   inquest statement, I've reviewed video.  So it's -- so my

22   understanding now is different than my LEIFI statement.

23   Q.   How does your understanding now differ from your

24   LEIFI statement?

25   A.   My LEIFI statement, I didn't know where Hall was,

80

1    but now, after seeing the video, I saw that Arboleda

2    clearly drove into him when he had other avenues to leave

3    or to stop, and that Hall very nearly was run over by him.

4        Q.    And that's the understanding that you developed

5    when?

6        A.    After reviewing dash cam and body cam.

7        Q.    And you mentioned that you gave testimony at the

8    inquest; correct?

9        A.    Correct.

10       Q.    What did you do, if anything, to prepare for your

11   testimony at the inquest?

12       A.    I reviewed my LEIFI statement and I know I

13   reviewed my body cam.  I don't recall if I reviewed other

14   people's body cam specifically for the inquest.

15       Q.    When you went to the inquest, you didn't offer

16   this opinion that you have today, that Officer Hall was

17   nearly ran over, or that Arboleda drove his car at Officer

18   Hall; correct?

19       A.    As I recall, I did not, because I was not asked

20   it.

21       Q.    You didn't offer it either, though; correct?

22       A.    That is correct.  I did not offer it.

23       Q.    And you were asked at the inquest, in terms of

24   what your observations were during this incident; correct?

25       A.    I don't specifically remember, but I'm fairly

81

1  certain they asked me something like that.

2      Q.   And when you gave your interview to homicide, you

3  were also asked to report your observations at that point

4  in time; right?

5      A.   Correct.

6      Q.   And you didn't offer that opinion during that

7  interview either; correct?

8      A.   Referring to the initial interview, the day of the

9  incident?

10     Q.   Yes.

11     A.   Correct, I hadn't reviewed anything or seen any

12  video, so my opinion was -- that was different at the

13  time.

14     Q.   Sure.  Now, I take it, you know, it's been my

15  experience -- you can correct me if I'm wrong -- you have

16  an opportunity as an officer -- you gave an interview to

17  homicide, like you say, within hours of the shooting of

18  Mr. Arboleda; correct?

19     A.   Same day.

20     Q.   Same day.  And since that day until today, have

21  you made any effort to supplement that interview by way of

22  providing a written report or supplemental report?

23     A.   No, other -- I beg your pardon, the coroner's

24  inquest.

25     Q.   So you had the homicide interview, you had the

                                                    82

1    coroner's inquest.  Have you made any other additional

2    efforts, other than those opportunities, to supplement

3    your statement or your official record as it relates to

4    what took place during the course of this incident?

5           MR. BAKER:  Objection.  Vague and ambiguous.

6           THE WITNESS:  Just trying to make sure I answer

7    correctly with what you're asking me.  I have not written

8    any reports or anything about the incident.

9    BY MR. POINTER:

10      Q.   You haven't made any recorded -- additional

11   recorded statements about the incident, have you?

12      A.   I have not.

13      Q.   Now, just so we're clear, going back to the

14   shooting itself, when this was taking place, you didn't

15   see that Hall was actually backpedalling and firing, did

16   you?

17      A.   At the time of the incident?

18      Q.   Yes.

19      A.   At the time of the incident, I could not see Hall.

20      Q.   Okay.  Was there something blocking your view,

21   obstructing your view?

22      A.   Yes.

23      Q.   And what was that?

24      A.   His SUV.

25      Q.   When you say "his SUV," you mean Muller or

83

1  Martin's or someone else's?

2      A.    Hall's patrol vehicle.

3          MR. POINTER:  Let's take a quick two-minute break.

4  I might be towards the end of this.

5          (Recess 3:57 p.m. - 4:08 p.m.)

6  BY MR. POINTER:

7      Q.    All right.  So we'll go back on the record.

8  Officer, thank you.  All the same rules and admonitions

9  apply as before.

10     A.    I understand.

11         MR. BAKER:  Did you want to make a clarification?

12         THE WITNESS:  If I could bring something up.  You

13  had asked me -- going back to the cul-de-sac incident --

14  if Arboleda had ever reversed or used a different

15  direction than forward.  After you brought it up, it did

16  stir a memory.  I think when I was giving him orders, he

17  took his -- I want to say he took his hands off the wheel,

18  and the car rolled backwards.  So if that helps in any

19  way.  When we sat here at the time of questioning, I

20  didn't have a memory of it, and then I started thinking

21  about it more, and I do remember the vehicle moving

22  backwards some, before he turned and all that.  Everything

23  else -- so nothing was changed, just added.  Just that I

24  do remember the vehicle going in a backward motion.

25  BY MR. POINTER:

84

1    Q.   Is there anything else you want to change about --

2 or add to or supplement or revise what you've testified to

3 here today?

4    A.   No.  As I sit here now, nothing that has come back

5 into memory or been clarified.

6    Q.   Because you'll have an opportunity at some later

7 point in time -- after today is over, Madam Reporter will

8 put everything that was said here today into a typewritten

9 booklet.  You'll have an opportunity to review that

10 booklet.  You can make any changes you want to make.  If

11 you should make some changes to your testimony today, then

12 I'll be allowed to comment at trial and to a judge that

13 you changed your testimony after today's date when we were

14 doing this deposition.  Do you understand that?

15    A.   I understand, yes, thank you.

16    Q.   So if you have any other changes, just let us

17 know.

18    A.   Understood.

19    Q.   So I just want to finish in terms of whatever your

20 observations were from the date of this incident.  So you

21 mentioned -- to kind of bring us back, you testified to

22 the Honda went through this gap between Sergeant Martin's

23 SUV and Officer Hall's patrol car; right?

24    A.   Correct.

25    Q.   While it was going through the gap, you heard the

85

1    sounds of gunfire and saw pieces of the windshield, with

2    glass flying; is that right?

3        A.    That's correct.

4        Q.    And when you saw these pieces of windshield or

5    glass flying, do you -- did you know which glass of the

6    Honda was being impacted or struck by bullets?

7        A.    I did not, no.

8        Q.    You didn't know whether it was a passenger window,

9    back passenger window, driver's window, front windshield,

10   you didn't know; correct?

11       A.    Correct, I did not know.

12       Q.    Okay.  As the car proceeded through this gap, I

13   think we already established, you didn't form the

14   impression that it hit any of the cars that were around

15   you, correct, at that time --

16       A.    Correct.

17       Q.    -- the police vehicles?

18       A.    That is correct.

19       Q.    It proceeded onto -- that would be Diablo,

20   correct, into the intersection?

21       A.    That's correct.

22       Q.    And it struck another car, civilian car, that was

23   at or about that intersection; correct?

24       A.    That's correct.

25       Q.    You, if I understand correctly, drove your police

                                                              86

1   vehicle to the right or on the driver's-side door side of

2   Officer Hall's car over to and behind Mr. Arboleda's

3   Honda; correct?

4       A.   That is correct.

5       Q.   Okay.  You got out of your car, and went to render

6   aid; is that right?

7       A.   First we went up to his vehicle.  Hall was at the

8   driver's-side door, I went up to the passenger, because we

9   didn't know -- or I didn't know what was the state of

10  Mr. Arboleda.

11      Q.   Okay.  And when you say you didn't know the state,

12  you didn't know whether he was alive, dead, conscious or

13  what his medical condition was?

14      A.   Correct.

15      Q.   Officer Hall broke the window on Mr. Arboleda's

16  car and pulled him out; is that right?

17      A.   That's correct.

18      Q.   And at that point in time, Mr. Arboleda was on the

19  ground on his back; is that correct?

20      A.   Yes, that's correct.

21      Q.   And did you hear him, to use my term, have labored

22  breathing or breathing with some type of labor?

23      A.   I don't have a memory of him breathing or not.

24      Q.   Do you have a memory of him moving?

25      A.   I do not.

1      Q.   All right.  Did you ever see his hands or arms

2   moving while he was there after the shooting?

3         MR. BAKER:  Are you talking about moving --

4   Arboleda moving his hands or his hands being moved because

5   he was moved?

6         MR. POINTER:  I'm finding out --

7      Q.   Well, you tell me, Officer.  Do you have any

8   memory of his hands and arms moving?  By "he," I mean

9   Mr. Arboleda.

10     A.   I'm pretty confident I understand your question.

11  And I do not have any memory of Mr. Arboleda moving or

12  breathing.

13     Q.   Okay.  All right.  I'm going to show you what has

14  been marked in this deposition -- strike that.

15         I'm going to show you an exhibit, what I've marked

16  in this deposition as Exhibit 1, but it's produced as

17  Bates stamp A, as in apple, H, as in Harry, 1389, it's 2,

18  dash, 5.  Okay, actually, you know what, do you see

19  what -- let's go with this one.

20         (Exhibit 1 was marked for identification.)

21  BY MR. POINTER:

22     Q.   Officer, do you see the panoramic picture that's

23  on the screen?

24     A.   Yes, I do.

25     Q.   Okay.  And at the top, you see it's

                                                        88

1  OIS_18-14203 --

2      A.   Yes.

3      Q.   -- underscore Panos, P-a-n-o-s, dash 2 dash 5?

4      A.   Yes.

5      Q.   Okay.  And I'd direct you to where I'm circling

6  the cursor, little arrow; do you see that?

7      A.   I do.

8      Q.   This is -- where I'm circling, two SUVs and a

9  patrol car.  This is at or about the intersection of Front

10 and Diablo; correct?

11     A.   Front and Diablo, correct.

12     Q.   This is where the shooting and incident took

13 place; correct?

14     A.   Correct.

15     Q.   And of those three cars that are gathered right

16 there at the intersection of Front and Diablo, the three

17 patrol cars, the one on the left here, the actual car

18 itself, is Officer Hall's; correct?

19     A.   Correct.

20     Q.   And the one in the middle, that would be Officers

21 Muller and Maka's SUV they were driving; correct?

22     A.   Correct.

23     Q.   And then the one to the far right is Sergeant

24 Martin's --

25     A.   Correct.

                                                        89

1    Q.   -- SUV?

2    A.   I'm sorry, I didn't mean to step over you.

3    Correct.

4    Q.   That's fine.

5         And now I'm showing you what appears to be a

6    patrol car that is on Diablo Street -- or Road, and it

7    looks to be, I don't know, some distance behind a car that

8    looks like it has its doors open.  It looks like to me

9    that that is Mr. Arboleda's gray Honda with the doors

10   open; correct?

11   A.   Correct.

12   Q.   And is that your police patrol car behind it?

13   A.   Yes, it is.

14   Q.   And as you testified to before, in order for you

15   to get from Front Street onto Diablo, where you parked

16   your car behind Mr. Arboleda's Honda, you went to the

17   right or to the driver's side of Officer Martin's patrol

18   car; right?

19   A.   Officer Hall's.

20   Q.   Officer Hall, I'm sorry.

21   A.   But yes, that is correct.

22   Q.   All right.  And you said that it was your opinion,

23   which you formed when you were looking at video about a

24   week ago, that you thought Mr. Arboleda could have driven

25   his car to the passenger side of Sergeant Martin's SUV,

                                                         90

1    and been able to leave the scene; correct?

2        A.    Correct.

3        Q.    And from your opinion, he would have been able to

4    do that without having to drive up on the curb?

5        A.    I don't know.

6        Q.    Okay.  You haven't gone out there and taken any

7    measurements, I take it; correct?

8        A.    Correct.

9        Q.    You formed that opinion after looking at either

10   body camera or dash cam video; correct?

11       A.    Correct.

12       Q.    And looking at this exhibit here, Exhibit 1 to

13   your deposition, do you still have that opinion, that the

14   Honda would have been able to fit here to the passenger

15   side of Sergeant Martin's SUV?

16       A.    Yes.

17       Q.    Okay.  Without driving on the curb or you're not

18   sure?

19       A.    That, I don't know.

20       Q.    And do you know if that would have required the

21   Honda to back up in order to clear and not strike Sergeant

22   Martin's SUV in order to proceed to the passenger side of

23   the SUV in order to leave the scene?

24       A.    I don't know.

25       Q.    I'm going to try to cue up one more thing.

                                                        91

1      A.    Sure.

2      Q.    Actually, you know, I think I can ask you without

3    having to go into other exhibits.

4           When Mr. Arboleda was brought out of the Honda and

5    he was laid on the ground, this is after the shooting, his

6    sweatshirt that he was wearing was cut off of him;

7    correct?

8      A.    That's correct.

9      Q.    And you actually visually can see what you thought

10   to be bullet holes in his chest area; correct?

11     A.    Correct.

12     Q.    Officer, I'm done with the deposition, unless you

13   have -- there's something else you'd like to add, I'm done

14   with my questioning, and we can conclude.

15          Perhaps Mr. Baker has some additional questions,

16   but I'm done.

17          MR. BAKER:   I have no questions.

18          THE REPORTER:   Copy of the transcript, Mr. Baker?

19          MR. BAKER:   Yes, please.

20          THE REPORTER:   Off the record?

21          MR. BAKER:   And can I get -- can I get a rough

22   copy of the transcript; is that possible?

23          THE REPORTER:   Okay.

24          MR. BAKER:   Do you have my e-mail address?

25          THE REPORTER:   Yes.

                                                          92

1          MR. BAKER:  I would like it that way.  And then

2    ultimately, I'd like the regular transcript that way.  And

3    I'll get it to Deputy Caruso for his revisions and

4    whatnot, so send that letter to me, please.

5          THE REPORTER:  Mr. Pointer, did you want a rough

6    also?

7          MR. POINTER:  No, I'm fine.

8          THE REPORTER:  Thank you.  Off the record?

9          MR. POINTER:  Yes.

10         (TIME NOTED:  4:22 p.m.)

11

12                    --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          93

```
 1                    DECLARATION OF WITNESS

 2

 3          I, CHARLES CARUSO, do hereby declare under

 4     penalty of perjury that I have read the foregoing

 5     transcript; that I have made any corrections as appear

 6     noted, in ink, initialed by me, or attached hereto; that

 7     my testimony as contained herein, as corrected,

 8     is true and correct.

 9     EXECUTED this _____ day of _____,

10     2020, at _____, _____.
                    (City)                    (State)
11

12

13

14          _____

15                    CHARLES CARUSO

16

17                    --o0o--

18

19

20

21

22

23

24

25

                                                          94
```

1        I, the undersigned, a Certified Shorthand Reporter

2    of the State of California, do hereby certify:

3        That the foregoing proceedings were taken before

4    me at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to

6    testifying, were administered an oath; that a record of

7    the proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11       Further, that if the foregoing pertains to the

12   original transcript of a deposition in a Federal Case,

13   before completion of the proceedings, review of the

14   transcript [ X ] was [  ] was not requested.

15       I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or any party to this action.

18       IN WITNESS WHEREOF, I have this date subscribed my

19   name.

20

21   Dated: December 11, 2020

22

               _/s/Gina Glantz_____

23           GINA GLANTZ

24           CSR No. 9795, RPR, RMR

25

95

1        DISPOSITION

2

3        Pertaining to the original transcript of a

4    deposition in a Federal Case, before completion

5    of the proceedings, review of the transcript

6    [ X ] was [   ] was not requested.

7

8                   --o0o--

9

10        Upon completion of the foregoing transcript, the

11    witness was notified it was ready for signature, but

12    the deposition was not signed by the witness for the

13    following reason:

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    BARBARA J. BUTLER & ASSOCIATES.

21

22        The sealed original will be forwarded to the

23    deposing attorney's office.

24

25                   --o0o--

96

WITNESS LETTER

TO:   Deputy Charles Caruso          Date: 12.16.20
      Attn:  D. Cameron Baker, Deputy County Counsel
      CONTRA COSTA COUNTY COUNSEL'S OFFICE
      1025 Escobar Street, 3rd Floor      Depo: 11.30.20
      Martinez, CA 94553                  Ref. #20113094

RE: Jeannie Atienza v. Andrew Hall, et al.

Dear Deputy Caruso:

       Please be advised that the transcript of your
deposition taken in the above matter has been completed
and is now available at this office for your reading and
signing.
       Please contact our office between the hours of 9:30
a.m. and 4:30 p.m. Monday-Friday, to schedule an
appointment.  Or, if you prefer, contact the attorney to
review and sign the copy of your deposition under
penalty of perjury.
       Read the transcript making any changes necessary.
In making any changes, please use the following guide:
       1. DO NOT WRITE on the original transcript.
       2. SIGN UNDER PENALTY OF PERJURY at the end of the
          Deposition on the Declaration of Witness Page.
       3. List each change on the Deposition Errata Sheet
          following this page. Signature is required at
          the bottom of the Errata Sheet.
       4. Forward the signed Declaration of Witness Page
          and signed Errata Sheet in addition to a copy of
          this letter to:
                  Barbara J. Butler & Associates
                  Certified Court Reporters
                  P.O. Box 3508, Santa Clara, CA  95055
                  (510) 832-8853 or (408) 248-2885.
       Upon receipt of items requested in this letter, I
will forward copies of same to all Counsel.
       In the event you have not reviewed your deposition
within 35 days or by trial date, whichever is sooner,
the original transcript will be sealed pursuant to
applicable laws and thereafter mailed to the deposing
attorney.

                  Sincerely,

                  /s/Barbara J. Butler
                  Barbara J. Butler, CSR

cc:  All Counsel

97

1              DEPOSITION ERRATA SHEET

2     RE: Jeannie Atienza v. Andrew Hall, et al.
3         Depo: 11.30.20              Ref. #20113094

4     Page No. _____ Line No. _____

      Change:_____
5
      Reason for change:
6     _____

7     Page No. _____ Line No. _____

8     Change:_____

9     Reason for change:
      _____
10
      Page No. _____ Line No. _____
11
      Change:_____
12
      Reason for change:
13    _____

14    Page No. _____ Line No. _____

15    Change:_____

16    Reason for change:
      _____
17
      Page No. _____ Line No. _____
18
      Change:_____
19
      Reason for change:
20    _____

21    Page No. _____ Line No. _____

22    Change:_____

23    Reason for change:
      _____
24
      _____          _____
25    CHARLES CARUSO                        DATE

                                                          98

1                          ATTORNEY'S NOTES

2        Page # Line #

3         _____/_____/_____

4         _____/_____/_____

5         _____/_____/_____

6         _____/_____/_____

7         _____/_____/_____

8         _____/_____/_____

9         _____/_____/_____

10        _____/_____/_____

11        _____/_____/_____

12        _____/_____/_____

13        _____/_____/_____

14        _____/_____/_____

15        _____/_____/_____

16        _____/_____/_____

17        _____/_____/_____

18        _____/_____/_____

19        _____/_____/_____

20        _____/_____/_____

21        _____/_____/_____

22        _____/_____/_____

23        _____/_____/_____

24        _____/_____/_____

25        _____/_____/_____

99