IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

JEANNIE ATIENZA,           )
individually and as        )
successor-in-interest to   )
Decedent LAUDEMER ARBOLEDA, )
                           )
        Plaintiffs,        )
                           )
            vs.            )CASE NO.: 3:19-cv-03440 RS
                           )
ANDREW HALL, individually; )
PHILLIP ARBOLEDA,          )
individually, as           )
Successor-in-interest to   )
Decedent LAUDEMER ARBOLEDA, )
and DOES 1-50, inclusive,  )
                           )
        Defendants.        )
_____)   CERTIFIED COPY


VIDEOCONFERENCE

DEPOSITION OF DETECTIVE SONASI MAKA

FRIDAY, OCTOBER 16, 2020

1:09 p.m. - 2:35 p.m.

Contra Costa County, California


REPORTED BY:  Liliana Rodriguez, CSR NO. 13783

1

```
 1              INDEX OF EXAMINATION

 2

      WITNESS:  SONASI MAKA
 3

 4    EXAMINATION                              PAGE

 5    By Mr. Pointer                            6

 6    By Mr. Mauck                             57

 7    By Mr. Pointer                           58

 8                      --o0o--

 9

10

      Appearance Page                          3
11
      Exhibit Page                             4
12
      Location                                 5
13
      Declaration of Witness                  61
14
      Reporter's Certificate                  62
15
      Disposition                             63
16
      Witness Letter                          64
17
      Deposition Errata Sheet                 65
18
      Attorney's Notes                        66
19

20                    --o0o--

21

22

23

24

25
                                               2
```

1                    APPEARANCES OF COUNSEL

2

3    For the Plaintiff:

4         BY:  ADANTE POINTER, ATTORNEY AT LAW
              POINTER & BUELNA, LLP
5             LAWYERS FOR THE PEOPLE
              1901 Harrison Street, Suite 1140
6             Oakland, California 94612
              (510)929-5400
7             apointer@lawyersftp.com

8

9    For the Defendants:

10        CONTRA COSTA COUNTY COUNSEL
          BY:  JASON W. MAUCK, DEPUTY COUNTY COUNSEL
11        BY:  D. CAMERON BAKER, DEPUTY COUNTY COUNSEL
          1025 Escobar Street, 3rd Floor
12        Martinez, California 94553
          (925)655-2290
13        Jason.Mauck@cc.cccounty.us
          Cameron.Baker@cc.cccounty.us

14

15

16                        --o0o--

17

18

19

20

21

22

23

24

25

                                                    3

1       INDEX TO EXHIBITS

2

3   MARKED              DESCRIPTION                    PAGE

4
                    (None marked)
5

6

7                      --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        4

1        Zoom videoconference deposition taken pursuant

2    to Subpoena and on Friday, October 16, 2020,

3    commencing at the hour of 1:09 p.m., thereof, before

4    me, LILIANA, RODRIGUEZ, CSR No. 13783, a Certified

5    Shorthand Reporter and Deposition Officer of the State

6    of California, there personally appeared:

7                      SONASI MAKA,

8    called as a witness by the Plaintiff, who having been

9    duly sworn by me, to tell the truth, the whole truth and

10   nothing but the truth, testified as hereinafter set

11   forth:

12

13                      --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

5

1    REPORTED REMOTELY FROM FRESNO COUNTY, CALIFORNIA;

2    FRIDAY, OCTOBER 16, 2020, 1:09 P.M.

3    THE REPORTER:  The parties participating in this

4    deposition acknowledge that I will be reporting the

5    proceedings remotely pursuant to California Code of

6    Civil Procedure 2025.310.

7    DETECTIVE SONASI MAKA,

8    having been first duly sworn,

9    testified as follows:

10    EXAMINATION

11   BY MR. POINTER:

12    Q.  Good afternoon, Deputy.

13    A.  Good afternoon.

14    Q.  Deputy, can you tell us your full name, please.

15    A.  My name is Sonasi Maka.

16    Q.  Deputy Maka, I am Adante Pointer.  I am one of

17   the attorneys representing Ms. Atienza whose son

18   Laudemer Arboleda was shot and killed November 3rd of

19   2018.  And you are here to have your deposition today.

20   Do you understand that?

21    A.  Yes.

22    Q.  Have you ever given a deposition?

23    A.  No.

24    Q.  This will be an opportunity for me to ask you

25   questions about the incident, your involvement, and it

6

1  will be done under oath.  Do you understand that?

2      A.  Yes.

3      Q.  I presume you've already been given some of the

4  guidelines and admonitions of a witness by your counsel,

5  who I believe is seated in the room there with you, but

6  I will go over some of those rules and admonitions just

7  so that we're on the same page.  Okay?

8      A.  All right.

9      Q.  So there's no judge here, and you're sitting in a

10  conference room with your counsel, and I'm here at home

11  taking your deposition; however, the oath you took has

12  the same force and effect as if you were in a court of

13  law and a judge was present.  Do you understand that?

14      A.  Yes.

15      Q.  We don't want you to guess or speculate, so if

16  you do not know something, just say you do not know.

17  Because when you provide an answer, a response to any of

18  the questions that I pose here to you today, we will

19  presume that you understood the question and you're

20  answering the question that I pose.  Do you understand

21  that?

22      A.  Yes.

23      Q.  If you need to take a break at any time, that's

24  fine.  I just ask that we do not take a break while a

25  question is pending.  Do you understand that?

7

1    A.  Yes.

2    Q.  I am entitled to your best recollection.  Is

3    there any reason why you would not be able to give your

4    deposition here today?  For example, you have been up a

5    long time; you're sleepy.  Any reasons like that?

6    A.  No.

7    Q.  It's important -- one of the more important

8    things that we both have to do today is that we speak

9    one at a time because there is a court reporter, who we

10   can see on our screen, that is making a typewritten

11   booklet of everything that is said here today.  In order

12   for that booklet to be as accurate as possible, it's

13   important that you allow me to ask my question and then

14   I do the same courtesy, which is allow you to complete

15   your question.  And that way we avoid talking over one

16   another, which makes it very difficult for the court

17   reporter, if not impossible for the court reporter, to

18   make an accurate transcript here today.  Do you

19   understand that?

20   A.  Yes.

21   Q.  So if for some reason you start talking or

22   answering while I'm still kind of making my way through

23   my question, I may ask you to pause or we may ask you to

24   repeat your answer.  We're not being rude.  We're just

25   trying to make sure that the transcript is accurate.  Do

8

1   you understand?

2       A.  Yes.

3       Q.  Great.  At some point in time you will be

4   provided a copy of the written transcript of today's

5   deposition for you to review.  If for any reason you

6   want to make a change to what you've said here today,

7   you are free to do that; however, if you should make

8   changes to the transcript after today, I can then

9   comment, whether it's to the judge or to a jury, as it

10  relates to your credibility, i.e., saying today when he

11  was under oath he said one thing.  Later when he got to

12  his house or wherever you reviewed this transcript at,

13  you wrote or changed your response.  Do you understand

14  that?

15      A.  Yes.

16      Q.  From time to time your counsel may pose

17  objections to a question that I ask you.  You are still

18  to answer that question unless you are specifically

19  instructed not to answer the question.  Do you

20  understand that?

21      A.  Yes.

22      Q.  All right.  So I'm going to get started with the

23  deposition.  Do you have any questions of me right now

24  before we get going?

25      A.  I do not.

9

1    Q.   Okay.  Thank you.

2        So, Deputy, how long have you been a deputy for

3    the sheriff's department?

4    A.   A little bit over four years now.

5    Q.   And as I mentioned at the outset of your

6    deposition, the incident concerning Mr. Arboleda took

7    place in November of 2018, and the question I have is:

8    How long had you been a deputy up until that point?

9    A.   Two years.

10   Q.   And during those two years that you had been a

11   deputy leading up to the shooting death of Laudemer

12   Arboleda, my understanding is you had spent some time

13   serving in the two Contra Costa jails, the west county

14   facility as well as MDF or Martinez detention facility;

15   is that true?

16   A.   Yes.

17   Q.   And that at the time of the incident concerning

18   Mr. Arboleda, you were still in your field training

19   program; is that correct?

20   A.   Yes.

21   Q.   However, you were due to complete that program --

22   I believe it was that Monday, which would have just been

23   a few days after Mr. Arboleda was shot and killed,

24   correct?

25   A.   Yes.

10

1     Q.  And it's also my understanding that at the time

2  of this incident concerning Mr. Arboleda, officer -- or

3  I should say Deputy Muller, M-U-L-L-E-R, was serving as

4  your field training officer on the date this incident

5  took place; is that correct?

6     A.  Yes.

7     Q.  It's also my understanding that during the course

8  of this incident, yourself as well as Officer Muller

9  were partnered up or riding together in one patrol car;

10  is that true?

11     A.  Yes.

12     Q.  And it's also my understanding that you were

13  driving that patrol car during the course of this

14  incident; is that true?

15     A.  Yes.

16     Q.  And Officer Muller was essentially sitting in

17  your front passenger seat except for the times where he

18  was outside of the car, correct?

19     A.  Yes.

20     Q.  Was there a division of labor between you two on

21  the date of this incident?  Meaning, was one of you

22  taking primary responsibility for putting out

23  transmissions while the other driving, things of that

24  nature?

25          MR. MAUCK:  Vague as to time.

11

1    BY MR. POINTER:

2        Q.  So you still answer, Officer.

3        A.  At the time throughout the day, it would just be

4    me, but there was times where Muller would intervene.

5        Q.  Thank you.  What I'm trying to figure out to try

6    to see if I can make this more clear, did one of you

7    have the responsibility of putting out radio

8    transmissions?

9        A.  No.

10       Q.  So during the -- and I'm talking about during the

11   course of this incident when you're investigating the

12   reports of a suspicious person.  Did either one of you

13   have the primary responsibility of putting out radio

14   transmissions?

15       A.  No.

16       Q.  Was that something that you each would engage in

17   during the course of the incident of investigating the

18   report of a suspicious person?

19       A.  Yes.

20       Q.  I'm going to take you to the date of the

21   incident, and, as I represented to you, that was

22   November 3rd of 2018.  Does that sound right to you?

23       A.  Yes.

24       Q.  And my understanding is you were, you know, in

25   uniform and driving a marked sheriff's deputy vehicle

12

1    during the course of this incident, correct?

2        A.  Yes.

3        Q.  And just so we're clear, because I'm using the

4    word "incident," and I want to make sure we're on the

5    same page.  When I say "incident," I am talking about

6    the investigation, response and ultimately the shooting

7    death of Laudemer Arboleda.  Do you understand that?

8        A.  Yes.

9        Q.  Thank you.  So during the course of this

10   incident, my understanding is that you're partnered up

11   with officer -- Deputy Muller, and you all are attached

12   to respond to a call for service from a residence in

13   Danville; is that correct?

14       A.  Yes.

15       Q.  And that call for service was about a person whom

16   the reporting party considered to be suspicious walking

17   around in a particular neighborhood, correct?

18       A.  Yes.

19       Q.  And that person, the reporting party, described

20   the person as being an Asian male wearing glasses,

21   correct?

22       A.  Yes.

23       Q.  That person described in terms of the things this

24   person considered to be suspicious -- strike that.

25           The reporting party reported that the person had

13

1    rung a doorbell, correct?

2        A.  Yes.

3        Q.  The reporting party had also informed dispatch

4    that the person was walking in the area where he had

5    rung this doorbell, correct?

6        A.  Yes.

7        Q.  During the course of your investigation into this

8    report of a suspicious person, you did not receive any

9    information that this person was armed with any weapons,

10   correct?

11       A.  No.

12       Q.  During the course of your investigation into this

13   person who was believed to be suspicious, there was no

14   reports that this person had verbally threatened anyone,

15   correct?

16       A.  No.

17       Q.  And you never --

18           MR. MAUCK:  Objection.  Vague.  Double negative,

19   but I think he's answered it.

20   BY MR. POINTER:

21       Q.  You never received any reports that this person

22   who was reported as suspicious had made any verbal

23   threats to anyone, did you?

24       A.  No.

25       Q.  And you never personally observed this person

14

1    holding any weapons in his hand, correct?

2        A.  No -- wait.

3        MR. MAUCK:  Sorry.  I think he misunderstood the

4    question.  Can you ask that again.

5        MR. POINTER:  I think he answered.

6    BY MR. POINTER:

7        Q.  We'll try it this way:  Is there something else

8    you want to add to your question now -- I mean to your

9    answer?

10       A.  He was not observed holding anything.

11       MR. MAUCK:  Okay.

12   BY MR. POINTER:

13       Q.  And so, Deputy, my understanding is you were

14   attached to this call for service, correct?

15       A.  Yes.

16       Q.  And that meant that you all, meaning yourself and

17   Deputy Muller, your field training officer, were going

18   to respond to the scene to investigate this call of a

19   suspicious person, correct?

20       A.  Yes.

21       Q.  Prior to arriving to the scene, you had not

22   formed the opinion that this person had committed any

23   type of crime, correct?

24       A.  I did not.

25       Q.  And when you drove yourself and Officer Muller to

                                                            15

1    the reported scene of this -- where this suspicious

2    person was identified as walking around, correct?

3        A.  Yes.

4        Q.  And at some point in time you arrived in or about

5    the location where the suspicious person was identified

6    as walking around, correct?

7        A.  Yes.

8        Q.  And when you got there -- strike that.

9            Where did you and Officer Muller go?  Where was

10   the scene located?

11       A.  I do not remember the address of the area.

12       Q.  Well, do you remember the street?

13       A.  I believe it was Laurel Drive.

14       Q.  And the scene of where -- strike that.

15           This area where you arrived at on or about Laurel

16   Drive, that's a residential community, correct?

17       A.  Yes.

18       Q.  When you arrived at the scene, were you greeted

19   by any residents, neighbors, or people who came out and

20   identified anyone as being the suspicious person?

21       A.  No.

22       Q.  When you arrived on the scene, did you observe

23   any crime afoot?

24       A.  No.

25       Q.  When you arrived on the scene, had you received

16

1   any information from any source that this person who had

2   been described as being suspicious had, in fact,

3   committed some alleged violation or crime?

4       A.  No.

5       Q.  When you made it to the scene, at some point in

6   time it's my understanding you pulled your patrol car to

7   the curb and essentially parked; is that true?

8       A.  Yes.

9       Q.  And what happened next after you arrived on the

10  scene?

11      A.  I spotted Arboleda getting into -- walking

12  towards his vehicle and getting into the driver's seat.

13      Q.  And when you saw Mr. Arboleda -- strike that.

14          When you saw the person who you later found out

15  was Mr. Arboleda getting into the driver's seat of his

16  car, was he committing any crime at that point in time?

17      A.  No.

18      Q.  And what made you believe that the person you saw

19  getting into the car was Mr. Arboleda -- or was the

20  person who had been reported as being suspicious?

21      A.  An Asian male wearing glasses.

22      Q.  Okay.  So he fit the description that the

23  reporting party had provided to dispatch?

24      A.  Yes.

25      Q.  And when you arrived to Laurel and you made this

                                                        17

1   observation of the Asian male wearing glasses, who you

2   later come to find out was Mr. Arboleda, had you turned

3   on your lights or sirens on your patrol car?

4   A. No.

5   Q. And when you saw Mr. Arboleda getting into his

6   car, did you turn on your lights and sirens at that

7   point in time?

8   A. No.

9   Q. Is there a reason why?

10   A. At that time I was just trying to talk to him.

11   Q. At that time you had no information that he, in

12   fact, had committed a crime, correct?

13   A. Yes.

14   Q. And when he got into his car -- and by "he," I

15   mean Mr. Arboleda -- that car was on the opposite side

16   of the street essentially facing the direction that you

17   were coming from as you pulled up, correct?

18   A. Yes.

19   Q. And as you saw Mr. Arboleda get into -- strike

20   that.

21   Prior to Mr. Arboleda getting in his car, had you

22   exited your patrol car?

23   A. Yes.

24   Q. So when Mr. Arboleda -- strike that.

25   Is it fair to say, then, that you were outside of

18

1  your patrol car when Mr. Arboleda had -- before

2  Mr. Arboleda had gotten into his car?

3      A.  Yes.

4      Q.  And did you make any attempts to say anything to

5  Mr. Arboleda prior to him getting into his car?

6      A.  No.

7      Q.  Did officer -- or did Deputy Muller make any

8  verbal attempts to communicate with Mr. Arboleda prior

9  to Mr. Arboleda getting in his car?

10     A.  I don't know.

11     Q.  As you sit here today, you don't have a memory of

12 that happening, correct?

13     A.  I don't.

14     Q.  Now, prior to Mr. Arboleda getting in his car,

15 did either you or Officer Muller attempt to use the

16 car's public announcement system to communicate with

17 Mr. Arboleda?

18     A.  No.

19     Q.  So it's my understanding Mr. Arboleda got in his

20 car and essentially proceeded to drive away; is that

21 correct?

22     A.  Yes.

23     Q.  Passing the location that you and Officer Muller

24 were at, correct?

25     A.  Yes.

19

1    Q.  And it's my understanding that -- let me back up.

2         At or about the time of this incident after the

3    shooting had taken place, you were interviewed, correct?

4    A.  Yes.

5    Q.  And you were interviewed by some investigators

6    from the sheriff's office, correct?

7    A.  Yes.

8    Q.  And there were also persons present from the

9    Contra Costa district attorney's office; is that right?

10   A.  Yes.

11   Q.  And did you have legal counsel present at that

12   interview?

13   A.  Yes.

14   Q.  And that was legal counsel provided to you by the

15   police union, correct?

16   A.  Yes.

17   Q.  And so going back to the incident itself, as you

18   saw Mr. Arboleda driving away, he did not make any eye

19   contact with you, correct, or at least none that you

20   could discern, correct?

21   A.  No.

22   Q.  He was just --

23        MR. MAUCK:  Sorry.  Was that, "Did Mr. Arboleda

24   make eye contact with you when he drove away"?

25        MR. POINTER:  Essentially.  But I'll rephrase the

                                                      20

1    question.  Not a problem.

2         MR. MAUCK:  Okay.

3    BY MR. POINTER:

4       Q.  Mr. Arboleda was driving -- strike that.

5           As Mr. Arboleda was driving away, did you

6    perceive that he made eye contact with you?

7       A.  Yes.

8       Q.  You did.  Okay.

9           And you told that to the investigators when you

10   gave them your interview shortly after he was shot and

11   killed?

12      A.  Can I look at it again real quick?  Look at this

13   again real quick?

14      Q.  You have a copy of your interview with you?

15      A.  Yes.

16      Q.  The angle we have, we're far away, so I can't

17   really tell what you have or what you're doing.

18      A.  My interview with Detective Morris.

19      Q.  That's fine.  I direct you to look at Lines 281

20   through 284.

21      A.  289?

22         MR. MAUCK:  What were the numbers, Counselor?

23         MR. POINTER:  281 to 284.

24   BY MR. POINTER:

25      Q.  If you could just look up after you've finished

                                                        21

1  taking a look at it.

2      A.  All right.

3      Q.  Is that -- let me ask you this:  Does that

4  refresh your recollection as to whether or not

5  Mr. Arboleda made eye contact with you as he drove away?

6      A.  It does recollect my memory.  So I'm standing in

7  the street and he's driving towards me.  I'm on the

8  opposite side, but I'm in the middle of the street.

9  He's driving towards me, and I'm waving, but he -- as

10 he's driving by, he doesn't look towards my direction.

11     Q.  Okay.  Did you notice any grimace or anything

12 like that on his face?

13     A.  No.

14     Q.  Did he make any gestures towards you as he

15 approached and drove by you?

16     A.  No.

17     Q.  Did he burn rubber as he drove off?  Did you hear

18 the car's tires burning any rubber or screeching?

19     A.  No.

20     Q.  And as he was driving off, did you form the

21 opinion that he was trying to hit you as you stood in

22 the street?

23     A.  No.

24     Q.  And at the time you were out in the street trying

25 to get Mr. Arboleda's attention, Deputy Muller was

                                                        22

1    outside of the car as well, right?

2        A.  Yes.

3        Q.  And as Mr. Arboleda drove by, yourself as well as

4    Officer Muller got back into your patrol car and decided

5    to follow Mr. Arboleda; is that right?

6        A.  Yes.

7        Q.  And it's true that when you initially made

8    contact -- strike that.

9            It's true that when you initially tried to make

10   contact with Mr. Arboleda during this particular

11   instance there on or about Laurel, you didn't actually

12   specifically tell him to stop, correct?

13       A.  I did not.

14       Q.  And you did not hear Officer -- Deputy Muller

15   give a command or an order specifically to stop, did

16   you?

17       A.  I did not hear Mr. Muller say anything.

18       Q.  And, in fact, at or about that time there on

19   Laurel Street, Deputy Muller actually told you that you

20   guys were not going to make a traffic stop, correct?

21       A.  I don't remember that.

22       Q.  Do you remember Deputy Muller telling you that

23   you two were going to actually make a traffic stop at

24   that point in time?

25       A.  No.

23

1    Q.  In fact, the conversation between yourself and

2  your field training officer, Deputy Muller, was that you

3  were simply going to try to speak to Mr. Arboleda at

4  that point in time, correct?

5    A.  Yes.

6    Q.  That would have made that a consensual stop,

7  correct?

8    A.  Yes.

9    Q.  You didn't have any reasonable suspicion that he

10  had committed a crime of any sort, correct?

11    A.  Yes.

12    Q.  And nor did you have any information -- strike

13  that.

14       Nor did you have probable cause to make an arrest

15  at that time, correct?

16       MR. MAUCK:  Calls for a legal conclusion.

17       Go ahead.

18  BY MR. POINTER:

19    Q.  Let me back up.  You attended a POST academy,

20  correct?

21    A.  Yes.

22    Q.  Police Officers Standard of Training Academy,

23  correct?

24    A.  Yes.

25    Q.  Graduated from that academy, right?

24

1      A.  Yes.

2      Q.  You had to study and learn the principles of what

3  reasonable suspicion means, correct?

4      A.  Yes.

5      Q.  You also had to learn and study and understand

6  the principles of probable cause, too, correct?

7      A.  Yes.

8      Q.  These are not terms that are new to you today,

9  correct?

10     A.  No.

11     Q.  Now, we just were discussing that at this point

12  the contact that you all were seeking to make with

13  Mr. Arboleda would have been considered a consensual

14  stop, correct?

15     A.  Yes.

16     Q.  What does that term mean to you?

17     A.  Consensual is speaking to anyone that's in the

18  public.  We're not stopping them to investigate a crime.

19  It's just if they wanted to talk to us, they can talk to

20  us.

21     Q.  And if they don't want to talk to you, they don't

22  have to, right?

23     A.  They do not have to.  They can walk away.

24     Q.  Or drive away, too, correct?

25     A.  Yes.

25

BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA 95050  -  (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)

1    Q.  So they have no duty to sit there and be detained

2  and respond to whatever questions you have, right?

3    A.  Yes.

4    Q.  Now, so Mr. Arboleda drives away.  Yourself and

5  Deputy Muller get back into your patrol car, make a

6  U-turn, and then start following Mr. Arboleda; is that

7  right?

8    A.  No.

9    Q.  Okay.

10    A.  At that time he was nowhere on Laurel Drive or

11  nowhere in sight.

12    Q.  When you left Laurel Drive -- strike that.

13        Mr. Arboleda got in his car and drove away.

14  Yourself and Deputy Muller got into your patrol car, and

15  what was your intent at that point in time?

16    A.  To see where he drives.

17    Q.  Okay.  So your attempt was to find him and follow

18  him, correct?

19    A.  Yes.

20    Q.  And in order to do that, you all got in the car

21  and then drove off of Laurel Drive in search of where

22  Mr. Arboleda was at, correct?

23    A.  Yes.

24    Q.  And at some point in time you found Mr. Arboleda;

25  is that right?

26

1    A.  Yes.

2    Q.  And where did you find Mr. Arboleda at?  Which

3  street?

4    A.  I found Mr. Arboleda on Princeton.

5    Q.  Okay.  So on Princeton, that's where yourself and

6  Officer Muller tried to make contact with Mr. Arboleda

7  for the second time, correct?

8    A.  Yes.

9    Q.  Had you activated your lights and sirens at any

10  point in time prior to seeing Mr. Arboleda on Princeton?

11    A.  No.

12    Q.  When you saw Mr. Arboleda on Princeton, what was

13  the car doing?  Was it moving or was it still?

14    A.  It just pulled into a parking spot on the curb,

15  parked his vehicle.

16    Q.  Okay.  And it was -- had he lawfully parked the

17  vehicle?

18    A.  He lawfully parked his vehicle.

19    Q.  And so at the time you saw Mr. Arboleda lawfully

20  parking his vehicle, what did you do next?

21    A.  Parked my vehicle in the opposite end, got out my

22  vehicle, made an attempt to walk towards his vehicle on

23  the street.

24    Q.  And when you parked your vehicle on the opposite

25  end and got out and attempted to -- or started walking

27

1   towards his vehicle, had Officer Muller got out of the

2   car too?

3       A.  I don't know.

4       Q.  Had Officer Muller given you any instructions

5   prior to you getting out the car on Princeton?  And just

6   so we're clear, I'm asking about the point in time from

7   when you saw Mr. Arboleda drive away until the time you

8   got out the car on Princeton and started walking towards

9   Mr. Arboleda.

10      A.  No.  I do not remember.

11      Q.  So as you sit here today, you don't have any

12  memory of receiving any instruction from Deputy Muller

13  between those two time periods, meaning when

14  Mr. Arboleda got in his car and drove away on Laurel

15  until the time he got out of the car on Princeton,

16  correct?

17      A.  Yes.

18      Q.  And as you started walking towards Mr. Arboleda's

19  car on Princeton, what took place next, if anything?

20      A.  Mr. Arboleda exited where he parked and was

21  driving towards me.

22      Q.  So in a similar fashion as on Laurel Street,

23  correct?

24      A.  Yes.

25      Q.  He wasn't burning rubber or screeching the tires

28

1  of the car, correct?

2     A.  No.

3     Q.  It didn't appear to you like he was trying to

4  strike you with the car, correct?

5     A.  No.

6     Q.  Did it appear as if he made eye contact with you

7  on this occasion?

8     A.  Did it appear he made eye contact?  I was

9  standing in the street and he was driving towards me,

10  but as he drove by he never looked in my direction.

11     Q.  Okay.  And as he drove by you when you were

12  standing in the street, how close did the car get to

13  you, your best estimate?

14     A.  Foot and a half to my left.

15     Q.  Is it fair to say that as the car passed you, you

16  were closest to the driver's side of Mr. Arboleda's

17  Honda?

18     A.  Yes.

19     Q.  And when it was -- when the Honda was approaching

20  you and got within a foot and a half of you, did you

21  unholster your firearm and point it at Mr. Arboleda's

22  car?

23     A.  No.

24     Q.  And you didn't discharge your firearm at any

25  point in time during this incident, correct?

29

1      A.  No.  No, I did not.

2      Q.  And so as the car was approaching you on

3  Princeton and driving past you, did you see Mr. Arboleda

4  grimacing his face in your direction?

5      A.  No.

6      Q.  Now, my understanding is at some point in time

7  during the course of these chain of events,

8  Mr. Arboleda's license plate was ran; is that true?

9      A.  His license plate was what?

10      Q.  You ran his license plate to see what came back.

11      A.  Yes.

12      Q.  And when you -- when that happened, you received

13  information about the registered owner of the Honda,

14  correct?

15      A.  Yes.

16      Q.  And just so we're clear, that's the type of car

17  Mr. Arboleda was driving.  It was a silver or grey

18  Honda, correct?

19      A.  Yes.

20      Q.  So what information -- strike that.

21          You didn't receive any information that the car

22  was reported stolen, correct?

23      A.  No, it was not.

24      Q.  You didn't receive any information that the

25  registered owner of the car had any wants or warrants,

30

1   correct?

2       A.  No, I did not.

3       Q.  You didn't receive any information that there was

4   a "be on the lookout," a BOLO, for this particular

5   vehicle, correct?

6       A.  No.

7       Q.  And up to this point in time, you hadn't seen

8   this vehicle break any type of traffic laws, correct?

9       A.  Yes.

10      Q.  You say "yes," meaning you did not see any?

11      A.  I did not see any.

12      Q.  Okay.  Nor had anyone told you that the car had

13  broken any traffic laws, correct?

14      A.  Correct.

15      Q.  Now, I understand as the car drove away you were

16  describing that you're in the street.  He got within a

17  foot and a half of you.  Why was it at that time that

18  you did not pull your weapon?

19      A.  I had no fears for my safety.

20      Q.  Say that again.  I'm sorry.

21      A.  I had no fears for my safety.

22      Q.  Okay.  Was that because he wasn't looking at you?

23      A.  He was driving on the opposite side, and I was on

24  the other side of the street.

25      Q.  So he was driving on his -- he was driving on the

31

1    proper side of the street, correct?

2        A.  Yes.

3        Q.  The car was moving.  It's coming towards you,

4    correct?

5        A.  Yes.

6        Q.  All right.  And you didn't even unholster your

7    weapon, right?

8        A.  No.

9        Q.  And Mr. Arboleda was essentially looking straight

10   ahead as if almost he didn't even see you, correct?

11       A.  Yes.

12       Q.  And as the car passed you, it got within a foot

13   and a half of you, as you said, right?

14       A.  Yes.

15       Q.  So you're almost -- it's fair to say you're,

16   like, in the middle of the street, right?

17       A.  Yes.

18       Q.  So as the car is coming in your direction and

19   passes you, did Officer Muller pull his weapon -- pull

20   his firearm out?

21       A.  No.

22       Q.  As the car passed you, did Officer Muller make

23   any attempt that you heard to communicate with

24   Mr. Arboleda?

25       A.  I did not hear any.

                                                          32

1    Q.  And so the car passes you, goes back in the

2  direction from which you came, and what happens next, if

3  anything?

4    A.  He's driving past me.  I turn around and I see

5  him making a left on Brookside and running the stop sign

6  that's at Princeton and Brookside.

7    Q.  And when you say you saw him run the stop sign,

8  did he run the stop sign meaning he made a left or right

9  turn, or did he just continue straight?

10    A.  He made a left turn onto Brookside without

11  stopping at the stop sign.  It was at Princeton and

12  Brookside.

13    Q.  And where were you at, at that point in time in

14  relation to Mr. Arboleda's car when he made this left

15  onto Brookside and not stopping at the stop sign?

16    A.  Probably approximately 50 yards.

17    Q.  Was your car essentially behind Mr. Arboleda's

18  traveling in the same direction he was when he made the

19  left off of Princeton onto Brookside?

20    A.  No.  I was still standing in the street.

21    Q.  Okay.  Did you have your body camera activated at

22  that point in time when you were standing in the street

23  and observed Mr. Arboleda not stop at the stop sign on

24  Brookside?

25    A.  I don't know.

33

1    Q.   Okay.  Have you seen any video clips or footage

2  that depicts Mr. Arboleda running the stop sign on

3  Brookside?

4    A.   No.

5    Q.   Did you remark to Deputy Muller that Mr. Arboleda

6  had not stopped at the stop sign?

7    A.   No.

8    Q.   Did he -- "he" meaning Deputy Muller -- did he

9  tell you that he observed Mr. Arboleda not stop at the

10  stop sign at Brookside?

11    A.   Yes.

12    Q.   And what did he say?

13    A.   He said, "Did you see him running a stop sign?"

14  And I said yes.

15    Q.   And so what happened next?

16    A.   I made a U-turn and I drove towards -- I believe

17  it's Mr. Arboleda's vehicle had made a left onto

18  Brookside and was looking for his vehicle to conduct a

19  traffic enforcement stop.

20    Q.   And at some point in time you activated your

21  lights and sirens, right?

22    A.   Yes.

23    Q.   That means going Code 3?

24    A.   No.  Just activated my lights and sirens to

25  conduct a traffic enforcement stop.

34

1    Q.   Code 3 is different than activating your lights

2    and sirens; is that right?

3    A.   Yes.  Like responding to scenes with your lights

4    and sirens and -- your lights and sirens on, pretty much

5    it, yeah.

6    Q.   Okay.  And so is it fair to say that -- well,

7    strike that.

8         So you turn on the lights and sirens, but you

9    weren't responding to a scene; is that correct?

10   A.   Yes.

11   Q.   And at some point in time -- did -- strike that.

12        Did you put out a transmission advising dispatch

13   that you all were going to make a traffic stop?

14   A.   Yes.

15   Q.   And who made that transmission?

16   A.   I don't know.

17   Q.   And so it's fair to say, then, that you then

18   pursue Mr. Arboleda after he had made the left onto

19   Brookside; is that correct?

20   A.   I couldn't find his vehicle when I made the left

21   onto Brookside, and I believe I made a right onto Glen

22   Arms and drove down.  And when I spotted his vehicle,

23   that's when I turned on the lights and sirens to conduct

24   a traffic enforcement stop.

25   Q.   And so when you saw Mr. Arboleda on Glen Arms,

                                                           35

1    what was the car doing, if anything?

2        A.  Driving normally.

3        Q.  When you say "normally," meaning it was obeying

4    all the traffic --

5        A.  Obeying all traffic -- yes.

6            MR. MAUCK:  Sorry.  Just remember to wait for him

7    to finish.  You know where he's going.  He knows what

8    you're going to say.  Let's just wait so we have a clean

9    record here.

10           THE WITNESS:  Got you.

11           MR. POINTER:  Were you able to get that, Madam

12   Reporter, or do I need to go back?

13           THE REPORTER:  The end was cut off.  So if you

14   want to ask him again.

15   BY MR. POINTER:

16       Q.  When you saw Mr. Arboleda driving on Glen Arms,

17   was he obeying the traffic laws at that point?

18       A.  Yes.

19       Q.  And I believe you said you turned on your lights

20   and sirens in order to effect a traffic stop; is that

21   right?

22       A.  Yes.

23       Q.  And what happened next, if anything?

24       A.  Mr. Arboleda yielded, and as I was getting out of

25   my driver's side of the vehicle, he drove away.

                                                          36

1    Q.  And so how far did you get out your car?

2    A.  Just got out of the vehicle.

3    Q.  I'm sorry -- go ahead.

4    A.  As soon as I stepped both of my -- my second foot

5    touched the floor, he took off at a high rate of speed.

6    Q.  When you say "high rate of speed," are you saying

7    50 miles an hour?  How fast are you --

8    A.  Enough for the vehicle to jerk when he took off.

9    Q.  So the vehicle jerked?

10   A.  Yes.

11   Q.  When you say it jerked, are you saying like it --

12   like it kicked gravel and rocks?

13   A.  No.

14   Q.  When it jerked, was it jerking from left to

15   right?

16   A.  No.  Forward.

17   Q.  Okay.  So it was accelerating from a stop; is

18   that what you're saying?

19   A.  Yes.

20   Q.  And it wasn't, like, fishtailing or anything,

21   right?

22   A.  No.

23   Q.  And so at that point in time, you used -- up

24   until then you used lights and sirens.  Had you used the

25   PA on the car?

37

1    A.  No.

2    Q.  And by "PA," you understand that means public

3    announcement, like a loudspeaker?

4    A.  Yes.

5    Q.  And so Mr. Arboleda pulled off -- had he been

6    parked at a curb?

7    A.  Yes.

8    Q.  And so he had lawfully parked the car and then

9    pulled off from the curb as, I believe you said, you put

10   both of your feet on the ground, correct?

11   A.  Yes.

12   Q.  Then what happened next, if anything?

13   A.  He took off from Glen Arms, made a right onto

14   Laurel Drive, and I got back into the vehicle and was

15   driving onto -- making a right on Laurel Drive and my

16   partner Carusso -- Deputy Carusso was behind the

17   vehicle, and we were following Deputy Carusso.

18   Q.  So if I understand the order correctly,

19   Mr. Arboleda's in the lead, if you will, Deputy Carusso

20   is behind Mr. Arboleda's car, and now you as well as

21   Deputy Muller are behind Deputy Carusso all following or

22   pursuing Mr. Arboleda; is that true?

23   A.  Yes.

24   Q.  And had officer -- or strike that.

25       Had Deputy Carusso turned on his lights and

38

1  sirens at that point in time?

2   A.  Yes.

3   Q.  And did you also have your lights and sirens on

4  at that point in time?

5   A.  Yes.

6   Q.  And so what happened next, if anything?

7   A.  We're pursuing Mr. Arboleda onto Laurel Drive,

8  and then he makes a right onto Hartz Way, and he drives

9  down Hartz Way and attempts to make a left into a

10  parking complex, I believe, or he was on a driveway.

11  And at that point in time, Deputy Muller jumps out of my

12  vehicle.  I park the vehicle, get out, and we're

13  attempting to stop Mr. Arboleda.

14   Q.  When you say "attempting to stop Mr. Arboleda,"

15  what were you physically doing in particular to try to

16  stop him?

17   A.  Just yelling at him to stop the vehicle and get

18  out.

19   Q.  As you were approaching the vehicle, were you

20  approaching him from the rear?  Side?  Front?  Can you

21  describe the angle in which you were approaching the

22  vehicle?

23   A.  Initially it was from the driver's side as

24  Arboleda was in the driveway, and as he's backing out of

25  the driveway we're just backing up and making sure we're

39

1  staying in front of him so he can see us so he can get

2  out to stop the vehicle.

3      Q.  And at that point in time, you still didn't make

4  eye contact with Mr. Arboleda, correct?

5      A.  No.

6      Q.  He continued to kind of just be looking forward,

7  right?

8      A.  Yes.

9      Q.  And you never heard him say anything or any words

10  to any effect up until this point, correct?

11      A.  No.

12      Q.  And you mentioned that yourself, Deputy Muller,

13  and Deputy Carusso are now out of the cars and

14  essentially approaching Mr. Arboleda's vehicle, and I

15  think you said you guys moved out of the way; is that

16  correct?  As the car was backing up?

17      A.  No.  As the car was driving towards our

18  direction, we were yelling just "Move out of the way."

19      Q.  Who yelled, "Move out of the way"?

20      A.  I heard Muller saying just "Get out of the way,"

21  and then I was telling Carusso to just step off to the

22  left.

23      Q.  And so when you heard Deputy Muller telling you

24  to get out of the way, where were you at in relation to

25  Mr. Arboleda's car?

40

1    A.   Directly in front.

2    Q.   When you say "directly in front," meaning like in

3   front of the hood, the headlight/grille area of the car?

4    A.   Yes.

5    Q.   And did you follow Deputy Carusso's -- I mean

6   Deputy Muller's commands to you to get out of the way?

7    A.   Yes.

8    Q.   How far -- can you give me your best estimate as

9   to how far -- strike that.

10       Can you give me your best estimate as to how

11  close the car got to you before you moved out of the

12  way?

13   A.   Ten feet.

14   Q.   And up to the point where you had moved out of

15  the way and the car got 10 feet close to you, had you at

16  that point pulled your firearm?

17   A.   Yes.

18   Q.   At what point in time did you pull your firearm?

19   A.   When Mr. Arboleda was backing out of the driveway

20  and started driving, like, as soon as he started backing

21  out of the driveway is when I pulled my firearm.

22   Q.   And did you fire your firearm?

23   A.   No.

24   Q.   Why not?

25       MR. MAUCK:   Objection.   Calls for speculation.

41

1    Go ahead.

2    THE WITNESS:  At that time my partners were near

3    the vehicle, and I didn't have -- didn't fear for

4    anyone's safety at that time, myself or others.

5    BY MR. POINTER:

6    Q.  And, in fact, you've been trained that you're not

7    to use deadly force against a person driving a car if

8    you can just move out of the way, correct?

9    A.  I'm not to discharge firearm towards a vehicle

10   unless in fear of myself or others' safety.

11   Q.  And you've been trained that if you can move out

12   of the path of a moving vehicle, you should, correct?

13   A.  Yes.

14   Q.  Now, when the car's moving again and you get out

15   of the way and you tell Officer Carusso to get out of

16   the way, what happens next?

17   A.  Arboleda drives past us, and then we get into our

18   vehicles and pursue him.

19   Q.  When he drove past you, he once again was not

20   looking -- he did not make eye contact with you,

21   correct?

22   A.  No.  But he's driving and weaving around us and

23   our patrol vehicles.

24   Q.  Okay.  But you didn't make eye contact with

25   Mr. Arboleda at this time, correct?

42

1     A.  No.

2     Q.  And as he's driving -- you said he's moving

3  around yourself and the vehicles -- it didn't appear he

4  was trying to strike either you or one of the officers

5  or the vehicles, correct?

6     A.  No.

7     Q.  And so what happens next, if anything?

8     A.  We get into our vehicle and pursue Mr. Arboleda,

9  and at this time we're directly behind Mr. Arboleda

10  driving on Hartz Way towards Front Street.

11     Q.  Now, Hartz Way, that's the street that would take

12  you into downtown Danville, correct?

13     A.  I believe so.

14     Q.  And Front Street will also do the same, correct?

15     A.  Yes.

16     Q.  And while you're driving in pursuit of

17  Mr. Arboleda, I take it you're listening to police

18  dispatch, correct?

19     A.  No.  Are you asking am I listening to police

20  dispatch?

21     Q.  Yeah.  Let me ask it a different way.  As this is

22  going on, do you guys have your radio on so you can hear

23  radio transmissions and dispatch?

24     A.  Yes.

25     Q.  Okay.  Did that change at any point in time while

43

1    you were pursuing Mr. Arboleda?

2        A.   No.

3        Q.   Were you paying attention to the transmissions on

4    the dispatch?

5        A.   No.

6        Q.   Were you listening out for any orders or commands

7    that your field training officer was giving as you were

8    pursuing Mr. Arboleda?

9        A.   Yes.

10       Q.   Did you hear your field training officer say

11   words to the effect that he was going to call or

12   terminate the pursuit if the pursuit made it to

13   downtown?

14       A.   No.

15       Q.   Did you hear anyone make a statement to that

16   effect?

17       A.   No.

18       Q.   Was there any discussion between yourself and

19   Deputy Muller as to what your plans were going to be if

20   Mr. Arboleda made it to downtown?

21       A.   No.

22       Q.   Did you ever hear -- strike that.

23            On this day I understand you were in the field

24   training program, Deputy Muller, who was your field

25   training officer, and it's my understanding that

44

1    Sergeant Martin was the patrol supervisor that day; is
2    that correct?
3       A.  Yes.
4       Q.  Did you hear Sergeant Martin give you or Officer
5    Muller any orders or commands or directives as to what
6    to do during the course of this pursuit?
7       A.  No.
8       Q.  Did you request for any directives or advice as
9    to what to do with Mr. Arboleda from the patrol sergeant
10   during the course of this pursuit?
11      A.  No.
12      Q.  Now, I may have missed it, and if I did I
13   apologize.  There was some point in time where one or
14   more of the deputies tried to open Mr. Arboleda's car
15   door; is that correct?
16      A.  Yes.
17      Q.  Which street did that happen on?
18      A.  On Hartz Way when he was in the driveway.
19      Q.  Okay.  So when Mr. Arboleda was in the driveway,
20   I believe that was Deputy Muller got close enough to the
21   car and tried to open up the driver's side door of the
22   Honda; is that right?
23      A.  Yes.
24      Q.  And that was during the course when Mr. Arboleda
25   was reversing out of the driveway, right?

45

1    A.  Yes.

2    Q.  And then there was a point in time -- strike

3  that.

4        When this was taking place, you were at the rear

5  of your car; is that right?

6        MR. MAUCK:  I'm sorry.  When is this?

7  BY MR. POINTER:

8    Q.  Going back to this point in time in the driveway,

9  you were standing near the rear of your patrol car,

10  right?

11    A.  No.

12    Q.  You said "no" or "don't know"?

13    A.  No.

14    Q.  Now, just let me try to clarify this -- get this

15  point down.  When you were on Hartz Way and Mr. Arboleda

16  in the Honda is in this driveway, you had gotten out

17  your car with your firearm drawn, correct?

18    A.  Yes.

19    Q.  Deputy Muller actually approached Mr. Arboleda's

20  Honda and tried to open the driver's side door, correct?

21    A.  Yes.

22    Q.  And was there a point in time where you were at

23  the rear of your car?

24    A.  I don't recall.

25    Q.  So as you sit here today, you don't have a memory

                                                            46

1   of that, correct?

2     A.  No.

3     Q.  Was there a point in time when you were on Hartz

4   Way where you were standing in the vicinity of the rear

5   of Mr. Arboleda's car?

6     A.  No.

7     Q.  Now, when the car -- Mr. Arboleda's car was

8   moving from this driveway on Hartz Way, was going to

9   continue on, had there been a point in time where Deputy

10  Muller told you, "Don't shoot"?

11     A.  I don't know -- I don't recall that.

12     Q.  When you say you don't recall that, do you not

13  have a memory of ever hearing someone say that, or is it

14  just that you don't recall that taking place during this

15  sequence in the chain of events?

16     A.  I don't have a memory of anyone saying that.

17     Q.  So when Mr. Arboleda reversed his car on Hartz

18  Way and then started driving, I take it he -- after he

19  reversed his car out of the driveway, he wound up

20  driving the car forward, right?

21     A.  Yes.

22     Q.  Okay.  And what did you do, if anything, at that

23  point in time?

24     A.  At that point in time, I got out of his way and

25  was yelling for my partner Carusso to get out of his

47

1  way, which we did.

2      Q.  And why did you yell at your partner Carusso to

3  get out of the way?

4      A.  Because he was standing directly in front of the

5  vehicle.

6      Q.  You didn't open fire on the vehicle at that point

7  in time, did you?

8      A.  No.

9      Q.  And neither did Deputy Carusso, correct?

10     A.  He did not.

11     Q.  Neither did Deputy Muller, correct?

12     A.  He did not.

13     Q.  Now, my understanding is after this takes place,

14  you guys get back into your patrol vehicles, correct?

15     A.  Yes.

16     Q.  All right.  What happened next?

17     A.  We pursued Mr. Arboleda on Hartz Way, and he made

18  a right onto Front, and we continued to pursue him onto

19  Front until he got to Diablo and Front.

20     Q.  Now, at some point during the course of this

21  pursuit, did you hear anyone make statements to the

22  effect that they were going to terminate the pursuit if

23  the pursuit made its way downtown?

24     A.  No.

25     Q.  Did you hear anybody make statements or words to

48

1   the effect saying, "Don't shoot him"?

2      A.  I'm sorry.  I didn't hear that.

3      Q.  Did you hear anybody during the course of this

4   incident make a statement or say words to the effect of

5   "Don't shoot him"?

6      A.  No.

7      Q.  Do you recall there being a point during the

8   course of this incident where Deputy Muller was between

9   the Honda and two parked cars?

10      A.  No.

11      Q.  Did you ever put out a transmission letting

12   dispatch and your fellow officers know that you all had

13   Mr. Arboleda at gunpoint?

14      A.  No.

15      Q.  Did you hear anybody put out such a transmission?

16      A.  Yes.

17      Q.  Who was that?

18      A.  I do not know.

19      Q.  Did you hear anybody during the course of this

20   incident put out a transmission over dispatch indicating

21   the violations that Mr. Arboleda had committed during

22   the course of this pursuit?

23      A.  No.

24      Q.  Did you -- so as this vehicle is proceeding up

25   Front Street towards Diablo Road, can you describe the

49

1   position of the cars, meaning, Mr. Arboleda's car is in

2   the lead, and going backwards from there to his rear,

3   what were the positions of the cars?  In terms of were

4   you the second car, middle, or third car?

5       A.  At that point in time onto Front Street, I was

6   right behind Mr. Arboleda's vehicle, and Deputy Carusso

7   was behind me.

8           MR. POINTER:  This would be a good time to take a

9   break.  I think we've been going for about an hour.

10  Let's take a five-minute break, and we'll come back.

11          (Off the record.)

12  BY MR. POINTER:

13      Q.  You understand that you are still under oath and

14  all the rules and admonitions I gave to you earlier

15  today at the start of your deposition are still in

16  effect; you understand that?

17      A.  Yes.

18      Q.  Okay.  Now, I'm going to direct your attention or

19  your memory, if you will, to a point of this incident

20  where you are essentially behind Mr. Arboleda's Honda

21  and it is approaching Front Street and Diablo Road.

22  Okay?

23      A.  Okay.

24      Q.  And if I understand, you are now the first police

25  car behind Mr. Arboleda's Honda, correct?

                                                        50

1    A.  Yes.

2    Q.  And at this point in time, there's no other cars

3 between yourself and Mr. Arboleda, correct?

4        MR. MAUCK:  Objection.  Asked and answered.

5        Go ahead.

6 BY MR. POINTER:

7    Q.  Is that true?

8    A.  No one was in front of me.

9    Q.  And Front Street is a -- when it comes to -- when

10 it's approaching, I should say, the intersection of

11 Front Street and Diablo Road, it turns into a two-lane

12 street, correct?

13   A.  Yes.

14   Q.  The right-hand lane when it gets to the

15 intersection of Front Street and Diablo Road turns

16 right, and the left-hand lane turns left, correct?

17   A.  Yes.

18   Q.  And there's a third lane that's essentially the

19 opposite lane of traffic; is that correct?

20   A.  Yes.

21   Q.  So it's fair to say there's three lanes of

22 traffic at the intersection of Front Street and Diablo

23 Road where Front Street runs into Diablo Road, the

24 street that you were traveling on, correct?

25   A.  Yes.

51

1    Q.  And as you all are approaching Diablo Road and

2    Front Street, there are one or more cars that are

3    actually civilian cars that are traveling in the same

4    direction, correct?

5    A.  Yes.

6    Q.  And as you all are approaching the intersection

7    of Front Street and Diablo Road, you see a police

8    cruiser, which you come to find out is Deputy Hall, pull

9    onto Front Street, correct?

10   A.  Yes.

11   Q.  And Deputy Hall's cruiser essentially is almost,

12   like, nose to nose with Mr. Arboleda's car as he

13   approached that intersection, right?

14   A.  Yes.

15   Q.  And you could tell that Officer Hall -- or Deputy

16   Hall had applied the brakes pretty quickly, brought his

17   car to an abrupt stop, correct?

18   A.  Yes.

19   Q.  Mr. Arboleda, as he's approaching the

20   intersection, Deputy Hall's car essentially is coming

21   towards him head-on.  Mr. Arboleda then goes to the left

22   around -- essentially taking his car towards the

23   passenger's side of Deputy Hall's vehicle, correct?

24   A.  Yes.

25   Q.  At or about that time, Sergeant Martin is coming

52

1  from the same direction as Deputy Hall, and he turns

2  onto Front Street in an SUV, correct?

3      A.  Yes.

4      Q.  And when he turns onto Front Street, he brings --

5  he also brings his car or his SUV to a halt, correct?

6      A.  Yes.

7      Q.  At or about that time, yourself and Deputy Muller

8  are behind Mr. Arboleda's car, and you guys are

9  approaching the intersection as well, correct?

10     A.  Yes.

11     Q.  And someone in your car -- you could tell me

12 who -- says, "Stop.  Stop.  Stop," words to that effect,

13 correct?

14     A.  Yes.

15     Q.  And was that you or Deputy Muller?

16     A.  That was me.

17     Q.  And Sergeant Martin had brought his car to a

18 stop, and that leaves -- you can use my term -- a gap

19 between Deputy Hall's car and Sergeant Martin's SUV,

20 correct?

21     A.  Yes.

22     Q.  And you saw Mr. Arboleda turn his car into that

23 gap, correct?

24     A.  Yes.

25     Q.  And at some point in time while he was going

53

1    through that gap, you hear gunshots, correct?

2        A.   Yes.

3        Q.   When you heard these gunshots take place, did you

4    know who was firing them?

5        A.   No.

6        Q.   You later learned that it was Officer Hall,

7    correct?

8        A.   Yes.

9        Q.   When you heard the gunshots, did you see the

10   person actually firing their gun?

11       A.   No.

12       Q.   And a part of that is because you were getting

13   out of your car at or about the time those gunshots

14   started, correct?

15       A.   Yes, I was.

16       Q.   So your vision was not directed at the person

17   firing the gun, right?

18       A.   It was not.

19       Q.   Prior to you getting out of the car, did you see

20   Officer Hall standing in the gap between his patrol car

21   and Sergeant Martin's SUV?

22       A.   No.

23       Q.   Prior to you getting out the car, had there been

24   any discussion that you heard between any of the

25   deputies involved in this incident about a plan as to

                                                        54

1  how to bring this pursuit to a nonviolent conclusion?

2      A.  No, there was not.

3      Q.  When you were driving up to the intersection of

4  Front Street and Diablo Road, did you know or did you --

5  yeah -- did you know that Deputy Hall was going to be

6  coming from Diablo and coming down Front Street?

7      A.  No.

8      Q.  Did you see him driving -- strike that.

9      Did you hear anyone giving Mr. Arboleda any

10  orders there on Front Street and Diablo?

11      A.  No.

12      Q.  I'm asking -- this is at or about the time of the

13  gunshots.

14      A.  No.

15      Q.  Now, my understanding is that when you gave your

16  statement to investigators, you were accompanied by

17  attorney Sarah Burkett from the DA's office as well as

18  Investigator Ingersol; is that correct?

19      A.  I believe so, yes.

20      Q.  And did you also have your legal defense attorney

21  present?

22      A.  Yes.

23      Q.  And the car that you were driving was outfitted

24  with a dash cam camera, correct?

25      A.  Yes.

55

1      Q.  And you also had a body-worn camera as well,

2   correct?

3      A.  Yes.

4      Q.  Have you looked at either of the recordings from

5   the patrol car or your body-worn camera?

6      A.  I saw the one from the patrol vehicle that I was

7   driving.

8      Q.  When did you see that for the first time?

9      A.  First time about maybe six, seven months after

10  the incident that day.

11     Q.  Was that in preparation for any interviews or --

12     A.  No.

13     Q.  -- strike that.

14         Why did you review it seven months after the

15  incident?

16     A.  Not sure.

17     Q.  You don't have a recollection?

18     A.  I don't know.  I remember seeing it at the -- on

19  the -- on a YouTube.

20     Q.  Did you see -- have you seen any video related to

21  this incident at any other time than this one that was

22  seven months after the incident on YouTube?

23     A.  Yes.  About three months ago.

24     Q.  Okay.

25     A.  I reviewed the dash cam footage of that

56

1    vehicle -- the vehicle I was driving.

2       Q.  And what was the purpose of reviewing it three

3    months ago?

4       A.  No purpose at all.  Just reviewing the footage

5    from a pursuit that I was in.

6       Q.  Was it in preparation for you giving testimony in

7    the civil case?

8       A.  No.

9       Q.  Have you been interviewed by anyone else other

10   than the time you were interviewed by investigators

11   immediately after and/or on the same day of this

12   incident?

13      A.  No.

14      MR. POINTER:  One second.  I think I'm going to

15   be done.  Do you have any questions, Counsel?

16      MR. MAUCK:  Yeah.  Just two.

17      MR. POINTER:  You can proceed.  If I have some

18   follow-up, I'll go.

19      MR. MAUCK:  All right.

20                 EXAMINATION

21   BY MR. MAUCK:

22      Q.  Deputy, are you aware that there was audio

23   recording of the pursuit or the incident as it's been

24   described the day of?

25      A.  Yes.

1  Q.  Do you think that, to your recollection, does

2  that include the radio chatter, for lack of better word?

3  A.  Yes.

4  Q.  Okay.  And you think that would be better

5  evidence as to what was actually said over the radio

6  during the incident?

7  A.  Yes.

8  Q.  All right.  Thank you.

9                          EXAMINATION

10  BY MR. POINTER:

11  Q.  And this audio, Deputy, have you made any efforts

12  to review it?

13  A.  No.

14  Q.  And you knew you were having your deposition here

15  today.  This wasn't a surprise, was it?

16  A.  No, it was not.

17  Q.  And you didn't make any effort to review in

18  preparation for today's deposition, did you?

19  A.  No.

20  Q.  During any of the breaks, have you made any

21  effort to review the audio?

22  A.  No.

23  Q.  Do you want to listen to the audio now -- strike

24  that.

25          Is there some portion of the testimony that you

                                                        58

1    gave today that you think the audio is going to refresh

2    your recollection so that you can give accurate and

3    truthful testimony here today?

4        A.  No.

5            MR. POINTER:  All right.  No further questions.

6    Thank you, Deputy.  You're free to go as far as I'm

7    concerned.

8            THE WITNESS:  Thank you.

9            MR. MAUCK:  Adante, I think Sarah Burkett was

10   from the Legal Defense Fund, not from the DA's office.

11           MR. POINTER:  Okay.

12           MR. MAUCK:  I don't know if that makes any

13   difference to what you were saying earlier, but -- so

14   she wouldn't be the one questioning.

15           MR. POINTER:  Right.  Okay.  We can remain on the

16   record.  Looks like she's still going anyway.  I'll just

17   ask the deputy.  He can repeat what you're saying.

18   BY MR. POINTER:

19       Q.  Deputy, my understanding is you were accompanied

20   or that there was an attorney present by the name of

21   Sarah Burkett during the course of you giving your

22   interview to investigators on the date of this incident.

23   Do you remember that person?

24       A.  I do not.

25       Q.  Okay.  Do you know whether -- well, if you don't

                                                          59

1   remember -- it's -- what are you going to say?

2      A.   Right.

3           MR. POINTER:   All right.   We can wrap up the

4   deposition at this point.   Thank you, Deputy, for coming

5   down.   I hope you have a good weekend.

6           (Deposition concluded at 2:35 p.m.)

7

8                        --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        60

1                    DECLARATION OF WITNESS

2

3           I, SONASI MAKA, do hereby declare under

4      penalty of perjury that I have read the foregoing

5      transcript; that I have made any corrections as appear

6      noted, in ink, initialed by me, or attached hereto; that

7      my testimony as contained herein, as corrected,

8      is true and correct.

9      EXECUTED this _____ day of _____,

10     2020, at _____, _____.
                    (City)                    (State)

11

12

13

14           _____

15                    SONASI MAKA

16

17

18                        --oOo--

19

20

21

22

23

24

25

                                                        61

1    STATE OF CALIFORNIA )
                         )
2    COUNTY OF FRESNO    )

3

4        I, LILIANA RODRIGUEZ, Certified Shorthand Reporter,

5    in and for the State of California, do hereby certify:

6        That the foregoing proceedings were taken before me

7    remotely at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were duly sworn; that a record of the

10   proceedings was made by me using machine shorthand which

11   was thereafter transcribed under my direction; that the

12   foregoing is a true record of the testimony given.

13       Pursuant to Federal Rule 30(e), transcript review

14   was not requested.

15       I further certify that I am neither financially

16   interested in the action, nor a relative or employee of

17   any attorney or party to this action.

18       IN WITNESS WHEREOF, I have this date subscribed my

19   name.

20

21   DATED:  10/30/2020

22   Fresno, California

23

24       __/s/Liliana Rodriguez_____
         LILIANA RODRIGUEZ, CSR No. 13783
25

62

1                              DISPOSITION

2

3        Pertaining to the original transcript of a

4   deposition in a Federal Case, before completion

5   of the proceedings, review of the transcript

6   [  ] was [ X ] was not requested.

7

8                              --o0o--

9

10       Upon completion of the foregoing transcript, the

11  witness was notified it was ready for signature, but

12  the deposition was not signed by the witness for the

13  following reason:

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  BARBARA J. BUTLER & ASSOCIATES.

21

22       The sealed original will be forwarded to the

23  deposing attorney's office.

24

25                              --o0o--

                                                          63

1                         WITNESS LETTER
     TO:  Detective Sonasi Maka        Date: 12.14.20
2         Attn:  Jason W. Mauck, Deputy County Counsel
          CONTRA COSTA COUNTY COUNSEL OFFICE
3         1025 Escobar Street, 3rd Floor    Depo: 10.16.20
          Martinez, CA 94553                Ref. #20101678
4
     RE: Jeannie Atienza v. Andrew Hall, et al.
5
     Dear Detective Maka:
6
          Please be advised that the transcript of your
7    deposition taken in the above matter has been completed
     and is now available at this office for your reading and
8    signing.
          Please contact our office between the hours of 9:30
9    a.m. and 4:30 p.m. Monday-Friday, to schedule an
     appointment.  Or, if you prefer, contact the attorney to
10   review and sign the copy of your deposition under
     penalty of perjury.
11        Read the transcript making any changes necessary.
     In making any changes, please use the following guide:
12        1. DO NOT WRITE on the original transcript.
          2. SIGN UNDER PENALTY OF PERJURY at the end of the
13           Deposition on the Declaration of Witness Page.
          3. List each change on the Deposition Errata Sheet
14           following this page. Signature is required at
             the bottom of the Errata Sheet.
15        4. Forward the signed Declaration of Witness Page
             and signed Errata Sheet in addition to a copy of
16           this letter to:
                     Barbara J. Butler & Associates
17                   Certified Court Reporters
                     P.O. Box 3508, Santa Clara, CA  95055
18                   (510) 832-8853 or (408) 248-2885.
          Upon receipt of items requested in this letter, I
19   will forward copies of same to all Counsel.
          In the event you have not reviewed your deposition
20   within 35 days or by trial date, whichever is sooner,
     the original transcript will be sealed pursuant to
21   applicable laws and thereafter mailed to the deposing
     attorney.
22
                         Sincerely,
23
                         /s/Barbara J. Butler
24                       Barbara J. Butler, CSR

25   cc:  All Counsel

                                                    64

```
                    DEPOSITION ERRATA SHEET

     RE: Jeannie Atienza v. Andrew Hall, et al.
         Depo:  10.16.20                    Ref. #20101678

     Page No. _____ Line No. _____

     Change:_____

     Reason for change:
     _____

     Page No. _____ Line No. _____

     Change:_____

     Reason for change:
     _____

     Page No. _____ Line No. _____

     Change:_____

     Reason for change:
     _____

     Page No. _____ Line No. _____

     Change:_____

     Reason for change:
     _____

     Page No. _____ Line No. _____

     Change:_____

     Reason for change:
     _____

     Page No. _____ Line No. _____

     Change:_____

     Reason for change:

     _____        _____
     SONASI MAKA                     DATE
```

65

1

ATTORNEY'S NOTES

2

Page # Line #

3 _____/_____/_____

4 _____/_____/_____

5 _____/_____/_____

6 _____/_____/_____

7 _____/_____/_____

8 _____/_____/_____

9 _____/_____/_____

10 _____/_____/_____

11 _____/_____/_____

12 _____/_____/_____

13 _____/_____/_____

14 _____/_____/_____

15 _____/_____/_____

16 _____/_____/_____

17 _____/_____/_____

18 _____/_____/_____

19 _____/_____/_____

20 _____/_____/_____

21 _____/_____/_____

22 _____/_____/_____

23 _____/_____/_____

24 _____/_____/_____

25 _____/_____/_____

66