United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEANNIE ATIENZA, et al.,

Plaintiffs,

v.

ANDREW HALL, et al.,

Defendants.

Case No. 19-cv-03440-RS

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

On November 3, 2018, Contra Costa County Sheriff's Deputy Andrew Hall shot and killed Laudemer Arboleda. Plaintiff Jeannie Atienza, Arboleda's mother, alleges Officer Hall's use of deadly force violated her son's Fourth and her Fourteenth Amendment rights as well as several state statutes. Officer Hall now moves for summary judgment contending he applied reasonable force and that he is immune from suit. For the reasons set forth below, the motion is denied.

## II. BACKGROUND

At approximately 11:00 a.m. on Saturday, November 3, 2018, a Danville resident contacted police dispatch to report that a suspicious person, described as an Asian male about 28 years old and 5'7", rang the doorbells of a few homes near Laurel Avenue. Danville Police Officers Sonasi Maka and Nicholas Muller, riding in the same vehicle, responded to the call. Upon arrival, Officers Maka and Muller saw a man later identified as Arboleda outside his vehicle, a Honda Civic. The officers attempted a consensual stop without activating their lights or sirens but Arboleda entered his vehicle and began to drive away before they initiated contact. At this point,

1    another officer, Charles Caruso, with a civilian ride-along, joined Officers Maka and Muller. None

2    of the officers commanded Arboleda to stop as he drove away. All three officers re-entered their

3    vehicles and followed Arboleda, again without activating their lights or sirens, intending to initiate

4    a consensual stop. This scene repeated itself on Princeton Lane. The Officers parked their patrol

5    cars several car lengths away from Arboleda's parked car and as Officer Maka began to approach

6    Arboleda's vehicle, he pulled away from the curb and down Princeton Lane past Officer Maka.

7    From Princeton Lane, Arboleda made a left onto Brookside Lane. As he did so, Officer Maka

8    observed him run a stop sign. The Officers then turned around and began to pursue Arboleda.

9    Around this time, radio dispatch confirmed the Honda was registered to Arboleda, not stolen, and

10   not associated with any outstanding crimes.

11        When Officer Maka spotted Arboleda driving on Glen Arms Drive, he activated his lights

12   and siren to initiate a traffic enforcement stop related to the stop sign. Arboleda slowed and pulled

13   his vehicle to the right-hand curb. Officer Caruso, who had not been present for the Princeton

14   Lane encounter, parked his vehicle behind theirs. Officers Maka and Muller approached

15   Arboleda's vehicle, at which point he again drove away, turning back onto Laurel Avenue. Officer

16   Caruso, who had not exited his vehicle, activated his lights and siren and pursued Arboleda. He

17   radioed to the other officers that Arboleda had thrown something from the window of his car but

18   did not stop to investigate.[1] Arboleda then slowed as if to pull over but drove away before Officer

19   Caruso was out of his vehicle. By this point, Officers Maka and Muller had re-joined the pursuit

20   and followed Arboleda as he pulled away. On the same street, Arboleda slowed to a stop with

21   Officers Maka and Muller behind him and Officer Caruso to his left. Before any of the officers

22   fully exited their vehicles, he drove away again. Both cars pursued him.

23        Arboleda made a right on to Hartz Way, observing a stop sign, then attempted to make a

24   slow left on to a dead end. Officer Caruso pulled ahead of Arboleda, blocking Arboleda's

---

[1] In his deposition, Officer Caruso clarified that he had not actually witnessed Arboleda throwing something from his car but was instead repeating what his ride-along told him.

United States District Court
Northern District of California

1   progress. As the officers exited their vehicles and unholstered their weapons, Arboleda began to

2   reverse. The officers yelled at Arboleda throughout the encounter to stop the car. Officer Muller

3   approached the driver-side door and attempted to open it as it moved slowly in reverse, but it was

4   locked. The Honda continued to roll backward while Officer Muller clearly instructed the other

5   officers: "Don't shoot, don't shoot!". Arboleda then shifted the car into drive and advanced

6   forward past Officer Muller. Officer Maka, who was then directly in front of the vehicle, stepped

7   aside and let Arboleda pass. All three officers then got back in their patrol vehicles to continue the

8   pursuit down Front Street. Officer Muller radioed that though they had the Honda at gunpoint,

9   Arboleda had driven around them. He also reported that traffic was light and that Arboleda was

10   traveling at about 30 miles per hour.

11        Around this time, both Sergeant Chris Martin, the patrol sergeant for the shift, and Officer

12   Hall, finishing a nearby traffic stop, decided to join the pursuit. Officers Hall and Martin were

13   driving down Diablo Road, which runs perpendicular to Front Street, when Officer Hall spotted

14   Arboleda and made a left into the same lane on Front Street in which Arboleda was traveling.

15   Both cars quickly braked, and the Honda pointed slightly to the left of Officer Hall's cruiser. As

16   Officer Hall opened his driver side door, Arboleda began to move to the left. At the same time,

17   Officer Martin began a left turn on to Front Street. Arboleda continued to move to the left of

18   Officer Hall's patrol car as Officer Martin finished his left turn, creating a gap between his and

19   Officer Hall's vehicles while Officer Hall ran around the back of his patrol car. His

20   straightforward route blocked, Arboleda began a sharp right into the newly-created tunnel. Officer

21   Hall emerged from behind his vehicle into the space between the two cruisers with his weapon

22   drawn and moved toward the Honda, firing into the windshield. He then stepped back and

23   continued to fire as the Honda moved past him, ceasing fire when the it entered the intersection of

24   Front Street and Diablo Road. The Honda continued across the intersection, with Officer Hall in

25   pursuit, until it collided with another car. Officer Hall then approached the Honda, gun drawn, and

26   smashed the front window and opened the front door. Officers Maka and Muller removed

27   Arboleda from the vehicle and placed him on the pavement. Officer Muller knelt down and spoke

28

United States District Court
Northern District of California

to Arboleda, who appeared to be alive and making small movements, asking him to "stay with us." The pathologist at the coroner's inquest reported Arboleda likely died while being transported to the hospital. He was pronounced dead within a minute of arriving at the hospital.

In all, Officer Hall fired ten shots, nine of which hit Arboleda. According to Officer Hall's expert, seven went through the front windshield – five clustered on the mid-left side and the other two in the upper left-hand corner. The last three shots were spread out. One went through the front passenger window and the other two did not enter the vehicle.[2] The autopsy revealed a single fatal shot, which went through Arboleda's heart and left lung. The pathologist at the coroner's inquest could not identify which of the ten shots was the fatal one.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which it bears the burden of proof at trial. *Id.* at 322–23.

To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

---

[2] Officer Hall's testimony is contradictory on the number of shots that entered the Honda.

United States District Court
Northern District of California

1   *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The trial court must "draw all

2   justifiable inferences in favor of the nonmoving party, including questions of credibility and of the

3   weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496,

4   520 (1991). The court must then "determine whether the 'specific facts' set forth by the

5   nonmoving party, coupled with undisputed background or contextual facts, are such that a rational

6   or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Serv., Inc.*

7   *v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

## IV. DISCUSSION

### A.  Fourth Amendment Claim

10      Plaintiff asserts Officer Hall violated Arboleda's rights under the Fourth Amendment,

11  which prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "Apprehension by

12  deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement."

13  *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010). To determine "whether the force used to

14  effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing

15  of the nature and quality of the intrusion on the individual's Fourth Amendment interests against

16  the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989)

17  (internal quotation marks omitted). This is a test "not capable of precise definition or mechanical

18  application," and so requires "careful attention to the facts and circumstances of each particular

19  case." *Id.* Courts weigh, without limitation, "the severity of the crime at issue, whether the subject

20  poses an immediate threat to the safety of the officers or others, and whether he is actively

21  resisting arrest or attempting to evade arrest by flight." *Id.*

22      The immediacy of the threat is the most important factor. *George v. Morris*, 736 F.3d 829,

23  838 (9th Cir. 2013). "The 'reasonableness' of a particular use of force must be judged from the

24  perspective of a reasonable officer on the scene rather than with 20/20 vision of hindsight[,]" and

25  must allow "for the fact that police officers are often forced to make split-second judgments[.]"

26  *Graham*, 490 U.S. at 396–97. "When the officer has probable cause to believe that the suspect

27  poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally

28

*United States District Court*
*Northern District of California*

ORDER DENYING MOTION FOR SUMMARY JUDGMENT
CASE NO.  19-cv-03440-RS

1   unreasonable to prevent escape by deadly force." *Monzon v. City of Murrieta*, 978 F.3d 1150,

2   1157 (9th Cir. 2020) (internal quotation marks omitted). Nonetheless, "summary judgment should

3   be granted sparingly in excessive force cases," especially when "the only witness other than the

4   officers was killed during the encounter." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th

5   Cir. 2014).

6       Officer Halls contends all the *Graham* factors favor him, especially because his use of

7   force was justified when Arboleda posed an immediate threat to himself and others. When Officer

8   Hall emerged from behind his patrol car, he discovered the Honda accelerating "with its front

9   wheels pointed directly at [him]," at an average of 14 miles per hour, according to his expert

10  report. Motion ("Mot.") at 11. He need not, he argues, "await being hit." *Id.* Though he admits to

11  stepping back throughout his volley of shots, he insists that he was mere inches from the Honda

12  and could have been hit at any moment. Alternatively, he argues it was Arboleda's flight in an

13  allegedly speeding automobile that posed the threat of physical harm to all those around. *See Scott*

14  *v. Harris*, 550 U.S. 372, 382 n.9 (2007).

15      Though Officer Hall makes a variety of arguments analogizing to other cases in which

16  officers were found justified in using deadly force, these types of arguments are impossible to

17  evaluate while so many facts remain actively in dispute. For example, in *Monzon v. City of*

18  *Murrieta*, the fatal altercation took place on an unlit street at night and technical evidence

19  suggested the driver pushed the accelerator pedal from 84 to 99 percent and reached a maximum

20  speed of 17.4 miles per hour as the suspect drove toward the officers. 978 F.3d at 1155, 1158.

21  Here, Plaintiff disputes the efficacy of the expert determination that the Honda was traveling an

22  average 14 miles per hour. Officer Hall's expert calculated this speed by comparing the time the

23  Honda passed two points on Officer Martin's patrol car. He acknowledges "[t]he beginning speed

24  appears to be lower but even at 5 mph it would move at 7.3 feet per second." Mot. Ex A at 8.

25  Considering that Officer Hall fired many of his shots before the nose of the Honda was even with

26  Officer Martin's trunk, it is probable the Honda was traveling closer to, or under, 5, rather than 14,

27  miles per hour as Officer Hall took his shots. Regardless, Plaintiff has clearly created a genuine

28

1   dispute about the speed of the Honda, a material fact to the immediacy of the threat to Officer

2   Hall.

3          There are likewise genuine disputes about the direction in which the Honda's wheels were

4   pointed and when Arboleda made the decision to drive into the corridor created by Officer

5   Martin's Car. Officer Hall contends in his papers that he feared for his safety because the Honda

6   accelerated with its front wheels pointed at him. At his deposition, however, Officer Hall agrees he

7   told investigators that he "didn't believe [Arboleda] was gunning it to run [him] over." Mot. Ex. D

8   ("Hall Dep.") at 87.[3] The dash camera footage from the vehicle in which Officers Maka and

9   Muller were riding confirms that Arboleda was headed into the space narrowed by Officer

10  Martin's arrival while Officer Hall was still making his way around the cruiser. It furthermore

11  does not endorse Officer Hall's characterization of the direction of the wheels as "undisputed." To

12  the contrary, at best the video evidence shows it is uncertain in what direction the wheels were

13  pointed. Officer Hall thus cannot point to an established set of facts to argue under *Graham* that

14  his actions were objectively reasonable.[4]

15         Taking the evidence in the light most favorable to the non-movant, it must be assumed the

16  Honda was moving fairly slowly. The case thus appears most analogous to *Orn v. City of Tacoma*,

17  in which the Ninth Circuit determined there was no immediate threat warranting deadly force. 949

18  F.3d 1167 (9th Cir. 2020). In that case, an officer originally standing behind the rear bumper of his

19  own patrol car shot into a vehicle after it made a sharp right into a tight gap between the

20  confronting officer's and another officer's vehicles. 949 F.3d at 1174–75. The Ninth Circuit

21  observed that because the claimant's car was moving at only 5 miles per hour, the officer could

22  have "avoided any risk of being struck by simply taking a step back, a common-sense conclusion

23

24  _____

    [3] Though the "objective reasonableness" standard applied to Fourth Amendment cases does not
25  probe the subjective perception of the officer, a contradiction like this one is relevant to evaluating
    the sincerity of Officer Hall's contention that he feared Arboleda posed an immediate threat.
26
    [4] That the third *Graham* factor weighs in his favor – the parties agree Arboleda was "attempting to
27  evade arrest by flight" – cannot cure this deficiency. *See* 490 U.S. at 396.

28
                                                    ORDER DENYING MOTION FOR SUMMARY JUDGMENT
                                                    CASE NO.  19-cv-03440-RS

confirmed by [the officer's] own admission that he 'was able to step backwards and get out of the path of [claimant's] vehicle.'" *Id.* Similarly, Officer Hall in his deposition responded "correct" to the question: "During the course of this incident, you're able to back up and get out of the path of the car and avoid being hit; correct?" Hall Dep. at 89. While it is of course possible that Officer Hall's shots changed the Honda's course, it appears Officer Hall, like the officer in *Orn*, could have defused the immediacy of the threat by simply stepping back. The second *Graham* factor therefore weighs against Officer Hall. Because Officer Hall could not show Arboleda posed an immediate threat to himself or others, he has not established that use of deadly force was objectively reasonable.[5] He is therefore not entitled to summary judgment on the Fourth Amendment claim.

### B. Fourteenth Amendment Claim

A police officer's conduct "shocks the conscience" and violates the substantive due process clause of the Fourteenth Amendment if he acts with either "deliberate indifference" or "a purpose to harm unrelated to legitimate law enforcement objectives." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1139 (9th Cir. 2019) (internal quotation marks and alteration omitted). The "deliberate indifference" standard applies in circumstances where "actual deliberation is practical." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692 (9th Cir. 2019). "The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state." *Id.* The "purpose to harm" standard applies when an officer "makes a snap judgment because of an escalating situation." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013).

Officer Hall assumes without proving that the "purpose to harm" standard applies here. He further insists that Plaintiff cannot show a purpose to harm because Officer Hall's "use of force was related to a legitimate law enforcement objective, protecting himself and others." Mot. at 18. He compares this case to *Zion v. County of Orange*, in which an officer fired an initial nine-round

---

[5] That the third *Graham* factors weighs in his favor – the parties agree Arboleda was "attempting to evade arrest by flight" – cannot cure this deficiency. *See* 490 U.S. at 396.

United States District Court
Northern District of California

1    volley at a suspect who had just stabbed another officer, ran to where the suspect had fallen, and

2    fired nine more rounds at the suspect from a distance of about four feet. 874 F.3d 1072, 1075 (9th

3    Cir. 2017). The officer then circled the suspect, who was curled up, and took a running start to

4    stomp on the suspect's head three times. *Id.* The plaintiff challenged the second volley and head-

5    stomping as violative of the Fourteenth Amendment. *Id.* The court analyzed the actions separately

6    and concluded the officer did not violate the Fourteenth Amendment "by emptying his weapon"

7    because "[w]hether excessive or not, the shootings served the legitimate purpose of stopping a

8    dangerous suspect." *Id.* The head-stomping, on the other hand, was a clear violation. *Id.*

9         In a case like this one where the record is hotly disputed, an officer cannot combat the

10    accusation that he acted without a legitimate law enforcement purpose by merely stating the

11    contrary. Though Officer Hall contends in his papers that he acted to protect himself and others, he

12    agrees in his deposition that he "didn't believe [Arboleda] was gunning [the Honda] to run [him]

13    over" and that he was "able to back up and get out of the path of the car and avoid being hit." Hall

14    Dep. at 87, 89. Indeed, the decision to fire into the Honda may have put his fellow officers in

15    danger – Officer Martin admitted in his deposition that he was "quite concerned" that he would be

16    hit by one of Officer Hall's bullets. Opposition Ex. 7 at 61. Officer Hall therefore cannot

17    demonstrate, at this point, that his actions had a legitimate law enforcement purpose.

18         Officer Hall also argues that even if some of his shots, purportedly in defense of Officer

19    Martin, were unrelated to a legitimate law enforcement purpose, he is still entitled to summary

20    judgment because Plaintiff cannot establish it was those particular shots which killed Arboleda.

21    Yet the shots cannot and need not be parsed. Plaintiff has identified genuine disputes of fact about

22    whether Officer Hall was justified in discharging his weapon at all. It is therefore of no particular

23    significance, in the Fourteenth Amendment analysis, which shot was fatal. Officer Hall is not

24    entitled to summary judgment on the Fourteenth Amendment claim.

25         **C.  Qualified Immunity**

26          "Qualified immunity shields an officer from suit when she makes a decision that, even if

27    constitutionally deficient, reasonably misapprehends the law governing the circumstances she

28

1    confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Because the inquiry turns on "fair

2    notice," "[i]f the law at that time did not clearly establish that the officer's conduct would violate

3    the Constitution," the officer is immune from suit. *Id.* The dispositive question is "whether it

4    would be clear to a reasonable officer that his conduct was unlawful in the situation he

5    confronted." *Id.* at 199. However, Defendants are not entitled to qualified immunity "simply

6    because there is no case on all fours prohibiting this particular manifestation of unconstitutional

7    conduct." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962,

8    974 (9th Cir. 2005) (internal alterations omitted).

9          In the absence of a Supreme Court or Ninth Circuit case directly on point, the bulk of

10   Officer Hall's argument is aimed at the proposition that "excessive force cases involving car

11   chases reveal [a] hazy legal backdrop." *See Mullenix v. Luna*, 577 U.S. 7, 14 (2015). Nonetheless,

12   the above-discussed disputes about the speed and acceleration of the car, as well as the direction of

13   its wheels, preclude a finding at this time that Officer Hall is entitled to qualified immunity. As the

14   Supreme Court articulated in *Brusseau*, the inquiry focuses on "whether it would be clear to a

15   reasonable officer that his conduct was unlawful *in the situation he confronted*." 543 U.S. at 199

16   (emphasis added). This fact-intensive, "particularized" analysis requires a court to compare and

17   contrast the factual situation in the case before it with other excessive force cases. *See id.* It is

18   impossible to do so, however, when the parties actively disagree about what occurred, and a jury

19   has yet to pass on the question. Because the qualified immunity analysis cannot be performed at

20   this stage of the litigation, Officer Hall is not immune to Plaintiff's Fourth or Fourteenth

21   Amendment claims.

22         **D.  State Law Immunities**

23         Officer Hall contends two California immunity statutes shield him from Plaintiff's state

24   law claims. First, California Penal Code § 196 provides that "[h]omicide is justifiable when

25   committed by peace officers" in two circumstances: "(a) In obedience to any judgment of a

26   competent court. (b) When the homicide results from a peace officer's use of force that is in

27   compliance with Section 835a." Courts have interpreted § 196 to mean, essentially, that "there is

United States District Court
Northern District of California

no civil liability when a homicide is justified." *Garcia v. Santa Clara Cty.*, 2004 WL 2203560, at

\*11 (N.D. Cal. Sept. 29, 2004). A homicide is, in turn, justifiable if "the circumstances reasonably

created a fear of death or serious bodily harm to the officer or to another." *Id.* (internal quotation

marks and alterations omitted).

This is a familiar test echoing the most important *Graham* factor – "whether the subject

poses an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. Officer

Hall contends there is "undisputed evidence" indicating Arboleda drove the Honda toward Officer

Hall and created the requisite fear of harm. Yet as described in detail above, there are a number of

genuine factual disputes surrounding the elements that might contribute to Officer Hall's fear of

death or serious bodily injury to himself or others. The other asserted basis for immunity stems

from § 835a which, as Officer Hall concedes, also evaluates the reasonableness of force applied

under the *Graham* standard. It would therefore be inappropriate at this juncture to hold Officer

Hall categorically immune under either section from Plaintiff's state law claims.

**E.  State Law Claims**

It would be similarly improper to wade into Officer Hall's arguments against Plaintiff's

state law claims because they, too, rely on the notion that he acted reasonably. To succeed on a

negligence claim, for example, a plaintiff must show "the defendant had a duty to use due care,

that he breached that duty, and that the breach was the proximate or legal cause of the resulting

injury." *Hayes v. Cty. of San Diego*, 57 Cal.4th 622, 629 (2013). California courts have "long

recognized that peace officers have a duty to act reasonably when using deadly force," and that

reasonableness depends on the totality of the circumstances *Id.* Without a determination of what,

exactly, occurred after Officer Hall made a left on to Front Street, there is no way to evaluate if he

acted reasonably.[6] Indeed, Officer Hall acknowledges both Plaintiff's Bane Act and assault[7]

---

[6] If there cannot, at this stage, be a finding in Officer Hall's favor on the breach prong, there need not be any discussion of his proximate cause arguments.

[7] The operative complaint contains a battery, not assault, claim. Neither party addresses this discrepancy.

United States District Court
Northern District of California

claims are premised on the assertion that he violated Arboleda's Fourth Amendment rights. As discussed above, it cannot be said at this point in the litigation that Officer Hall definitively did not. The claims accordingly survive.

**F.  Damage "Claims"**

Though Officer Hall moves for summary judgment on Plaintiff's two damage "claims," her request for wrongful death and punitive damages are simply theories of recovery that cannot be substantively challenged at this stage.

### V. CONCLUSION

For the reasons set forth above, the motion is denied.

**IT IS SO ORDERED**.

Dated: August 4, 2021

_____
RICHARD SEEBORG
Chief United States District Judge